RECORD NO. 15-1261
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

CHARITY CHIDINMA EMERONYE SWIFT,

Plaintiff-Appellant,

v.

FRONTIER AIRLINES, INC.
and
JANE DOE,

Defendants-Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA
_____

JOINT APPENDIX

_____

Stephen Christopher Swift
E-Mail: steve@swift.law.pro
Charity Chidinma Emeronye Swift
E-Mail: charity@swift.law.pro
Swift & Swift, Attorneys at Law, P.L.L.C.
2121 Eisenhower Avenue, Suite 200
Alexandria, Virginia 22314-4688
Telephone: (703) 418-0000
Facsimile: (703) 535-8205
*Counsel for Plaintiff-Appellant*
*Charity Chidinma Emeronye Swift*

Sarah E. Moffett
E-Mail: sarah.moffett@leclairryan.com
LeClairRyan
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
Telephone: (703) 647-5930
Facsimile: (703) 647-5980
*Counsel for Defendant-Appellee*
*Frontier Airlines, Inc.*

## TABLE OF CONTENTS

**Document**                                                                          **Page**

District Court Docket Report                                                             1

Plaintiff's Motion for Leave of Court to Amend Complaint                                 7

Memorandum in Support of Plaintiff's Motion for Leave of Court to Amend Complaint   10

Frontier Airlines, Inc.'s Opposition to
Plaintiff's Motion for Leave of Court to Amend Complaint                                14

Plaintiff's Rebuttal to Frontier Airlines, Inc.'s Opposition to
Her Motion for Leave of Court to Amend Complaint                                        30

Order Granting in Part and Denying in Part
Plaintiff's Motion for Leave of Court to Amend Complaint                                50

Amended Complaint                                                                       51

    Exhibit A                                                        79

    Exhibit B                                                        82

    Exhibit C                                                        84

    Exhibit D                                                        86

    Exhibit E                                                        88

    Exhibit F                                                        92

    Exhibit G                                                        99

    Exhibit H                                                       104

    Exhibit I                                                       114

Frontier Airlines, Inc.'s Motion to Enforce the Settlement Agreement
and for Other Relief                                                                   121

i

**Document**                                                                    **Page**

Frontier Airlines, Inc.'s Memorandum of Law in Support of Its
Motion to Enforce the Settlement Agreement and for Other Relief          123

    Affidavit of Paula L. Wegman                                    132

    Exhibit A                                                        136

    Exhibit B                                                        137

    Exhibit C                                                        141

    Exhibit D                                                        142

    Exhibit E                                                        143

Plaintiff's Opposition to Frontier Airlines, Inc.'s Motion
to Enforce the Settlement Agreement and for Other Relief                 148

    Affidavit of Charity C. Emeronye Swift                           156

    Exhibit A                                                        168

Frontier Airlines, Inc.'s Reply in Support of Its
Motion to Enforce the Settlement Agreement                               174

Transcript of Hearing on Frontier Airlines, Inc.'s Motion
to Enforce the Settlement Agreement and for Other Relief                 185

Order Dismissing Case as Settled                                         210

Notice of Appeal                                                         211

APPEAL,CLOSED,JURY

# U.S. District Court
## Eastern District of Virginia – (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:14–cv–01139–AJT–IDD

Swift v. Frontier Airlines, Inc. et al
Assigned to: District Judge Anthony J Trenga
Referred to: Magistrate Judge Ivan D. Davis
Case in other court:  4th Circuit, 15–01261
Cause: 42:1981 Civil Rights

Date Filed: 09/04/2014
Date Terminated: 02/20/2015
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Charity Chidinma Emeronye Swift**
    represented by

**Geoffrey Stewart Burke**
Burke Law PLC
PO Box 6933
Arlington, VA 22206
703–665–4454
Fax: 703–649–6224
Email: gburke@burkelawpractice.com
*TERMINATED: 11/18/2014*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Christopher Swift**
Swift &Swift Attorneys at Law PLLC
2121 Eisenhower Avenue
Alexandria, VA 22314–4688
(703) 418–0000
Fax: 703–535–8205
Email: steve@swift.law.pro
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Frontier Airlines, Inc.**
*a Colorado corporation*
    represented by

**Sarah Elizabeth Moffett**
LeClairRyan PC (Alexandria)
2318 Mill Road
Suite 1100
Alexandria, VA 22314
703–684–8007
Fax: 703–684–8075
Email: sarah.moffett@leclairryan.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jane Doe**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/04/2014 | 1 | COMPLAINT against Jane Doe, Frontier Airlines, Inc. ( Filing fee $ 400, receipt number 14683046159.), filed by Charity Chidinma Emeronye Swift. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Civil Cover Sheet, # 6 Receipt)(nhall ) (Entered: 09/09/2014) |
| 09/04/2014 | 2 | Summons Issued and given for service by SPS as to Frontier Airlines, Inc. (nhall) (Entered: 09/09/2014) |
| 09/29/2014 | 3 | SUMMONS Returned Executed Frontier Airlines, Inc. served on 9/17/2014, answer due 10/8/2014. (nhall) (Entered: 10/03/2014) |

**1**

| 10/08/2014 | 4 | MOTION for Extension *of Time to File Responsive Pleadings* by Frontier Airlines, Inc.. (Attachments: # 1 Proposed Order)(Moffett, Sarah) (Entered: 10/08/2014) |
| 10/08/2014 | 5 | Financial Interest Disclosure Statement (Local Rule 7.1) by Frontier Airlines, Inc.. (Moffett, Sarah) (Entered: 10/08/2014) |
| 10/10/2014 | 6 | ORDER granting 4 Motion for Extension of Time to File responsive pleadings to the complaint to 10/22/14. Signed by Magistrate Judge Ivan D. Davis on 10/10/14. (gwalk, ) (Entered: 10/10/2014) |
| 10/14/2014 | 7 | Motion to appear Pro Hac Vice by Steve Lee Boldt and Certification of Local Counsel Sarah E. Moffett Filing fee $ 75, receipt number 0422–4150231. by Frontier Airlines, Inc.. (Moffett, Sarah) (Entered: 10/14/2014) |
| 10/16/2014 | 8 | ORDER granting 7 Motion for Pro hac vice. Signed by District Judge Liam O'Grady on 10/16/14. (gwalk, ) (Entered: 10/17/2014) |
| 10/22/2014 | 9 | Motion to appear Pro Hac Vice by Paula LoMonaco Wegman and Certification of Local Counsel Sarah E. Moffett Filing fee $ 75, receipt number 0422–4160206. by Frontier Airlines, Inc.. (Moffett, Sarah) (Entered: 10/22/2014) |
| 10/22/2014 | 10 | MOTION to Dismiss for Failure to State a Claim *in Counts III and IV of Plaintiff's Complaint* by Frontier Airlines, Inc.. (Attachments: # 1 Proposed Order Proposed Order)(Moffett, Sarah) (Entered: 10/22/2014) |
| 10/22/2014 | 11 | Roseboro Notice as to Frontier's Motion to Dismiss for Failure to State a Claim in Counts III and IV of Plaintiff's Complaint by Frontier Airlines, Inc. (Moffett, Sarah) (Entered: 10/22/2014) |
| 10/22/2014 | 12 | Memorandum in Support re 10 MOTION to Dismiss for Failure to State a Claim *in Counts III and IV of Plaintiff's Complaint* filed by Frontier Airlines, Inc.. (Moffett, Sarah) (Entered: 10/22/2014) |
| 10/22/2014 | 13 | ANSWER to 1 Complaint, by Frontier Airlines, Inc..(Moffett, Sarah) (Entered: 10/22/2014) |
| 10/24/2014 | | Notice of Correction re 10 MOTION to Dismiss for Failure to State a Claim *in Counts III and IV of Plaintiff's Complaint*. The filing user has been notified to file a Notice of Hearing Date. (dvanm, ) (Entered: 10/24/2014) |
| 10/28/2014 | 14 | Notice of Hearing Date set for December 12, 2014 re 10 MOTION to Dismiss for Failure to State a Claim *in Counts III and IV of Plaintiff's Complaint* (Moffett, Sarah) (Entered: 10/28/2014) |
| 10/29/2014 | | Set Deadlines as to 10 MOTION to Dismiss for Failure to State a Claim *in Counts III and IV of Plaintiff's Complaint*. Motion Hearing set for 12/12/2014 at 10:00 AM in Alexandria Courtroom 700 before District Judge Liam O'Grady. (clar, ) (Entered: 10/29/2014) |
| 11/03/2014 | 15 | First MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Dismiss* by Charity Chidinma Emeronye Swift. (Attachments: # 1 Proposed Order)(Burke, Geoffrey) (Entered: 11/03/2014) |
| 11/04/2014 | | ***Entered In Error***Notice of Correction re 15 First MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Dismiss* AND 10 MOTION to Dismiss for Failure to State a Claim *in Counts III and IV of Plaintiff's Complaint*. The filing user has been notified to file a Notice of Hearing Date. (gwalk, ) Modified on 11/4/2014 because should have only be as to DE #15 and not DE # 10 (dvanm, ). (Entered: 11/04/2014) |
| 11/04/2014 | | Notice of Correction ONLY AS TO 15 First MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Dismiss*. The filing user has been notified to file a Notice of Hearing Date. (dvanm, ) (Entered: 11/04/2014) |
| 11/04/2014 | 16 | ORDER granting 15 Motion for Extension of Time to File Response/Reply re 10 MOTION to Dismiss for Failure to State a Claim *in Counts III and IV of Plaintiff's Complaint*. Responses due by 11/20/2014. Signed by Magistrate Judge Ivan D. Davis on 11/4/2014. (rban, ) (Entered: 11/04/2014) |

**2**

| | | |
|---|---|---|
| 11/07/2014 | 17 | ORDER granting 9 Motion for Pro hac vice. Signed by District Judge Liam O'Grady on 11/7/14. (nhall ) (Entered: 11/07/2014) |
| 11/17/2014 | 18 | MOTION to Withdraw , MOTION to Withdraw as Attorney by Charity Chidinma Emeronye Swift. (Attachments: # 1 Proposed Order)(Burke, Geoffrey) (Entered: 11/17/2014) |
| 11/17/2014 | 19 | Memorandum in Support re 18 MOTION to Withdraw MOTION to Withdraw as Attorney filed by Charity Chidinma Emeronye Swift. (Burke, Geoffrey) (Entered: 11/17/2014) |
| 11/17/2014 | 20 | Waiver of re 18 MOTION to Withdraw MOTION to Withdraw as Attorney , 19 Memorandum in Support by Charity Chidinma Emeronye Swift (Burke, Geoffrey) (Entered: 11/17/2014) |
| 11/18/2014 | 25 | ORDER granting 18 Motion to Withdraw as Attorney. Attorney Geoffrey Stewart Burke terminated. Plaintiff shall have ten days to retain new counsel and the time to file its responsive pleadings to the Defendant Frontier Airline's Motion to Dismiss is hereby extended to and including December 5, 2014. Signed by Magistrate Judge Ivan D. Davis on 11/18/14. (gwalk, ) (Entered: 11/19/2014) |
| 11/19/2014 | 21 | MOTION to Expedite *Motion to Withdraw as Counsel* by Charity Chidinma Emeronye Swift. (Attachments: # 1 Proposed Order Granting Expedited Motion to Withdraw as Counsel)(Burke, Geoffrey) (Entered: 11/19/2014) |
| 11/19/2014 | 22 | Memorandum in Support re 21 MOTION to Expedite *Motion to Withdraw as Counsel* filed by Charity Chidinma Emeronye Swift. (Burke, Geoffrey) (Entered: 11/19/2014) |
| 11/19/2014 | 23 | Waiver of re 22 Memorandum in Support, 21 MOTION to Expedite *Motion to Withdraw as Counsel* by Charity Chidinma Emeronye Swift (Burke, Geoffrey) (Entered: 11/19/2014) |
| 11/19/2014 | 24 | ORDER granting 21 Motion to Expedite. Signed by Magistrate Judge Ivan D. Davis on 11/19/2014. (Davis, Ivan) (Entered: 11/19/2014) |
| 12/05/2014 | 26 | Opposition to 10 MOTION to Dismiss for Failure to State a Claim *in Counts III and IV of Plaintiff's Complaint* filed by Charity Chidinma Emeronye Swift. (Swift, Stephen) (Entered: 12/05/2014) |
| 12/05/2014 | 27 | Memorandum in Opposition re 10 MOTION to Dismiss for Failure to State a Claim *in Counts III and IV of Plaintiff's Complaint* filed by Charity Chidinma Emeronye Swift. (Swift, Stephen) (Entered: 12/05/2014) |
| 12/09/2014 | 28 | SCHEDULING ORDER: Initial Pretrial Conference set for 1/14/2015 at 11:00 AM in Alexandria Courtroom 400 before Magistrate Judge Ivan D. Davis. Final Pretrial Conference set for 4/16/2015 at 10:00 AM in Alexandria Courtroom 700 before District Judge Liam O'Grady. Discovery due by 4/10/2015. Signed by District Judge Liam O'Grady on 12/9/2014. (Attachments: # 1 Magistrate Consent, # 2 Pretrial Notice)(rban, ) (Entered: 12/09/2014) |
| 12/09/2014 | 29 | NOTICE of Appearance by Stephen Christopher Swift on behalf of Charity Chidinma Emeronye Swift (Swift, Stephen) (Entered: 12/09/2014) |
| 12/09/2014 | 30 | Consent MOTION to Continue *Hearing on Motion to Dismiss* by Charity Chidinma Emeronye Swift. (Attachments: # 1 Proposed Order)(Swift, Stephen) (Entered: 12/09/2014) |
| 12/09/2014 | | Case Reassigned to District Judge Anthony J Trenga. District Judge Liam O'Grady no longer assigned to the case. (rban, ) (Entered: 12/09/2014) |
| 12/09/2014 | | Set/Reset Deadlines as to 10 MOTION to Dismiss for Failure to State a Claim *in Counts III and IV of Plaintiff's Complaint*. Motion Hearing set for 12/12/2014 at 10:00 AM in Alexandria Courtroom 701 before District Judge Anthony J Trenga. (rban, ) (Entered: 12/09/2014) |

**3**

| 12/09/2014 | | Set/Reset Scheduling Order Deadlines: Final Pretrial Conference set for 4/16/2015 at 10:00 AM in Alexandria Courtroom 701 before District Judge Anthony J Trenga. (rban, ) (Entered: 12/09/2014) |
| --- | --- | --- |
| 12/10/2014 | 31 | First MOTION to Amend/Correct *Complaint* by Charity Chidinma Emeronye Swift. (Swift, Stephen) (Entered: 12/10/2014) |
| 12/10/2014 | 32 | Memorandum in Support re 31 First MOTION to Amend/Correct *Complaint* filed by Charity Chidinma Emeronye Swift. (Attachments: # 1 Proposed Order, # 2 Exhibit 1 – Proposed Amended Complaint, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I)(Swift, Stephen) (Entered: 12/10/2014) |
| 12/10/2014 | 33 | Notice of Hearing Date set for 01/09/2015 re 32 Memorandum in Support, 31 First MOTION to Amend/Correct *Complaint* (Swift, Stephen) (Entered: 12/10/2014) |
| 12/10/2014 | 34 | ORDER – It is hereby ORDERED that the hearing presently set for Friday, December 12, 2014 at 10:00 a.m. be, and the same hereby is, CANCELLED and the parties' Unopposed Motion for Continuance of Hearing on Frontier Airline, Inc.'s Motion to Dismiss Counts III&IV of Plaintiffs Complaint 30 is otherwise DENIED. The Court has taken defendant Frontier Airline, Inc.'s Motion to Dismiss Counts III &IV of Plaintiffs Complaint 10 under advisement and will decide the motion without a hearing. Signed by District Judge Anthony J Trenga on 12/10/14. (gwalk, ) (Entered: 12/10/2014) |
| 12/11/2014 | | Set Deadlines as to 31 First MOTION to Amend/Correct *Complaint*. Motion Hearing set for 1/9/2015 at 10:00 AM in Alexandria Courtroom 400 before Magistrate Judge Ivan D. Davis. (clar, ) (Entered: 12/11/2014) |
| 12/11/2014 | | MOTIONS REFERRED to Magistrate Judge: Davis. 31 First MOTION to Amend/Correct *Complaint* (clar, ) (Entered: 12/11/2014) |
| 12/11/2014 | 35 | REPLY to Response to Motion re 10 MOTION to Dismiss for Failure to State a Claim *in Counts III and IV of Plaintiff's Complaint* filed by Frontier Airlines, Inc.. (Moffett, Sarah) (Entered: 12/11/2014) |
| 12/11/2014 | | Per AJT chambers motions set for 12/12/14 an order is to be issued (clar, ) (Entered: 12/11/2014) |
| 12/23/2014 | 36 | Memorandum in Opposition re 31 First MOTION to Amend/Correct *Complaint* filed by Frontier Airlines, Inc.. (Moffett, Sarah) (Entered: 12/23/2014) |
| 12/29/2014 | 37 | Rebuttal Brief re 31 First MOTION to Amend/Correct *Complaint* filed by Charity Chidinma Emeronye Swift. (Swift, Stephen) (Entered: 12/29/2014) |
| 12/31/2014 | 38 | ORDER granting 10 Motion to Dismiss for Failure to State a Claim. ORDERED that Counts III and IV are DISMISSED. Signed by District Judge Anthony J Trenga on 12/31/2014. (rban, ) (Entered: 12/31/2014) |
| 01/07/2015 | 39 | *Joint* Discovery Plan by Charity Chidinma Emeronye Swift.(Swift, Stephen) (Entered: 01/07/2015) |
| 01/07/2015 | 40 | AMENDED COMPLAINT *proposed* against All Defendants, filed by Charity Chidinma Emeronye Swift.(Swift, Stephen) (Entered: 01/07/2015) |
| 01/08/2015 | 41 | *Amended Joint* Discovery Plan by Charity Chidinma Emeronye Swift.(Swift, Stephen) (Entered: 01/08/2015) |
| 01/09/2015 | 42 | Minute Entry for proceedings held before Magistrate Judge Ivan D. Davis:Motion Hearing held on 1/9/2015 re 31 First MOTION to Amend/Correct *Complaint* filed by Charity Chidinma Emeronye Swift. Appearances of counsel. Matter argued. Motion is Granted in part and Denied in part. Order to follow. (Tape #ftr.)(jwil, ) (Entered: 01/09/2015) |
| 01/09/2015 | 43 | ORDERED that Plaintiffs Motion for Leave of Court to Amend Complaint 31 is GRANTED in part and DENIED in part. The Motion is granted as to adding Count V (Breach of Contract of Carriage) to the Complaint, and denied as to adding Count VI (False Imprisonment). Plaintiff shall promptly file an Amended Complaint with the Clerk of the Court, which shall be deemed filed as of the date |

| | | |
|---|---|---|
| | | of this Order. Signed by Magistrate Judge Ivan D. Davis on 01/09/2015. (jwil, ) (Entered: 01/12/2015) |
| 01/09/2015 | 44 | Order Rule 16(b) Scheduling Order – Pursuant to the Rule 16(b) Conference it is ordered that 1. All discovery shall be concluded by April 10, 2015. 2. Disclosures under Fed. R. Civ. P. 26(a)(1) and (2), notices of depositions,interrogatories, requests for documents and admissions, and answers thereto shall not be filed except on order of the court, or for use in a motion or at trial. 3. The parties' Amended Joint Discovery Plan is approved and shall control discovery to the extent of its application unless further modified by the court. See Order for details. Signed by Magistrate Judge Ivan D. Davis on 01/09/2015. (jwil, ) (Entered: 01/12/2015) |
| 01/14/2015 | 45 | AMENDED COMPLAINT against All Defendants, filed by Charity Chidinma Emeronye Swift. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Swift, Stephen) (Entered: 01/14/2015) |
| 01/20/2015 | 46 | MOTION for Extension *of Time to Make Objections* by Charity Chidinma Emeronye Swift. (Attachments: # 1 Proposed Order)(Swift, Stephen) (Entered: 01/20/2015) |
| 01/20/2015 | 47 | Memorandum in Support re 46 MOTION for Extension *of Time to Make Objections* filed by Charity Chidinma Emeronye Swift. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I)(Swift, Stephen) (Entered: 01/20/2015) |
| 01/22/2015 | | Notice of Correction re 46 MOTION for Extension *of Time to Make Objections* The filing user has been notified to file a Notice of Hearing Date or a Notice of Waiver of Oral Argument. (dvanm, ) (Entered: 01/22/2015) |
| 01/26/2015 | 48 | MOTION for Settlement *Agreement to be Enforced and Other Relief* by Frontier Airlines, Inc.. (Attachments: # 1 Proposed Order)(Moffett, Sarah) (Entered: 01/26/2015) |
| 01/26/2015 | 49 | Memorandum in Support re 48 MOTION for Settlement *Agreement to be Enforced and Other Relief* filed by Frontier Airlines, Inc.. (Attachments: # 1 Declaration of P. Wegman, # 2 Exhibit Ex. A – 1.9.2015 e–mail, # 3 Exhibit Ex. B – 1.12.2015 e–mail and agreement, # 4 Exhibit Ex. C – 1.13.2015 e–mail, # 5 Exhibit Ex. D – 1.14.2015 e–mail, # 6 Exhibit Ex. E – 1.16.2015 e–mail and agreement)(Moffett, Sarah) (Entered: 01/26/2015) |
| 01/26/2015 | 50 | Notice of Hearing Date set for February 20, 2015 re 48 MOTION for Settlement *Agreement to be Enforced and Other Relief* (Moffett, Sarah) (Entered: 01/26/2015) |
| 01/27/2015 | | Set Deadlines as to 48 MOTION for Settlement *Agreement to be Enforced and Other Relief*. Motion Hearing set for 2/20/2015 at 10:00 AM in Alexandria Courtroom 701 before District Judge Anthony J Trenga. (clar, ) (Entered: 01/27/2015) |
| 01/28/2015 | 51 | Memorandum in Opposition re 46 MOTION for Extension *of Time to Make Objections* filed by Frontier Airlines, Inc.. (Attachments: # 1 Proposed Order)(Moffett, Sarah) (Entered: 01/28/2015) |
| 01/30/2015 | 52 | ANSWER to Complaint by Frontier Airlines, Inc..(Moffett, Sarah) (Entered: 01/30/2015) |
| 02/03/2015 | 53 | Rebuttal Brief re 46 MOTION for Extension *of Time to Make Objections* filed by Charity Chidinma Emeronye Swift. (Attachments: # 1 Affidavit of Charity C.E. Swift)(Swift, Stephen) (Entered: 02/03/2015) |
| 02/09/2015 | 54 | Opposition to 48 MOTION for Settlement *Agreement to be Enforced and Other Relief* filed by Charity Chidinma Emeronye Swift. (Attachments: # 1 Proposed Order, # 2 Affidavit of Charity Swift, # 3 Exhibit A)(Swift, Stephen) (Entered: 02/09/2015) |

| 02/12/2015 | 55 | Notice of Hearing Date re 46 MOTION for Extension *of Time to Make Objections* (Swift, Stephen) (Entered: 02/12/2015) |
|---|---|---|
| 02/13/2015 | | Set Deadlines as to 46 MOTION for Extension *of Time to Make Objections*. Motion Hearing set for 3/13/2015 at 10:00 AM in Alexandria Courtroom 400 before Magistrate Judge Ivan D. Davis. (clar, ) (Entered: 02/13/2015) |
| 02/13/2015 | | MOTIONS REFERRED to Magistrate Judge: Davis. 46 MOTION for Extension *of Time to Make Objections* (clar, ) (Entered: 02/13/2015) |
| 02/13/2015 | | Reset Deadlines as to 46 MOTION for Extension *of Time to Make Objections*. Motion Hearing set for 3/13/2015 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Ivan D. Davis. (clar, ) (Entered: 02/13/2015) |
| 02/16/2015 | 56 | REPLY to Response to Motion re 48 MOTION for Settlement *Agreement to be Enforced and Other Relief* filed by Frontier Airlines, Inc.. (Moffett, Sarah) (Entered: 02/16/2015) |
| 02/20/2015 | 57 | Minute Entry for proceedings held before District Judge Anthony J Trenga: Motion Hearing held on 2/20/2015 re 48 MOTION for Settlement *Agreement to be Enforced and Other Relief* filed by Frontier Airlines, Inc.. Appearances of Counsel for Pltf. and Deft. Motion argued and GRANTED IN PART/DENIED IN PART. This matter is GRANTED to the extent that this matter is dismissed as settled. Otherwise the motion is denied. The Court denies fees. (Court Reporter R. Montgomery.) (jall) (Entered: 02/20/2015) |
| 02/20/2015 | 58 | ORDER re: 48 Motion for Settlement: This matter is before the Court on Frontier Airlines, Inc.'s Motion to Enforce the Settlement Agreement and for Other Relief [Doc. No. 48] (the "Motion"). Upon consideration of the Motion, the memoranda in support thereof and in opposition thereto, the argument of counsel presented at the hearing held on February 20, 2015, and for the reasons stated in open court, it is hereby ORDERED that Frontier Airlines, Inc.'s Motion to Enforce the Settlement Agreement and for Other Relief [Doc. No. 48] be, and the same hereby is, GRANTED in part and DENIED in part, The Motion is GRANTED to the extent that this matter is hereby DISMISSED as settled and it is otherwise DENIED. Signed by District Judge Anthony J Trenga on 2/20/2015. (jall) (Entered: 02/20/2015) |
| 03/04/2015 | 59 | TRANSCRIPT of proceedings held on 2/20/15 ( 48 FRONTIER AIRLINES, INCS MOTION TO ENFORCE THE SETTLEMENT AGREEMENT AND FOR OTHER RELIEF), before Judge Anthony J. Trenga, Court Reporter/Transcriber Rhonda Montgomery, Telephone number 703–299–4599. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 4/3/2015. Redacted Transcript Deadline set for 5/4/2015. Release of Transcript Restriction set for 6/2/2015.(montgomery, rhonda) (Entered: 03/04/2015)** |
| 03/05/2015 | 60 | NOTICE OF APPEAL as to 58 Order on Motion for Settlement,,, by Charity Chidinma Emeronye Swift. Filing fee $ 505, receipt number 0422–4344722. (Swift, Stephen) (Entered: 03/05/2015) |
| 03/11/2015 | 61 | Transmission of Notice of Appeal to US Court of Appeals re 60 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (nhall) (Entered: 03/11/2015) |
| 03/11/2015 | 62 | USCA Case Number 15–1261 4th Circuit, Case Manager B. Rowe for 60 Notice of Appeal filed by Charity Chidinma Emeronye Swift. (rban, ) (Entered: 03/12/2015) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| |
|---|
CHARITY CHIDINMA
EMERONYE SWIFT,

         **Plaintiff,**

   **v.**

FRONTIER AIRLINES, INC.
(a Colorado corporation),
and JANE DOE,

       **Defendants.**

Civil Action No. 1:14-cv-1139

Hon. Anthony J. Trenga
Hon. Magistrate Judge Ivan D. Davis

**PLAINTIFF'S MOTION FOR LEAVE OF COURT**
**TO AMEND COMPLAINT**

Plaintiff Charity Chidinma Emeronye Swift ("Mrs. Swift"), through her undersigned attorney, pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, moves this Court for leave to amend her Complaint, for reasons set forth in the memorandum submitted herewith. Mrs. Swift' counsel has conferred with counsel for Frontier Airlines, Inc., but they have not consented to this motion.

**7**

Dated: December 10, 2014                    Respectfully submitted,


                                            */s/ Stephen Christopher Swift*
                                            Stephen Christopher Swift
                                            Virginia State Bar ID No. 38419
                                            Swift & Swift, Attorneys at Law, P.L.L.C.
                                            2121 Eisenhower Avenue, Suite 200
                                            Alexandria, Virginia  22314-4688
                                            Telephone: (703) 418-0000
                                            Facsimile: (703) 535-8205
                                            E-Mail: steve@swift.law.pro

                                            *Attorney for Plaintiff*
                                            *Charity Chidinma Emeronye Swift*


-2-

**8**

## CERTIFICATE OF SERVICE

I hereby certify that, on December 10, 2014, I electronically filed the foregoing document with the Clerk of the Court, using the Court's CM/ECF system, which will automatically cause all counsel of record to be served therewith.


*/s/ Stephen Christopher Swift*
Stephen Christopher Swift

**9**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

_____
|
**CHARITY CHIDINMA**                    |
**EMERONYE SWIFT,**                     |
                                        |
   **Plaintiff,**        |  **Civil Action No. 1:14-cv-1139**
                                        |
   **v.**                |  **Hon. Judge Anthony J. Trenga**
                                        |  **Hon. Magistrate Judge Ivan D. Davis**
**FRONTIER AIRLINES, INC.**             |
**(a Colorado corporation),**           |
**and JANE DOE,**                       |
                                        |
   **Defendants.**       |
_____|

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR LEAVE OF COURT**
**TO AMEND COMPLAINT**

Plaintiff Charity Chidinma Emeronye Swift ("Mrs. Swift"), through her undersigned

counsel, proposes to substitute the Amended Complaint attached hereto as Exhibit 1 for her

original Complaint in this case.  Her reasons for amending her Complaint are as follows:

1.  She did not file an Amended Complaint for more than twenty-one days after Frontier

Arlines, Inc. ("Frontier") filed its Answer and Motion to Dismiss, because settlement

negotiations were ongoing, and appeared promising at the time.

2.  Her former counsel withdrew more than twenty-one days  after Frontier Arlines, Inc.

("Frontier") filed its Answer and Motion to Dismiss.

3.  She has discovered new facts and information that are included in the Amended

Complaint, that have enabled her to better state her claims.

**10**

In *Sepmoree v. Bio-Medical Applications of Virginia, Inc.* Civil Action No. 2:14-cv-141

(E.D. Va., 2014), the Court stated:

> If a motion to amend is filed more than twenty-one days after a responsive pleading or motion under Rule 12(b) is served, either leave of court or the consent of the opposing party is required.  Fed R. Civ. P. 15(a)(2).  The courts are instructed to "freely give leave when justice so requires." Id. [Citing *Pueschel v. United States*, 369 F.3d 345, 353 n.3 (4th Cir. 2004)] Thus, leave to amend a pleading should only be denied when (1) the amendment will prejudice the defendant; (2) the moving party has acted in bad faith; or (3) the amendment would be futile.  Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006).  An amendment would be futile if it fails to state a claim under the Federal Rules of Civil Procudure.  See Katle v. Penn Nat.Gaming, Inc. 637 F.3d 462, 471 (4th Cir. 2011).

The attached Amended Complaint will in no way prejudice the defendants.  Plaintiff has

in no way acted in bad faith, but was unable to meet the 21-day deadline filing it (after Frontier's

Answer and Motion to Dismiss were filed) only because settlement negotiations seemed likely to

resolve the case, and her former counsel withdrew their representation after the 21 days expired.

Plaintiff believes that the attached Amended Complaint will not be futile, because she has

alleged sufficient facts that meet the *Twombly* and *Iqbal* plausibility test.  Finally, justice

requires that Mrs. Swift be allowed to amend her complaint.

**11**

For the foregoing reasons, Plaintiff's Motion for Leave of Court to Amend Complaint should be granted.

Dated: December 10, 2014    Respectfully submitted,

            */s/ Stephen Christopher Swift*
            Stephen Christopher Swift
            Virginia State Bar ID No. 38419
            Swift & Swift, Attorneys at Law, P.L.L.C.
            2121 Eisenhower Avenue, Suite 200
            Alexandria, Virginia  22314-4688
            Telephone: (703) 418-0000
            Facsimile: (703) 535-8205
            E-Mail: steve@swift.law.pro

            *Attorney for Plaintiff*
            *Charity Chidinma Emeronye Swift*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 10, 2014, I electronically filed the foregoing document with the Clerk of the Court, using the Court's CM/ECF system, which will automatically cause all counsel of record to be served therewith.

<u>*/s/ Stephen Christopher Swift*</u>
Stephen Christopher Swift

**13**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **CHARITY CHIDINMA EMERONYE SWIFT,** | |
| **Plaintiff,** | **Civil Action No. 1:14-CV-1139** |
| **v.** | **Hon. Judge Anthony J. Trenga** |
| | **Hon. Magistrate Judge Ivan D. Davis** |
| **FRONTIER AIRLINES, INC. (a Colorado corporation), and JANE DOE,** | |
| **Defendants.** | |

**FRONTIER AIRLINES, INC.'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR LEAVE OF COURT TO AMEND COMPLAINT**

Defendant Frontier Airlines, Inc. ("Frontier"), pursuant to the Federal Rules of Civil Procedure and Local Rule 7(f) of this Court, submits this Opposition to Plaintiff Charity Chidinma Emeronye Swift's ("Plaintiff") Motion for Leave of Court to Amend Complaint.

## I.      INTRODUCTION

This case arises out of a $25.00 baggage fee Plaintiff claims she was wrongfully charged due to her race and/or national origin by a gate agent employed by Frontier on September 4, 2013. On September 4, 2014, Plaintiff filed a Complaint asserting, among other things, claims for intentional infliction of emotional distress ("IIED") (Count III) and defamation (Count IV) against Frontier. On October 22, 2014, Frontier filed a Motion to Dismiss both of these counts pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Motion to Dismiss is now fully briefed by the parties and set for oral argument on January 9, 2015.

**14**

On December 10, 2014, Plaintiff filed a Motion for Leave of the Court to Amend Complaint and attached a proposed Amended Complaint. Notably, Plaintiff's proposed Amended Complaint fails to correct any of the legal deficiencies in her IIED and defamation claims. Instead, Plaintiff seeks to add two new causes of action: (1) false imprisonment; and (2) breach of contract. In sum, Plaintiff now alleges that she was also falsely imprisoned by a Frontier gate agent because the agent allegedly threatened to deny her boarding and call airport security if she refused to pay the $25.00 baggage fee. She also claims Frontier breached a contract by charging her the fee and refusing to allow her to board the plane prior to paying the fee. These new claims fail for several reasons and, since the amendments would be futile, leave should be denied.

First, Plaintiff, by her own admission in the Amended Complaint, was never detained at any point during the incident. She merely alleges that she was wrongfully required to pay the fee before being allowed to board her flight, and therefore, she was falsely imprisoned. This is not false imprisonment, as Plaintiff was never actually detained in the gate area or anywhere else.

Second, Plaintiff fails to state a claim for breach of contract because the terms of the purported contracts attached to her proposed Amended Complaint clearly establish that Plaintiff was properly charged the $25.00 fee. Plaintiff purchased her tickets on August 19, 2013 from a third-party travel agency, and not from Frontier's website. As such, her ticket was a "Basic" ticket, and Plaintiff was rightfully charged the $25.00 fee. There was simply no breach. Further, the tort damages sought in her contract claim are improper under Virginia law. As such, Plaintiff's request to amend her complaint to add her breach of contract claim must be denied.

Accordingly, dismissal of Plaintiff's IIED (Count III) and defamation (Count IV) claims continues to be warranted since her proposed Amended Complaint does not cure the deficiencies

raised in Frontier's fully-briefed Motion to Dismiss. Likewise, leave for Plaintiff to allege her breach of contract (Count V) and false imprisonment (Count VI) claims must be denied as futile.

## II.    STATEMENT OF FACTS

On September 4, 2013, Plaintiff was traveling on Frontier Airlines from Bozeman, Montana (BZN) to Arlington, Virginia (DCA) with a stopover in Denver, Colorado (DEN). (Doc. # 32-2, ¶¶15, 18). While boarding her connecting flight, Plaintiff alleges that a Frontier agent told Plaintiff that she would have to pay a $25.00 fee for her carry-on baggage before she was allowed to board. *Id.*, ¶20. Plaintiff claims she was the only one asked to pay the $25.00 fee due to her race and national origin. *Id.*, ¶¶25-26.

After being informed of the fee, Plaintiff debated with the agent as to why she should not have to pay it. *Id.* ¶¶20-24. At some point thereafter, the agent allegedly became impatient with Plaintiff and told her, "Can't you see that I don't care, and I don't want to hear you say anything more to me again, you pay or I will call the airport security police to come and arrest you." *Id.* ¶23. After Plaintiff failed to respond, the agent then allegedly stated, "Can someone call me [sic] an airport security police?" *Id.* ¶23. Ultimately, Plaintiff paid the $25.00 fee and boarded her flight without incident, though she "felt devastated by the thought that she could have been arrested, had someone called the police as Jane Doe requested." *Id.* ¶27. By paying the fee, Plaintiff claims she was falsely imprisoned because the agent "restrained [Plaintiff's] liberty and freedom to board her flight, which she had paid for, without just cause." *Id.* ¶57.

On August 19, 2013, Plaintiff booked her ticket through a third-party travel agency, Air World Travel and Train, and not on FlyFrontier.com. *Id.*, ¶¶15, 54. According to Exhibit G to Plaintiff's Amended Complaint, Frontier offered the following fare options:

**16**

**Available at FLYFRONTIER.COM**

| Available on all Frontier Flights | CLASSIC PLUS<br>Includes STRETCH seating, 1 checked bag, beverage, and fully refundable fare | CLASSIC<br>Includes STRETCH seating, 1 checked bag, and beverage | ECONOMY<br>Our lowest fare booked at FLYFRONTIER.COM | BASIC<br>Our lowest fare booked through other travel agencies |
|---|---|---|---|---|
| Free Advanced Seat Assignment | STRETCH Seating | STRETCH Seating | STANDARD Seating | Seats assigned at check-in |
| STRETCH Seating Upgrade (limited by capacity and availability) | $0<br>Eligible at purchase or at check-in | from $0<br>Eligible at purchase or at check-in | from $15*<br>Eligible at purchase or at check-in | from $15*<br>Eligible at purchase or at check-in |
| Advanced SELECT Seating Upgrade (limited by capacity and availability) | $0 | $0 | $5 | $15<br>Through Manage Reservations |
| Advanced STANDARD Seating Upgrade (limited by capacity and availability) | $0 | $0 | $0 | $8<br>Through Manage Reservations |
| Fully Refundable Fare | ✔ | | | |
| Priority Services (check-in, security access, and boarding where available) | ✔ | ✔ | | |
| On-board Beverages | ✔<br>Unlimited non-alcoholic drinks and one alcoholic drink | ✔<br>Unlimited non-alcoholic drinks and one alcoholic drink | From $1.99 | From $1.99 |
| 1st Checked Bag | ✔ | ✔ | $20 at check-in on FlyFrontier.com / $25 for check-in at airport | $20 at check-in on FlyFrontier.com / $25 for check-in at airport |
| 2nd Checked Bag | $30 | $30 | $30 | $30 |
| Carry-On Bag | ✔ | ✔ | ✔ | $0 for all tickets purchased through August 5, 2013<br><br>$25-$100** for all tickets purchased on or after August 6, 2013 |

(Doc. #32-9, p.2-3 (emphasis added)). These fare options are consistent with the May 1, 2013 press release attached as Exhibit E to Plaintiff's Amended Complaint, which states, in relevant part, as follows:

4

17

**Carry-On Baggage**

Frontier's most loyal customers have made it very clear that finding overhead bin space for carry-on bags has become unacceptably difficult. In response, Frontier will be introducing a charge for carry-on bags for customers buying Basic fares through third party sales. All tickets sold at FlyFrontier.com include a carry-on bag with the fare.

FlyFrontier.com will become the only channel through which customers will continue to enjoy free carry-on bags on all tickets.

(Doc. # 32-7, p.2 (emphasis added)). The alleged contract of carriage attached as Exhibit H also states, "Carry-On – A passenger may take on piece of carry-on baggage onto the aircraft. A charge may apply for the carry-on bag depending on the ticketed Fare Option." (Doc. # 32-10, p.8). Part A(1) of Rule 220 of Exhibit H notes that "[t]here is no free baggage allowance included with Basic tickets. Baggage fees apply to each checked bag." (Doc. # 32-10, p.8 (emphasis added)). The same holds true for "Economy" tickets. *Id.* The baggage fees are then cross-referenced in Rule 225, which states the fee schedule as follows:

| Charges based on ticket purchase date and travel date | | | | |
|---|---|---|---|---|
| | **Basic & Economy** | **Classic** | **Classic Plus** | **Summit & Ascent** |
| 1st Checked item | USD 20 at FlyFrontier.com online check-in USD 25 at airport check-in | Free | Free | Free |
| 2nd item for tickets purchased on or after June 2, 2013 for travel on or after November 14, 2013 | USD 30 | Free | Free | Free |
| 2nd item for tickets purchased on or after July 21, 2013 for travel on or after January 6, 2014 | USD 30 | USD 30 | Free | Free |
| 2nd item for tickets purchased on or after October 1, 2013 for travel on or after March 24, 2014 | USD 30 | USD 30 | USD 30 | Free |
| 3 or more items for tickets purchased on or after February 17, 2013 for travel on or after July 11, 2013* | USD 75 | USD 75 | USD 75 | USD 75 |
| * Charge applies per item | | | | |

(Doc. # 32-10, p.9).

**18**

Plaintiff alleges that Frontier breached the aforementioned "contracts"[1] by charging her the $25.00 fee at the airport for her carry-on bag and by not letting her board the flight until she paid the fee. (Doc. # 32-2, Count V, ¶¶54-55). She further claims undisclosed "Consequential and Compensatory" damages for defamation, false imprisonment and emotional distress arising out of this breach of contract, noting that "[t]he cumulative effect of [these] nonmaterial breaches may be material." (Doc. # 32-2, Count V, ¶54).

On September 4, 2014, Plaintiff filed her initial complaint, alleging discrimination under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, as well as claims for IIED and defamation under Virginia law. On October 22, 2014, Frontier moved to dismiss Plaintiff's IIED and defamation claims pursuant to Federal Rule of Civil Procedure 12(b)(6), which has been fully briefed by the parties and awaits ruling by the Court. (Doc. # 12). Plaintiff has not amended her complaint to plead any additional allegations pertinent to Frontier's Motion to Dismiss Counts III & IV of Plaintiff's Complaint. (*See* Doc. # 32-1; 32-2). Plaintiff's present motion appears to only seek leave to add two new causes of action under Virginia law[2]: (1) false imprisonment; and (2) breach of contract. *See id.* Because no new allegations impact the IIED and defamation claims subject to Frontier's Motion to Dismiss

---

[1] While it is unclear in Plaintiff's proposed Amended Complaint what provisions she relies on in the attached "contracts" to form the basis of her claim, Frontier raises only lack of breach based upon the purported attachments to her Amended Complaint and improper damages at this time. *See Bryant v. Wash. Mut. Bank*, 524 F. Supp. 2d 753, 757 (W.D. Va. 2007) ("The complaint is deemed to include any written instrument . . . incorporated in it by reference. Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002))). In doing so, Frontier does not concede that any of these documents are "contracts" and explicitly reserves its right to challenge Plaintiff's contract claim on other grounds not currently raised in response to Plaintiff's present motion to amend.

[2] As Plaintiff states in paragraph 1 of her proposed Amended Complaint that she brings her false imprisonment and breach of contract claims under Virginia law, Frontier assumes, without waiving, that Virginia law applies to the issues raised in Plaintiff's complaint solely for the purposes of the present motion.

**19**

Counts III & IV of Plaintiff's Complaint, the present response is directed only to Plaintiff's new claims for false imprisonment and breach of contract.

### III.    LEGAL STANDARD

A party seeking to amend a complaint after an opposing party has filed a responsive pleading, may do so only with the consent of the opposing party or the court's leave. FED. R. CIV. P. 15(a)(2); *Robert's Farm Equip., Inc. v. William Hackett Chains, Ltd.*, 2011 U.S. Dist. LEXIS 4851, at *9-10 (E.D. Va. Jan. 4, 2011). Although leave to amend a pleading may be liberally granted, the Court will not grant leave where it would be prejudicial to the opposing party, the plaintiff has acted in bad faith, or amendment of the complaint would be futile. *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010); *Scott v. US Bank, NA*, 2010 U.S. Dist. LEXIS 145409, at *5 (E.D. Va. Oct. 13, 2011) ("[A] motion to amend should be denied when the proposed amendment is futile." (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). As such, the Court will deny a motion for leave to amend a complaint as futile when the proposed amended complaint would not survive a 12(b)(6) motion to dismiss. *Dozier v. Skalsky*, 2009 U.S. Dist. LEXIS 36149, at *10 (E.D. Va. Apr. 28, 2009) (citing *Donaldson v. U.S. Dep't of Labor*, 930 F.2d 339, 349 (4th Cir. 1991)); *Scott*, 2010 U.S. Dist. LEXIS 145409, at *5 ("The Court may consider substantive issues in assessing futility." (citing *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980)).

To survive a motion to dismiss, a complaint must assert plausible facts that, if accepted as true, provide a basis on which relief may be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "demands more than an unadorned, defendant-unlawfully-harmed-me accusation." *Id.* at 678. As such, the Federal Rules do not "unlock the doors of discovery for a plaintiff armed

**20**

with nothing more than conclusions." *Id.* at 679. Facts that suggest a "mere possibility" or those that are "merely consistent" with misconduct are not enough to survive a motion to dismiss. *Id.* at 678. In evaluating such motions, courts do not credit a plaintiff's "legal conclusions, [recitations of] elements of a cause of action, and bare assertions devoid of further factual enhancement," and must "decline to consider 'unwarranted inferences, unreasonable conclusions, or arguments'" contained in the complaint. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com. Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

## IV.    ARGUMENT

### A.    PLAINTIFF'S FALSE IMPRISONMENT CLAIM FAILS BECAUSE SHE ADMITS THAT SHE WAS NEVER DETAINED.

In Virginia, false imprisonment is defined as "the direct restraint by one person of the physical liberty of another without adequate legal justification." *Whitlock v. Street*, 2012 U.S. Dist. LEXIS 120795, at *16 (E.D. Va. Aug. 24, 2012) (quoting *Jordan v. Shands*, 500 S.E.2d 215, 218 (Va. 1998)); *Smith v. Button*, 43 Va. Cir. 379, 383 (Va. Ct. App. 1997) ("[T]he central element in a false imprisonment action 'is the illegal detention of the person, without lawful process or the unlawful execution of lawful process.'" (citing *Montgomery Ward & Co. v. Wickline*, 50 S.E.2d 387, 389 (Va. 1948))). As such, a plaintiff may establish "a *prima facie* case of false imprisonment when he shows that he was <u>directly and forcibly detained</u>." *Whitlock*, 2012 U.S. Dist. LEXIS 120795, at *16 (emphasis added) (citing *Figg v. Schroeder*, 312 F.3d 625, 642 (4th Cir. 2002)). When a "defendant does not participate in the resulting illegal arrest, the defendant is not liable for false imprisonment." *Id.* at *17 (citing *Smith*, 43 Va. Cir. at 383).

For example, *Kirven v. Super Fresh Food Markets* is instructive. 45 Va. Cir. 198 (Va. Ct. App. 1998). There, plaintiff customer alleged that the defendant store falsely imprisoned him when an employee of the store told him he could not stay in the store. *Id.* at 198. In affirming demurrer of plaintiff's claim for false imprisonment, the court found that, in order to sufficiently state a claim for false imprisonment, there must be some "restraint of that person; that is, a limitation on the person's freedom of movement." As such, the *Kirven* court held:

> In the present case, the only restraint or limitation on plaintiff's freedom of movement was the plaintiff's ability to remain in the store. If this was done because of plaintiff's race, sex, religion, national origin, or other unlawful reason, plaintiff has a cause of action under one or more civil rights laws. The court is unwilling to recognize a cause of action for false imprisonment simply for telling a person to "get out."

*Id.* at 199-200.

Similarly, here, Plaintiff claims that she was falsely imprisoned because she was not allowed to board her flight if she did not pay for her carry-on bag. (Doc. # 32-2, Count VI, ¶57). This is not false imprisonment—there was no confinement, by threat or otherwise. Plaintiff was never detained or barred from leaving the gate area or the airport. Though Plaintiff claims that the gate agent asked someone to call airport security after she continued to refuse to pay the fee, no one ever came to the gate to restrain Plaintiff nor did anyone prohibit Plaintiff from leaving the area. There was simply no restraint—"the only restraint or limitation on plaintiff's freedom of movement was the plaintiff's ability to [board the aircraft]." *See Kirven*, 45 Va. Cir. at 199.

Because Plaintiff was not compelled to remain in an area against her will, her false imprisonment claim fails and her request for leave to amend her complaint must be denied as futile. *See id.*; *see also Smith v. Comair, Inc.*, 134 F.3d 254, 259-60 (4th Cir. 1998) ("[Plaintiff]

**22**

Smith's evidence simply does not show that he was compelled either to remain or to go anywhere he did not wish. He conceded that no Comair representative told him that he must remain in any specific part of the airport or that he was not free to leave the airport. Price told Smith only that Comair would not permit him to board the flight out of Cincinnati. Smith was therefore free at all times to leave the airport or leave Cincinnati altogether by any means he could arrange other than a Comair flight. False imprisonment results only if 'the restraint be a total one, rather than a mere obstruction of the right to go where the plaintiff pleases.' . . . Smith's evidence thus fails to support a claim for false imprisonment." (citing W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 11, at 47 (5th ed. 1984))).

**B.    PLAINTIFF'S BREACH OF CONTRACT CLAIM IS FUTILE BECAUSE FRONTIER DID NOT BREACH THE CONTRACT AND THE DAMAGES SOUGHT ARE NOT RECOVERABLE IN BREACH OF CONTRACT.**

To recover for breach of contract, Plaintiff must present "the existence of [a] duly executed and enforceable agreement[]; performance, or offers to perform in accordance with the terms of the contract[]; that the [defendant] failed to perform under or breach the agreement; that the breaches are the cause of actual damages sustained by plaintiffs; and that those damages are recoverable under Virginia law." *Johnson v. D&D Home Loans Corp.*, 2008 U.S. Dist. LEXIS 24114, at *18-19 (E.D. Va. Jan. 23, 2008) (quoting *Carley Capital Grp. v. Newport News*, 709 F. Supp. 1387, 1396 (E.D. Va. 1989)); *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).

Here, Plaintiff's proposed Amended Complaint does not set forth any actual breach of the alleged contractual terms by Frontier or properly seek damages recoverable in contract. Therefore, Plaintiff's request for leave to amend her complaint to state a claim for breach of contract must be denied.

1.     **Frontier Did Not Breach the Alleged Terms of the Contracts Attached to Plaintiff's Proposed Amended Complaint.**

Where a plaintiff fails to cite a particular provision breached by the defendant under the contract or where the factual support for the alleged breach does not follow the actual terms of the contract relied upon for that breach, the claim is improper. *See Reyes v. Wells Fargo Bank, N.A.*, 2013 U.S. Dist. LEXIS 104428, at *9-10 (E.D. Va. July 24, 2013). Further, Virginia courts follow the rule that "where an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Spain v. Mecklenburg County Sch. Bd.*, 2001 U.S. Dist. LEXIS 11217, at *28 (E.D. Va. July 31, 2001) (citing *Westbury Coal Mining P'ship v. J.S. & K. Coal Corp.*, 355 S.E.2d 571, 572 (Va. 1987) (reversing decision of a party who had read into an agreement exclusions which did not exist)). Unsupported legal conclusions arising out of a purported contract fail to state a claim and must be rejected. *E.g.*, *Khair v. Countrywide Home Loans, Inc.*, 2010 U.S. Dist. LEXIS 58922, at *15 (E.D. Va. June 14, 2010) ("The Complaint merely states the Plaintiffs' unsupported legal conclusion that [defendant] breached an undefined contractual duty and thereby caused the Plaintiffs some unspecified damage. Such conclusory allegations are insufficient to plausibly state a breach of contract claim against [defendant]."). As such, where "the facts as Plaintiff has alleged them belie the possibility of a breach of contract claim, this claim must be dismissed." *Inman v. Klockner-Pentaplast of Am., Inc.*, 467 F. Supp. 2d 642, 653 (W.D. Va. 2006), *rev'd on other grounds*, 347 Fed. Appx. 955 (4th Cir. 2009).

Here, Plaintiff alleges that Frontier breached its contractual obligations of the documents attached to her complaint by charging her the $25.00 fee at the airport for her carry-on bag. (Doc.

**24**

# 32-2, Count V, ¶¶54-55). This is false. In actuality, the documents Plaintiff incorporates by reference as the basis for her breach of contract claim explicitly contradict her conclusion that Frontier breached the contract. As further detailed in the statement of facts above, the ticket Plaintiff purchased on August 19, 2013 for travel on September 4, 2013 was indeed a "Basic" ticket by virtue of being purchased through a third-party travel agency, Air World Travel and Train, and not through Frontier's website. (Doc. #32-7, p.2; Doc. #32-9, p.2-3). As such, Plaintiff's ticket was subject to a "$25-$100" fee for her carry-on bag, as the documents Plaintiff relies upon consistently affirm. *Id.* Her reference in Exhibit I to Frontier's change in policy for "Economy" tickets that "came into effect on April 28, 2014" is completely irrelevant to the tickets she purchased nearly 8 months <u>before</u> on August 19, 2013. Despite Plaintiff's conclusory allegation that Frontier breached the attached documents by charging her $25.00, in reality, there simply was no breach at all. The actual terms of the documents attached to her proposed complaint contradict her claim.

In sum, Plaintiff has failed to properly allege a breach by Frontier of the alleged contractual documents in this matter. Plaintiff cannot simply attach documents that form the basis of her claim and conclude there was a breach, while contemporaneously ignoring the actual terms of those documents in order to manufacture a claim. *See, e.g.*, *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Brown v. Rectors & Visitors of the Univ. of Va.*, 361 Fed. Appx. 531, 534 (4th Cir. Va. 2010) ("The district court did not err because [plaintiff's] complaint contained only conclusory allegations that the Graduate Student Handbook constituted a contract

12

**25**

between himself and [defendant], and that assertion was unsupported by the terms of the Handbook and expressly contradicted by the Graduate Record incorporated therein.").

Accordingly, Plaintiff's request to add her breach of contract claim in her proposed Amended Complaint must be denied. *See, e.g.*, *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 938 (E.D. Va. 2010) ("Plaintiff has simply failed to 'plead[] sufficient factual content to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct' with respect to its breach of contract claim." (citing *Iqbal*, 556 at 679)); *Keitz v. Unnamed Sponsors of Cocaine Research Study*, 2013 U.S. Dist. LEXIS 144003, at *7 (W.D. Va. Oct. 2, 2013) (denying plaintiff leave to file proposed amended complaint for breach of contract claim where "the plaintiff merely offers conclusory statements that fail to state a claim under Federal Rule of Civil Procedure 12(b)(6)").

### 2.    Plaintiff's Alleged Damages Are Not Recoverable In Breach of Contract

In her proposed Amended Complaint, Plaintiff improperly attempts to recover her alleged tort damages under a theory of contract liability. Specifically, Plaintiff claims that as a result of Frontier's breach of the contract, she "suffered substantial harm because Frontier's agent defamed [her] as a result of her actions, even though they were in breach of Frontier's policies. Mrs. Swift suffered serious emotional distress as highlighted above. The cumulative effect of nonmaterial breaches may be material." (Doc. # 32-2, Count V, ¶54).

First, it must be noted that Plaintiff admits in her own Amended Complaint that the damages she seeks arise from "nonmaterial breaches" of the alleged contract. But in Virginia, a breach must be "material"—i.e., "something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Johnson*, 2008 U.S. Dist.

13

**26**

LEXIS 24114, at *19. There is simply no case law that supports Plaintiff's proposition that "nonmaterial breaches" can be the equivalent to a material breach. Her theory must be rejected.

Second, Plaintiff improperly attempts to cloak her tort damages (i.e., defamation, false imprisonment, and IIED) under a breach of contract theory. But Virginia courts have long held that a plaintiff cannot recover for tort-based injuries in a contract action: "The law of torts is well equipped to offer redress for losses suffered by reason of a 'breach of some duty imposed by law to protect the broad interests of social policy,' but it is 'not designed, however, to compensate parties for losses suffered as a result of breach of duties assumed only by agreement.'" *Sanders v. UDR, Inc.*, 2010 U.S. Dist. LEXIS 106567, at *10 (E.D. Va. Oct. 4, 2010) (citing *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc..*, 374 S.E.2d 55, 58 (Va. 1988)); *accord Streza v. Bank of Am.*, 2014 U.S. Dist. LEXIS 105915 ("[A]bsent some tort, damages for humiliation or injury to feelings are not recoverable in an action for breach of contract." (quoting *Sea-Land Serv., Inc. v. O'Neal*, 297 S.E.2d 647, 653 (Va. 1982)).

Accordingly, Plaintiff's attempt here to recast her false imprisonment, IIED, defamation, and discrimination claims in breach of contract must be rejected, because such damages are not recoverable in contract under Virginia law. As succinctly recognized by the Virginia Supreme Court:

> To allow [plaintiff] to recover damages for humiliation and embarrassment on his breach of contract claim would not only let [her] recover damages based solely on speculation, but it would also let [her] recover the same damages twice — once on a contract theory and once on a tort [defamation] theory. We refuse to permit such a recovery.

*Isle of Wight County v. Nogiec*, 704 S.E.2d 83, 87 (Va. 2011) ("'As a general rule,' we have stated, 'damages for breach of contracts are limited to the pecuniary loss sustained.'" (internal

citations omitted)); *accord Mekbib v. United Airlines, Inc.*, 1988 U.S. App. LEXIS 19971, at *3-4 (4th Cir. Sept. 26, 1988) ("In Virginia, damages on a breach of contract claim are limited to pecuniary loss resulting from the breach that was reasonably contemplated by the parties at the time the contract was executed. Since [plaintiff passenger] would be able to recover, at most, the cost of his ticket were he to prevail on his breach of contract claim, the district court properly dismissed this claim as failing to meet the jurisdictional mount required for a diversity action. (citing *A & E Supp Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F. 2d 669, 671 (4th Cir. 1986); *E. I. Dupont de Nemours & Co. v. Universal Moulded Prods. Corp.*, 62 S.E.2d 233 (Va. 1950))). If Plaintiff is to recover any damages for her torts at all (and she should not), she must plead and prove those claims separately, which she has failed to do. As such, Plaintiff's request for leave to add her breach of contract claim to attempt to recover these damages twice must be denied.

## V.    CONCLUSION

WHEREFORE, Defendant Frontier Airlines, Inc. respectfully requests that this Court deny Plaintiff's Motion for Leave of Court to Amend Complaint, dismiss the proposed Counts III, IV, V, and VI of her Amended Complaint with prejudice, and grant any further relief the Court deems just and proper.

Dated: December 23, 2014                    Respectfully submitted,


                                            /s/_____
                                            Sarah E. Moffett (VA Bar No. 72208)
                                            LECLAIRRYAN, A PROFESSIONAL CORPORATION
                                            2318 Mill Road, Suite 1100
                                            Alexandria, Virginia 22314
                                            Telephone: (703) 647-5930
                                            Facsimile:  (703) 647-5980

15

**28**

Email:  sarah.moffett@leclairryan.com

- and –

Paula L. Wegman (*pro hac vice pending*)
Steven L. Boldt (*admitted pro hac vice*)
ADLER MURPHY & MCQUILLEN LLP
20 South Clark Street, Suite 2500
Chicago, Illinois 60603
Telephone: (312) 345-0700
Facsimile:  (312) 345-9860
Email: sboldt@amm-law.com
Email: pwegman@amm-law.com

**Attorneys for Frontier Airlines, Inc.**


## CERTIFICATE OF SERVICE

I hereby certify that, on December 23, 2014, I served the following via electronic case

filing:

Stephen Christopher Swift
Swift & Swift, Attorneys at Law, P.L.L.C.
21 Eisenhower Avenue
Suite 200
Alexandria, VA 22314
*Attorneys for Plaintiff*


*/s/*_____
Sarah E. Moffett

16

**29**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

_____

CHARITY CHIDINMA                )
EMERONYE SWIFT,                  )
                                 )
      Plaintiff,            )        Civil Action No. 1:14-CV-1139
                                 )
      v.                    )        Hon. Judge Anthony J. Trenga
                                 )        Hon. Magistrate Judge Ivan D. Davis
FRONTIER AIRLINES, INC. (a Colorado )
Corporation), and JANE DOE,      )
                                 )
      Defendants             )
_____)

**PLAINTIFF'S REBUTTAL**
**TO FRONTIER AIRLINES, INC.'S OPPOSITION**
**TO HER MOTION FOR LEAVE OF COURT TO AMEND COMPLAINT**

Plaintiff Mrs. Charity Swift ("Mrs. Swift"), pursuant to Federal Rules of Civil Procedure and

Local Rule 7(F), submits this Rebuttal Brief to Defendant's opposition to her motion for leave of

court to amend her complaint.

**INTRODUCTION**

This case is **not** just about a $25.00 carry-on fee Defendant charged Mrs. Swift - it is more than

that. It is about the unlawful and discriminatory manner Mrs. Swift was singled out to pay the

fee, as a condition for her boarding the plane, while her own husband who is a white Caucasian

male, was not subjected to the same treatment, even though in all respects, they both were

similarly situated in the circumstances. Also a charge Mrs. Swift was forced to pay by

intimidation, threat of arrest, humiliation and ridicule. It is about the unlawful, hostile,

**30**

intimidating, threatening humiliating, ridiculing and abusive manner in which Defendant's agent

treated Mrs. Swift, solely in order to force her to pay the charge, i.e., part with her own property

($25.00) without any questions asked. It is about an out of control employee, intentionally using

cruel and unlawful tactic – intimidation, ridicule, humiliation, fear, threat of arrest and

defamation, to force another to part with her property without any justification and without any

questions asked. It is about Defendant Frontier Airlines, Inc. and its unknown agent, "Jane Doe",

demanding and mandating Mrs. Swift pay a carry-on fee, that they well knew they had no right

whatsoever to charge, based on their own contract of carriage, as Mrs. Swift later discovered at

Defendant's own website few days before preparing her Amended Complaint and motion for

leave of Court to file it. It is also about false imprisonment of Mrs. Swift, in breach of their own

policy and "Contract of Carriage" Rule 35 – Refusal to Transport, when Jane Doe, intentionally

and unlawfully, without just cause, detained her and refused to allow Mrs. Swift to board the

plane, and in doing so, restricted her ability and freedom to work past her and board the plane,

against Plaintiff's will and her rights, without just cause or justifiable reason. Defendant's

Contract of Carriage Rule 35 – Refusal to Transport (attached to the Amended Complaint),

details situations and or conditions that must be present before Defendant could refuse to

transport a passenger, and none of those conditions was present in the circumstances of the

present case. Yet, Defendant's agent emphatically told Mrs. Swift that there was no way she,

Jane Doe, would allow Mrs. Swift to board or travel on the flight unless she paid for carry-on,

while incredulously  and obdurately, refusing to respond to Mrs. Swift's reasonable request for

an explanation of the charge.

**Rebuttal of Defendant's Introduction**

When Defendant's state that "this case arises out of a $25.00 baggage fee…," they are only

tangentially accurate. Mrs. Swift is black, and not one of Jane Doe's "people – white people"

otherwise, why was her husband who is Caucasian not asked to pay the fee as she was asked to

do, and why was he free to board the plane and his wife Mrs. Swift was not? Does Mrs. Swift's

reputation have to be impugned by Defendant's agent calling the police to arrest Mrs. Swift, just

because she honestly did not know why she was being charged a fee for her carry-on, and

reasonably asked to know why she was being charged such fee or because Jane Doe did not like

her because she was black and an African? Is Defendant's agent justified to so impugn Mrs.

Swift's reputation by yelling and calling the security police to arrest Mrs. Swift and calling the

attention of everyone at the gate and adjoining gates to turn and look at Mrs. Swift as if she has

broken the law, or done anything unlawful or wrong, warranting a call for the police to arrest

her: Is Defendant's insulting and ridiculing of Mrs. Swift, justified, because of her perceived

accent, by asking her whether she understood English … just because there was a "debate" as

Defendants have labored to insinuate without any basis, that there was a debate (even though

they know no such debate took place). Is it unreasonable for Mrs. Swift, who honestly did not

know why and how she came to owe Defendant's $25.00 carry-on fee and only wanted to know

the reason before parting with her money, in the circumstances, given that Mrs. Swift and her

husband had already made three flights on same ticket and trip, including one on Defendant's

flight and no one asked them for any carry-on fees? And is it not legitimate and reasonable in the

circumstances, for Mrs. Swift to ask why the fee, given that two of Defendant's own ticket

agents checked her and her husband in, weighed their carry-ons, and issued them two boarding

passes without asking them for any fees? Plaintiff believes these questions need some answers.

**32**

In their motion, Defendant makes series of inaccurate statements that seems like an attempt to

distort facts and confuse issues:

> In their introduction, Doc.36 page 1, ¶ 2, Defendant states: "This case arises out of a
> $25.00 baggage fee Plaintiff claims she was wrongfully charged due to her race
> and/national origin by a gate agent employed by Frontier on September 4, 2013."

Defendant's quoted statements above, are inaccurate. They seem contrived, and attempts to

confuse what this case is all about and what Mrs. Swift maintains her claims are about, in all her

filings to this court.


For the record, Mrs. Swift and her husband never checked in any baggage. There is no "baggage

fee" issue in this case – only a carry-on fee issue. Plaintiff maintains she was discriminated

against, not only because she was singled out to pay for her carry-on without any reasons

whatsoever (other whites including her husband were not asked to pay), but also the way Jane

Doe treated her in an effort to make her pay a carry-on fee, on the basis of her race and national

origin. For example, no one other than Mrs. Swift, was ridiculed as she was, on the basis of her

perceived accent, when Defendant's agent yelled at her and said; "don't you understand English

…" threatening to call the security police to arrest her, and in fact, carrying out that threat by

actually calling for the security police to arrest Mrs. Swift, and for what reason?


On page 1-2 ¶ 1of her amended complaint, (NATURE OF THE CASE), Mrs. Swift states: "As

described in this Amended Complaint, Jane Doe, an agent of Defendant, unlawfully

discriminated against Mrs. Swift, by refusing to allow her, the only African/African-American

woman and black person on the flight, to board the plane unless she paid $25.00, even though

two different ticketing agents of the Defendant's had already weighed Mrs. Swift and her husband's carry-ons respectively, found them within the required measurement, issued them their boarding passes without asking either of them to pay for their carry-ons. Mrs. Swift was told she would not be allowed to travel or board the plane unless she paid. Her husband on the other hand, was not asked to pay for his carry-on. Mrs. Swift believes she was discriminated, on the basis of her perceived race, color, ethnicity, alienage, ancestry, and/or national origin." Mrs. Swift claims she was treated differently from white passengers including her own husband who is Caucasian.

> In their introduction, Doc. 36 page 2 ¶¶1-2, Defendant states: (1) "In sum, Plaintiff now alleges that she was also falsely imprisoned by a Frontier gate agent because the agent **allegedly threatened to deny her boarding and call airport security if she refused to pay the $25.00 baggage fee"** (emphasis added). (2) "First, Plaintiff, by her own admission in the Amended Complaint, was never detained at any point during the incident. She merely alleges that she was wrongfully required to pay the fee before being allowed to board her flight, and therefore, she was falsely imprisoned. This is not false imprisonment, as Plaintiff was never actually detained in the gate area or anywhere else."

Defendant's statements quoted above, are totally inaccurate and misleading. On the bottom of Doc.32-2 ¶ 2 page 2 of her Amended Complaint, among other statements, Mrs. Swift states: "…Defendants also breached their own policy and "Contract of Carriage" Rule 35 – Refusal to Transport, when Jane Doe, unlawfully, without just cause detained, and refused to allow Mrs. Swift to board the plane, and in fact, restricted her ability and freedom to board the plane against her will and her rights, **without just cause or justifiable reason**", and she referred to exhibit I - her "ticketed fare" that was attached to her Amended Complaint, which clearly states that her ticket was "Economy" and not "Basic" as Defendants wrongly claim. On Doc.32-2 ¶ 3, page 3, Plaintiff's Amended Complaint states: "Jane Doe was emphatic that Mrs. Swift will not board

**34**

the plane, or travel on Frontier Airlines unless she paid $25.00. She also backed that emphasis up with the threat of calling for Mrs. Swift's arrest…" As the quotes above show, Mrs. Swift in deed, stated, in her Amended Complaint, that she was detained, and in fact, she was detained because her freedom to board the plane was restricted by Defendant's agent as she attempted to board. She was unable to do so, on her own will or volition, even though boarding the plane was the only thing she wanted to do at the time, so that she could go home after her trip. She could not board the plane, because, Defendant's agent, did not just "threaten to deny…" as Defendant claimed in their above quoted statement in bold. On the contrary, Defendant's agent unequivocally asked Mrs. Swift to step out of the boarding line, and not to board the plane until she was given permission to by her, Jane Doe after she has paid the carry-on fee. Hence, Defendant's quote above is totally false and inaccurate.

> Defendant state in their opposition motion, Doc.36 ¶ 2 page 2, "Second, Plaintiff fails to state a claim for breach of contract because the terms of the purported contracts attached to her proposed Amended Complaint clearly establish that Plaintiff was properly charged the $25.00 fee…"

Defendant's above quoted statement is totally inaccurate and irrelevant for several reasons:

(1) On a very simple and basic level, their statement does not mirror the reality of the main contract document – the fare ticket. Mrs. Swift's ticket clearly states "Economy" as opposed to "Basic", and all through the three flights she made on the trip, including one leg, on Frontier, through the time she was issued a boarding pass, no one mentioned anything about Mrs. Swift's ticket being a "basic" as opposed to "economy." Even Jane Doe, did not tell Mrs. Swift that the reason she was asking her to pay the charge, was because she had a "basic" ticket when Mrs. Swift asked for such reason, until now in Defendant's motion and after Mrs. Swift attached

**35**

Defendant's fare chart as part of her newly discovered evidence, that forms the basis of the two

new counts of false imprisonment and breach of contract in her Amended Complaint. The only

reasonable and persuasive reason no one – not even Jane Doe herself was unable to say to Mrs.

Swift that she was charged because she had a basic ticket, was because such statement will be

totally false, and a misrepresentation, because Mrs. Swift's ticket is an "economy" ticket, which

at the time, was not subject to any carry-on fee as Defendant's fare chart on page 4 of their Doc.

36 clearly shows. That, also, logically explains why the agents who checked Mrs. Swift in from

Bozeman to Denver, and the two ticket agents who also checked her and her husband in at

Denver, for the DC final leg flight gave them their boarding pass and never asked for a carry-on

fee, until Jane Doe showed up and undermined them by invalidating the check-in service they

gave Mrs. Swift.


(2)  On page 4 of Defendant's Doc.36, Defendant incorporated their fare options chart, which

Plaintiff attached to her Amended Complaint, as proof that Defendant and its agent, wrongly

charged her for her carry-on because her fare ticket indeed, was "economy" and not "basic" as

Defendant claims. Defendant's claim that the fare chart "establish that Plaintiff was properly

charged…," has no basis. According to same chart, one of the attributes of a "basic" fare, among

other factors like being booked through other travel agencies, is, that basic fare ticket holders'

have their "seats assigned at check-in." Mrs. Swift and her husband's seats for the whole trip was

assigned to them when their ticket was booked, on August 19, 2013 and not at a check-in on

September 4, 2013.

**36**

(3) By ignoring the fact that Mrs. Swift's fare ticket clearly states "economy" and not "basic" and to argue that her ticket was "basic" because it was bought through third party agent, they seem to imply that the ticket Mrs. Swift travelled with, was not the controlling ticket/document of contract for her flight on the Defendant's aircraft. They also seem to imply that a passenger, after booking a fully paid flight on Frontier, through a third party agent, should in addition, go to Frontier's website to second guess the status of the ticket they have just been issued, even if the passenger expressly instructed the third party agent to book her an economy flight. This is unrealistic, and even Defendant's will agree that it does not make any sense because it will serve no purpose and make third party booking agent's services redundant. And if so, then Frontier might as well have a policy that states that passengers can only buy their fare tickets from Frontier.com if they wish to travel on Frontier's flights.

(4) Mrs. Swift has not heard and did not know there was a basic level of air fare, until her research found Defendant's fare charts on their website, because she and her husband **always** flew economy and **always** instructed their travel agent to book "economy" flights for them.

(5) Defendant's own statement on page 5 of their Doc. 36 ¶ 3 quoting their carry-on policy, which Plaintiff attached to her Amended Complaint, states:  "Carry-On - A passenger may take on piece of carry-on baggage onto the aircraft. A charge may apply for the carry-on bag depending on the ticketed Fare Option." "… [t]here is no free baggage allowance included with basic tickets. Baggage fees apply to each checked bag," corroborates Plaintiff's claim that she was wrongly charged carry-on fee, because such fee at her travel date, did not apply to her because her "ticketed Fare Option" was "economy" and not "basic", and because the charge

**37**

applied only to basic tickets. This, also logically corroborates Defendant's own carry-on policy

that instituted carry-on charges on "economy" tickets, "purchased on or after April 28, 2014, as

exhibit F of Plaintiff's Amended Complaint show."  Interestingly, that evidence was not attached

to Defendants opposition motion, Doc. 36, as they did the "basic" carry-on chart. Defendant's

statement continues: "The same hold true for 'Economy' tickets. *Id.* The baggage fees are then

cross-referenced in Rule 225, which states the fee schedule as follows:…", and incorporates its

checked in baggage chart, that is part of Plaintiff's exhibit H to her Amended Complaint. The

insertion of **"the same hold true for economy" tickets**, to statements that Defendant knows has

no connection to, and was not intended to have any connection to their carry-on charge policy

with regards to "basic" tickets, is deceptive, unfair, and serves no legitimate purpose. Defendant

is well aware, that that statement relates to "checked in baggage", and not carry-ons; that Mrs.

Swift and her husband had no checked-in baggage, and that the issue in this case concerns only

carry-ons and yet, they were comfortable to insert the language to confuse by claiming what their

own policy does not intend or mean.


## Rebuttal of Defendant's Statement of Facts

> On page 3 of their Doc. 36 ¶ 2, Defendant states: "… **While boarding** her connecting
> flight, Plaintiff alleges that a Frontier agent told Plaintiff that she would have to pay a
> $25.00 fee for her carry-on baggage **before she was allowed to board**."

This statement is not accurate and is at best, confusing, as Mrs. Swift cannot both at the same

time be boarding and also not allowed to board. To avoid confusion, What Mrs. Swift alleged on

page 12 of her Amended Complaint, Doc. 32-2 ¶ 19-20, in part states: "…When zone 2 was

called for boarding, Plaintiff and her husband fell in line. There were fewer than four people in

front of them. Plaintiff was in front of her husband in the line, and each was carrying their own

carry-on. The two young women who earlier, checked them in and gave them their boarding

pass, were at the gate letting people on-board. However, as Plaintiff was next in line, and just as

she stretched her hand to hand over her boarding pass to one of the two young women, another

woman ("Jane Doe") who was definitely older than the two young ladies that dealt with Plaintiff

and her husband earlier, appeared and said, "give it to me", i.e., Mrs. Swift should giver Jane

Doe her boarding pass. It happened so fast that Jane Doe basically snatched Mrs. Swift's

boarding pass out of her hand.


When Jane Doe took the boarding pass from Mrs. Swift's hand, instead of tearing and giving

Mrs. Swift the assigned seat coupon part of it, as they were doing with other passengers, and let

her pass to board the plane like others before her, Jane Doe looked at Mrs. Swift and her carry-on

and asked, "Is this your luggage?" Mrs. Swift answered "yes". Then Jane Doe said to her, "You

have to pay twenty-five dollars before you can board."

> On same page 3 of their Doc. 36 ¶ 2, Defendant continued:"… Plaintiff claims she
> was the only one asked to pay the $25.00 fee due to her race and national origin.
> Id. ¶¶ 25-26."

The above quoted statement, like many others, is contrived and attempts to distort and/or at best,

confuse the facts and the issues, and in no way reflects Mrs. Swift's statements in her Amended

Complaint, as it appears on page 1-2 ¶ 1 of her Amended Complaint Doc.32-2, (NATURE OF

THE CASE), which the Court presently has before it. Plaintiff asks the Court to pay close

attention and to weed out irrelevances and any mischaracterizations of Plaintiff's accounts so as

to serve the ends of justice.

**39**

"As Mrs. Swift and her husband moved aside, and off from their now boarding line, **Mrs. Swift watched everyone else boarding without being asked to pay for their luggage before boarding.** So, she asked Jane Doe, why was she the only one with a boarding pass who is asked to pay $25 before boarding the plane? She turned at Mrs. Swift and angrily threatened, "do you want me to make you pay fifty dollars ($50) or do you want to pay twenty-five dollars ($25)?" Mrs. Swift explained to Jane Doe that she failed to understand why she was singling her out to pay for her carry-on when the rest of the passengers were allowed to board without Jane Doe or anyone else asking them to pay before boarding. Mrs. Swift then asked Frontier's agent, "If I must pay, why are you not asking my husband also to pay because we both have carry-ons, booked same flight together, have exact same boarding passes? Jane Doe then became irate and yelled at Mrs. Swift and said, "Shut your mouth, I don't want you to talk to me again, I have already told you, if you don't pay, I will make sure you don't board this flight."

Mrs. Swift accounted for what she saw with her own eyes, from the time Jane Doe, asked her to step aside from boarding group 2; Plaintiff's husband is Caucasian, in all respects similarly situated as Plaintiff was in the circumstances, yet he was not asked to pay even despite Plaintiff's asking Jane Doe why her husband was not charged; Plaintiff was the only black person on the entire flight, and so far, Defendant have not disputed these facts: Finally, Plaintiff's "ticketed fare option" stated that it was "economy" and not "basic" and Plaintiff was unlawfully discriminated against because of her race and national origin.

    On same page 3 of their Doc. 36 ¶ 3, Defendant states: After being informed of the fee, Plaintiff debated with the agent as to why she should not have to pay it. *Id.* ¶¶20-24. At some point thereafter, the agent allegedly became impatient with Plaintiff and told her, "Can't you see that I don't care, and I don't want to hear you say anything more to me again, you pay or I will call the airport security police to come and arrest you." *Id.* ¶2.

**40**

After Plaintiff failed to respond, the agent then allegedly state, "Can someone call me [sic] an airport security police?"

Defendant's quoted statement above is a continuation of attempts to distort and confuse facts. The above statement distorts and confuses, because, although Defendant uses the word **allegedly**, in "allegedly became impatient with Plaintiff," it is not clear who is doing the alleging – Plaintiff or Defendant's agent?" Defendant cannot legitimately paraphrase statements they attribute to Plaintiff as facts of the case, while quoting Plaintiff's documents. They should quote such statements, verbatim for the sake of clarity and to avoid confusion.  Defendant also states, "Plaintiff debated with the agent" and cites Id. ¶¶25-25. Again, there is no clarity as to whether Defendant is claiming that Plaintiff made the statement in her Complaints or whether it is their own statement/account of what happened, because Plaintiff never debated with their agent. All Mrs. Swift did, was ask legitimate and reasonable questions, which Jane Doe never answered because she was full of hatred and contempt for the African, black lady, Mrs. Swift, who was not doing as she Jane Doe commanded her to do, and so could not care less, as Defendants stated above. Also, Defendant's statement, "…after Plaintiff failed to respond…" does not make any sense and is confusing. On one hand, Defendant states: "Plaintiff debated with agent" and in the same breath, "Plaintiff failed to respond" and "allegedly" that lack of response made their agent impatient with Mrs. Swift, or very mad with her, that she had to call the security office to arrest her without any justification. However, Defendant's statement above also corroborates Mrs. Swift's claim that Defendant's agent, treated her with unbridled arrogance, hostility and impunity because as a ticket agent, she obviously had the power to decide who boards or not. She knew she had considerable power over Mrs. Swift in that regard, and she had no qualms in using it anyway she chose, and did not care who she hurt, because was unaccountable to no one. Otherwise, she could have simply explained to Mrs. Swift, who merely asked to know why she

**41**

was suddenly being charged carry-on fee after she had already made three flights, including one

on Frontier, without being asked to pay anything for the same carry-on.

> Further down same page 3 of their Doc. 36 ¶ 3 of their documents, Defendants state:
> "…By paying the fee, Plaintiff claims she was falsely imprisoned because the agent
> "restrained Plaintiff's liberty and freedom to board her flight, which she had paid for,
> without just cause."

Defendant knows fully well that the basis of Plaintiff's false imprisonment claim is not just that

she paid a fee, or as Defendant's put it, "by paying the fee." Yet, they go to lengths to say so. On

the contrary, Mrs. Swift's Count VI, false imprisonment, Doc. 32-2, page 29-30 ¶¶ 56-57

sufficiently explain her claim with ample facts.  Mrs. Swift consistently has claimed, and it is

uncontroverted, that Jane Doe prevented her from boarding her flight when it was her turn to

board, and followed it with a threat of, and call for Mrs. Swift's arrest; there was no way Mrs.

Swift or anyone in her shoes would have attempted to walk into the plane without being arrested

by the security – Defendant's agent would have ensured such arrest. Jane Doe did not have legal

justification to deny Mrs. Swift her right to board the flight, because (a) Defendant had no right

at the time to charge her the fee, and (b), their "Contract of Carriage" Rule 35 – Refusal to

Transport, did not permit Defendant and their agent to prevent Mrs. Swift from boarding the

Flight, because none of the rules under that contract were broken by Mrs. Swift.


### STATEMENT OF FACTS

Plaintiff's Amended Complaint, with attached exhibits, are already before the Court. Plaintiff has

used a good portion of her Amended Complaint to rebut some inaccurate and or confusing

statements of the Defendant in its motion. Hence, Plaintiff did not find it helpful to deluge the

Court with same facts again here.

**42**

**LEGAL STANDARD**

**Motion for Leave of Court to file an Amended Complaint**

If a motion to amend is filed more than twenty-one days after a responsive pleading or motion

under Rule 12(b) is served, either leave of court or the consent of the opposing party is required.

Fed. R. Civ. P. 15(a)(2). The courts are instructed to "freely give leave when justice so requires."

Id. Thus, leave to amend a pleading should only be denied when (1) the amendment will

prejudice the defendant; (2) the moving party has acted in bad faith; or (3) the amendment would

be futile. *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). An amendment would be futile if it

fails to state a claim under the Federal Rules of Civil Procedure. See *Katyle v. PermNat. Gaming,

Inc.*, 637 F.3d 462, 471 (4th Cir. 2011).


**Motion to Dismiss**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint; "it does not resolve

contests surrounding the facts, the merits of a claim, or the applicability of defenses."

*Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). "To survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*. 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding the motion, a court may

consider the facts alleged on the face of the complaint, as well as "'matters of public record,

orders, items appearing in the record of the case, and exhibits attached to the complaint.'" *Moore

v. Flagstar Bank*. 6 F. Supp. 2d 496, 500 (E.D. Va. 1997) (quoting 5A Charles A. Wright &

Arthur R. Miller, Federal Practice & Procedure § Case 2:14-cv-00141-HCM-LRL, Document 17,

filed 09/08/14, page 4 of 15 Page ID# 165 1357 (1990)).

**43**

In considering a motion to dismiss, [the Court] accept[s] as true all well-pleaded allegations and view[s] the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Svs. Inc.* 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mvlan Labs. Inc. v. Matkari*. 7 F.3d 1130, 1134 (4th Cir.1993)).

## ARGUMENT

## I.  BREACH OF CONTRACT: PLAINTIFF'S BREACH OF CONTRACT CLAIM IS PROPER BECAUSE IT MEETS THE *TWOMBLY* AND *IQBAL* PLAUSIBIITY TEST AND SO SHOULD NOT BE DISSMISSED.

Virginia Code § 59.1-507.1. Breach of contract; material breach states:

*(a) Whether a party is in breach of contract is determined by the agreement or, in the absence of agreement, this chapter. A breach occurs if a party without legal excuse fails to perform an obligation in a timely manner, repudiates a contract, or exceeds a contractual use term, or otherwise is not in compliance with an obligation placed on it by this chapter or the agreement. A breach, whether or not material, entitles the aggrieved party to its remedies. Whether a breach of a contractual use term is an infringement or a misappropriation is determined by applicable informational property rights law.*
*(b) A breach of contract is material if:*
*(1) The contract so provides;*
*(2) The breach is a substantial failure to perform a term that is an essential element of the agreement; or*
*(3) The circumstances, including the language of the agreement, the reasonable expectations of the parties, the standards and practices of the business, trade, or industry, and the character of the breach, indicate that:*
*(A) The breach caused or is likely to cause substantial harm to the aggrieved party; or*
*(B) The breach substantially deprived or is likely substantially to deprive the aggrieved party of a significant benefit it reasonably expected under the contract.*
*(c) The cumulative effect of nonmaterial breaches may be material.*
*(2000, cc. 101, 996.)*

In Virginia, a plaintiff can prevail on a breach of contract claim by providing proof of three elements: "[A] legally enforceable obligation of a defendant to a plaintiff, a defendant's violation or breach of that obligation, and injury or damage to the plaintiff caused by the breach of obligation."  Ulloa v. QSP, Inc., 624 S.E.2d 43, 48 (Va. 2006).

**44**

Contrary to Defendant's views, Plaintiff has sufficiently made out an enforceable breach of

contract (agreement) claim against them, because at the time of Plaintiff's travel, Mrs. Swift

bought and paid fully for her trip (consideration), and was issued a ticket and promise from

Defendant to fly Plaintiff to her destination in accordance with the terms of ticket. Mrs. Swift

kept her part of the contract, but Defendant did not. At some point on the trip, at Denver Airport,

Defendant, through its agent, acted contrary to the terms of the contract and is in breach by not

honoring the terms of Mrs. Swift's "ticketed fare option." In breach, Defendant, wrongly and

unlawful changed the terms of Mrs. Swift's economic ticket and charged her for her carry–on

when they had no right to do so. Secondly, Defendant, through its agent, also breached their

Contract of Carriage Rule 35 – Refusal to Transport, which is a contract that governs

Defendant's relationship with its passenger, including Mrs. Swift when there is an issue of

refusal to board its flights." Rule 35, lists several factors and circumstances when it will be

lawful to refuse or prevent a passenger to board their booked flight, none of those factors applied

in the present case, yet, Jane Done in violation of Rule 35, prevented Mrs. Swift from boarding

and made her boarding subject to her paying a fee, which Defendant in the first place had no

right to, even in the face of their own policies that say the opposite.


Defendant argues that Plaintiff's contract damages are not recoverable. But they are wrong. In

Virginia, a party's conduct gives rise to both a contract and tort claim only in limited

circumstances. The Virginia Supreme Court had explained that to "recover in tort, the duty

tortiously or negligently breached must be a common law duty, not one existing between the

parties solely by virtue of the contract." *Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290, 293

(Va. 2007). Plaintiff' believes that her case falls within such limited cases, because her contract

**45**

breach is intertwined with her false imprisonment, defamation, and intentional infliction of emotional distress claims. The damages suffered, are also connected.


## II. FALSE IMPRISONMENT: PLAINTIFF'S FALSE IMPRISONMENT CLAIM IS PROPER BECAUSE IT MEETS THE *TWOMBLY* AND *IQBAL* PLAUSIBIITY TEST AND SHOULD NOT BE DISMISSED

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141' Under Virginia law, "false imprisonment" is restraint of one's liberty without sufficient legal excuse. Montgomery Ward & Company v. Wickline, 188 Va. 485, 50 S.E. 2d 387 (Va.App. 1948). Ark v. Shifflett U.S. 250, 251 (1891)). It is from this sacred right that this case finds its genesis.


"[T]he necessary elements of a case for false imprisonment are a deprivation of the liberty of another without his consent and without legal justification." Montgomery Ward v. Wilson, 664 A.2d 916, 926 (Md. 1995) (quoting Great Atl. & Pac. Tea Co. v. Paul, 261 A.2d 731, 738 (Md. 1970)) (citations omitted). *In Robert F. Spiers v. Gene E. Sydnor* No. 00-1712 (CA-97-841 (2001), The Fourth Circuit noted that the tort of false imprisonment is defined in Virginia as "restraint of one's liberty without any sufficient legal excuse therefor by word or acts which he fears to disregard, and neither malice, ill will, nor the slightest wrongful intentions is necessary to constitute the offense." *Montgomery Ward & Co. v. Freeman, 199 F.2d 720, 723 (4th Cir. 1952*) (internal quotation marks omitted). "False imprisonment may result not only from the arrest of a person without any valid warrant, but also from the unlawful detention of a prisoner

**46**

who has been lawfully arrested." *Sands & Co. v. Norvell*, 101 S.E. 569, 574 (Va. 1919); see

*Mullins v. Sanders,* 54 S.E.2d 116, 120 (Va. 1949).

If person is under reasonable apprehension that force will be used unless he willingly submits

and he does submit to extent he is denied freedom of action, this constitutes false imprisonment.

*Zayre, Inc. v. Gowdy*, 207 Va. 47, 147 S.E.2d 710. 1966. Court of Appeals of Maryland in *Okwa,*

*et ux. v. Michael G. Harper, et al.* No.  129, July 28, 2000, Court of Appeals of Maryland noted,

although the intentional torts of false arrest and false imprisonment are separate causes of action,

they share the same elements. See generally *Scott v. Jenkins*, 345 Md. 21, 29, 690 A.2d 1000,

1003 (1997); *Montgomery Ward*, 339 Md. at 721, 664 A.2d at 926.   We shall discuss the torts

concurrently.  For a successful cause of action based on false arrest or false imprisonment, the

plaintiff must establish that "the defendant deprived him or her of his or her liberty without

consent and without legal justification." See *Scott*, 345 Md. at 29, 690 A.2d at 1003;

*Montgomery Ward*, 339 Md. at 721, 664 A.2d at 926; *Ashton v. Brown*, 339 Md. 70, 119, 660

A.2d 447, 471 (1995); *Great Atlantic & Pacific Tea Co. v. Paul*, 256 Md. 643, 654, 261 A.2d

731, 738 (1970).   The core issue under Appellants "False Arrest/Imprisonment" cause of action

is whether Appellees had legal authority to facilitate the arrest of Mr. Okwa at the airport.

In *Betty Slagle Minton, et al., v. Nathan Alan Kennedy, et al.*, Case No. 2:13cv00036, the 14th

day of November, 2013, the United States District Court Western District Of Virginia in

*Bigstone Gap Division* noted that the terms false arrest and false imprisonment are used

interchangeably in Virginia.  The claims of false imprisonment and false arrest are

distinguishable in terminology only, the only difference being the manner in which they arise: a

**47**

person may be falsely imprisoned by another without being arrested, but a person falsely arrested is also concurrently falsely imprisoned. See *Smith v. Button*, 43 Va. Cir. 379 (Va. Cir. Ct. Sept. 24, 1997).  Under Virginia law, false imprisonment is "the direct restraint by one person of the physical liberty of another without adequate legal justification." *Figg v. Schroeder*, 312 F.3d 625, 637 (4th Cir. 2002) (quoting *Jordan v. Shands*, 500 S.E.2d 215, 218 (Va. 1998)); see also *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011) (citing *Montgomery Ward & Co. v. Wickline*, 50 S.E.2d 387, 388 (Va. 1984)).  In the context of an arrest, if such arrest is lawful, then a plaintiff cannot prevail on a false imprisonment claim.  *See Lewis,* 708 S.E.2d at 890 (citing *DeChene v. Smallwood*, 311 S.E.2d 749, 752 (Va. 1984)).  In other words, in stating a claim for false imprisonment, there must be some allegation that the process that led to the arrest was unlawful. *See Cole v. Eckerd Corp*., 54 Va. Cir. 269 (Va. Cir. Ct. Dec. 20, 2000) (citing *Coughlan v. Jim McKay Chevrolet, Inc*., 18 Va. Cir. 265 (Va. Cir. Ct. Nov. 13, 1989) (citing *Motley v. Va. Hardware & Mfg. Co*., 287 F. Supp. 700 (W.D. Va. 1968)).

The requisite restraint may be accomplished by "words or acts, which [the individual] fears to disregard, and neither malice, ill will, nor the slightest wrongful intention is necessary to constitute the offense."  *Cole,* 54 Va. Cir. 269 (quoting *Wickline,* 50 S.E.2d at 387). It is not essential that a citizen be confined in jail or placed in the custody of an officer to state a claim for false imprisonment.  See *S.H. Kress & Co. v. Musgrove*, 149 S.E. 453, 455 (Va. 1929); *Zayre of Va., Inc. v. Gowdy*, 147 S.E.2d 710, 713 (Va. 1966).  If a person is under a "reasonable apprehension that force will be employed unless he willingly submits, and he does submit to the extent that he is denied freedom of action, this, in legal contemplation, constitutes false imprisonment."  *Musgrove,* 149 S.E. at 455; *Gowdy*, 147 S.E.2d at 713.  However, as stated

**48**

herein, a plaintiff need not be in the formal custody of an officer to state a claim for false

imprisonment. See *Musgrove*, 149 S.E. at 455; *Gowdy*, 147 S.E.2d at 713.

## CONCLUSION

WHEREFORE, Plaintiff Mrs. Swift, respectfully requests that the Court grant Plaintiff's Motion

for Leave of Court to Amend her Complaint, and also to deny Defendant's Motion to Dismiss

Counts III, V, and VI.


Dated: December 29, 2014                          Respectfully submitted,

                                                  /s/ Stephen Christopher Swift
                                                  Stephen Christopher Swift
                                                  Virginia State Bar ID No. 38419
                                                  Swift & Swift, Attorneys at Law, P.L.L.C.
                                                  2121 Eisenhower Avenue, Suite 200
                                                  Alexandria, Virginia 22314-4688
                                                  Telephone: (703) 418-0000
                                                  Facsimile: (703) 535-8205
                                                  E-Mail: steve@swift.law.pro
                                                  *Attorney for Plaintiff*
                                                  *Charity Chidinma Emeronye Swift*


## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed on December 29, 2014 with the Clerk of

the Court through the Court's ECM/CF system, which will electronically serve all counsel of

record.

                                                  /s/ Stephen Christopher Swift
                                                  Stephen Christopher Swift

**49**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHARITY CHIDINMA                    )
EMERONYE SWIFT,                     )
                                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  )    Civil Action No. 1:14-cv-01139 (AJT/IDD)
                                    )
FRONTIER AIRLINES, INC., *et al.*,  )
                                    )
            Defendants.             )
_____)

## ORDER

FOR REASONS stated from the bench and in accord with specific rulings and instructions thereto, it is hereby

**ORDERED** that Plaintiff's Motion for Leave of Court to Amend Complaint [Dkt. No. 31] is **GRANTED in part and DENIED in part**. The Motion is granted as to adding Count V (Breach of Contract of Carriage) to the Complaint, and denied as to adding Count VI (False Imprisonment). Plaintiff shall promptly file an Amended Complaint with the Clerk of the Court, which shall be deemed filed as of the date of this Order.

The Clerk is directed to forward copies of this Order to all counsel of record.

ENTERED this 9th day of January 2015.

Alexandria, Virginia                    _____ /s/_____
                                        Ivan D. Davis
                                        United States Magistrate Judge

**50**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| **CHARITY CHIDINMA** | ) | |
| **EMERONYE SWIFT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 1:14-CV-1139** |
| | ) | |
| **v.** | ) | **Hon. Judge Anthony J. Trenga** |
| | ) | **Hon. Magistrate Judge Ivan D. Davis** |
| **FRONTIER AIRLINES, INC. (a Colorado** | ) | |
| **Corporation), and JANE DOE,** | ) | |
| | ) | |
| **Defendants** | ) | |
| _____ | ) | |

## <u>AMENDED COMPLAINT</u>

Charity Chidinma Emeronye Swift (hereinafter "Plaintiff"), by her undersigned attorney Stephen

Christopher Swift, and on her behalf, herein alleges the following:

## NATURE OF THE CASE

1.  Plaintiff, a citizen of the United States of America born in the Federal Republic of Nigeria,

and a resident of Fairfax County in the Commonwealth of Virginia, brings this action seeking

declaratory, injunctive, and monetary relief against Frontier Airlines, Inc., and Jane Doe,

("Defendants"), for unlawful discrimination under federal laws, and Breach of Contract under

Virginia laws. As described in this Amended Complaint, Jane Doe, an agent of Defendant,

unlawfully discriminated against Mrs. Swift, by refusing to allow her, the only African/African-

American woman and black person on the flight, to board the plane unless she paid $25.00, even

though two different ticketing agents of the Defendant's had already weighed Mrs. Swift and her husband's carry-ons respectively, found them within the required measurement, and issued them their boarding passes without asking them either of them to pay for their carry-ons. Mrs. Swift was told she would not be allowed to travel or board the plane unless she paid. Her husband on the other hand, was not asked to pay for his carry-on. Mrs. Swift believes she was discriminated against, on the basis of her perceived race, color, ethnicity, alienage, ancestry, and/or national origin.

2.  As it turned out, and as Mrs. Swift later discovered after filing her initial Complaint, Defendants breached their own "Contract of Carriage," when they charged Mrs. Swift for her carry-on, because, according to their own policy, only passengers who purchased a "Basic" ticket through third parties, were required to pay for their carry-on – economy ticket holders were allowed to board free with their carry-ons. Although Mrs. Swift and her husband purchased their ticket from a third party, their ticket, was "Economy" and not "Basic." Also, according to Defendant's own policy, as posted on their own website, carry-on fees for "Economy" ticket holders came into effect on April 28, 2014 and Mrs. Swift and her husband bought their ticket and travelled in August/September, 2013.  Hence, Mrs. Swift was not required to pay for her carry-on and Defendants had no right or justification to charge her any fees for her carry-on, in the first place. **See Attached Exhibits A-H.** Defendants also breached their own policy and "Contract of Carriage" Rule 35 – Refusal to Transport, when Jane Doe, unlawfully, without just cause detained, and refused to allow Mrs. Swift to board the plane, and in fact, restricted her ability and freedom to board the plane against her will and her rights, without just cause or justifiable reason. **See Attached Exhibit I.**

**52**

3. Jane Doe was emphatic that Mrs. Swift will not board the plane, or travel on Frontier Airlines unless she paid $25.00. She also backed that emphasis up with the threat of calling for Mrs. Swift's arrest, and in fact, did carry out that threat by calling for the airport security police to come and arrest Mrs. Swift, even though she knew Mrs. Swift had done nothing wrong, and that such actions were unlawful because they were not warranted by any standard, in the circumstances. When Jane Doe made good on her threat by calling for the security to come and arrest Mrs. Swift, Mrs. Swift, out of intimidation by Jane Doe, and fear that she will be arrested, handcuffed by the airport security, and locked up, paid the $25.00 demanded by Jane Doe, even though she did not know why she was paying it, because Jane Doe refused to answer her questions, or explain to her why she was being charged such fees, especially when her own husband who was similarly situated, was not asked to pay any fees, even at the prompt of Mrs. Swift asking Jane Doe, why her husband was not also asked to pay.

4. Defendant's agent Jane Doe, allowed Mrs. Swift's husband, who is Caucasian male, and similarly situated or in the same boat, because they had same ticket (they bought their ticket together, were checked in together, and issued boarding passes and seats together, to board the plane). When Plaintiff asked why her husband was not charged as she was, she was given no answers. Defendants treated Plaintiff differently from her husband who is a white Caucasian, and all other white passengers who were allowed to board the plane without more, who Mrs. Swift watched board as she was asked by Jane Doe, to step aside from the line. When Mrs. Swift asked why she was asked to pay for carry-on after she had already been checked in, her carry-on measured and approved, and issued a boarding pass, Jane Doe never gave Mrs. Swift any reason

or explanation. Instead, Jane Doe used insulting words, bullied, intimidated, threatened to call the airport security police to arrest Mrs. Swift, and indeed, did carry out that threat by asking someone to call the airport security police to arrest Mrs. Swift.  Defendants' actions were hostile, willful, intentional, reckless, and in violation of 42 U.S.C. § 1981 as amended by the Civil Rights Act of 1991; Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d.  By Jane Doe's actions, Mrs. Swift felt humiliated, vilified, traumatized, and emotionally stressed and she suffered lingering nightmares, sleeplessness and fatigue that affected the level of energy she used to have and needed to do her work. The experience was a very painful one for her.

5.  By calling the security police to come and arrest Mrs. Swift, Defendant's agent defamed Mrs. Swift as she impugned on Mrs. Swift's reputation by innuendo, insinuation, or implication, that Mrs. Swift has either committed a crime, or was in the process of committing a crime, was a security threat to other passengers or Frontier's staff, or was a security risk given that Jane Doe told Mrs. Swift in the presence of other passengers, that she was not going to let Mrs. Swift board the plane, and given the genuine reasons for heightened security these days, at America's airports and or that Mrs. Swift has disturbed or was disturbing the peace, or has acted in any manner, necessitating a call for the security police or warranting her arrest in the circumstances. Jane Doe also knew that what she was doing was not warranted and was unlawful, yet she acted as she did, without any care or regard as to how it would affect Mrs. Swift or her rights. Defendants breached their own Contract of Carriage when they failed to follow their own policies regarding carry-ons and also, when they failed to follow their own rules regarding refusal to transport a passenger.

**54**

6.  In addition to seeking compensatory and punitive damages, plaintiff seeks declaratory and

injunctive relief requiring defendant to desist from and remedy such discriminatory action.

## JURISDICTION AND VENUE

7.  The court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331,

1343(a)(4) and 1367. Plaintiff's action for damages, punitive, declaratory, equitable and other

monetary relief is authorized by 28 U.S.C. §§1343(a)(4), 2201, 2202 and 42 U.S.C. Section

1981a(b)(1). Venue is proper in the U.S. District Court in the state of Virginia under 28 U.S.C. §

1391 because the events giving rise to these claims arose from defendant doing business in

Virginia (Reagan Washington National International Airport), and Plaintiff resides in Virginia.

## INTRODUCTION

8.  Plaintiff brings this civil rights lawsuit to ensure that the mandate that everyone in this

country is treated equally, as embodied and guaranteed in federal and state anti-discrimination

laws, does not become meaningless when the rights of persons perceived to be African, African-

American, Black or non-Caucasian Americans are affected. The aftermath of the horrific events

of September 11, 2001, has seen a rise in incidents of discrimination by airlines against non-

Caucasian citizens of the United States. Airlines like Frontier and their agents have invariably

pretended and hidden behind security and safety arguments even in circumstances where their

actions clearly have nothing to do with anything close to, or relating to the security or the safety

of anyone. Some airlines and their agents have used the genuine fear and need for security and

safety of travelers to foster and carry out their personal bigotry and racist intentions. They have

done so, and continue to do so, despite President Bush's admonition during his address to

Congress following the attacks that "no one should be singled out for unfair treatment or unkind

words because of their background or religious faith." They have also ignored Attorney General

Ashcroft's plea that "we must not descend to the level of those who perpetrated Tuesday's

violence by targeting individuals based on their race, their religion, or their national origin."


9.  Several federal laws expressly prohibit airlines from discriminating against an individual

because of that person's race, color, national origin, religion, sex, or ancestry. Specifically, 49

U.S.C.  § 40127(a) provides that an "air carrier or foreign air carrier may not subject a person in

air transportation to discrimination on the basis of race, color, national origin, religion, sex, or

ancestry," 49 U.S.C.  § 41702 requires that U.S. carriers provide safe and adequate

transportation, and 49 U.S.C.  § 41310 prohibits air carriers and foreign air carriers from

unreasonably discriminating against any person in foreign air transportation. Finally, 49 U.S.C.

§ 41712 prohibits unfair and deceptive practices by air carriers. As the Department of

Transportation noted in its Consent Order against United Air Lines, Inc., Docket OST-2011-

0003, November 1, 2011,"each of these provisions has been interpreted to prohibit air carriers

from discriminating on the basis of race, color, national origin, religion, sex, or ancestry. See

American Airlines, Inc., OST-2003-15046-18 (August 21, 2003) and United Air Lines, Inc.,

Order 2003-11-13 (November 19, 2003). As exemplified by its numerous Consent Orders against

several airlines, the Department of Transportation, pursuant to aforementioned federal laws have

made clear to airlines that discrimination against persons solely on the basis of their race, color,

national origin, religion, sex, or ancestry, is prohibited. Nevertheless, airlines like defendant,

egregiously and recklessly continue to discriminate against persons on the basis of their race,

**56**

color, national origin, religion, sex, or ancestry, in violation of federal and state civil rights, without regard to the individual's rights, as they did to Plaintiff.

10.  This suit is brought in response to one such egregious and reckless incident. In an overt and blatant act of racial discrimination, Plaintiff Charity Chidinma Emeronye Swift, a woman, an American citizen of African descent, was denied her right to board the plane at the gate, after defendant's agents had already issued her and her Caucasian husband (both attorneys), their boarding passes and cleared them for boarding, until she paid twenty-five dollars ($25.00) for her carry-on luggage, even though no one else including her husband who checked in while she was detained, was asked to pay for their carry-ons as Mrs. Swift was asked. Two of Defendant's ticketing personnel had already measured Mrs. Swift's carry-on, found it met Frontier's required measurement and gave her and her husband their boarding passes without asking them to pay for their carry-ons.

11. When Mrs. Swift arrived at the boarding gate and when it was her turn to board, she stood in line. It was at this time, that Frontier's agent who suddenly appeared at the gate (name unknown and designated "Jane Doe" in the caption of this case) threatened, degraded, intimidated vilified and humiliated Mrs. Swift, telling her she was going to call the airport security office to arrest her and she in fact, did – she yelled out over the heads of everyone at the gate and surrounding gates, "can someone call the airport security police for me." Frontier's agent Jane Doe's actions had no basis and were unwarranted, as Frontier's Customer Relations person Mrs. Swift complained to few days later, agreed with Mrs. Swift. Plaintiff brings this suit to make sure that

Frontier and its agent, is made accountable for their unlawful actions, and to ensure that no one in the future is subjected to the same kind of unlawful, humiliating and degrading treatment by Mrs. Swift received in the hands of Frontier and its agent.

## PARTIES

**Plaintiff**

12.  Plaintiff Charity Chidinma Emeronye Swift, is a black woman, a citizen of the United States of America, and a citizen and resident of the Commonwealth of Virginia. She is a native of the Federal Republic of Nigeria in West Africa. Charity Chidinma Emeronye Swift has an L.L.B. from the University of London and a L.L.M. from DePaul University, and has been admitted to the bar in New York. She is an attorney and a member of the law firm, Swift & Swift, Attorneys at Law, P.L.L.C. where she works with her husband Stephen Christopher Swift (a Caucasian), also a member and attorney of the firm.

**Defendants**

13.  Defendant Frontier Airlines, Inc. ("Frontier Airlines") is an air carrier engaged in the business of transporting passengers.  It is incorporated in Colorado.  Its corporate headquarters is located at: 7001 Tower Road, Denver, Colorado 80249.  Defendant Jane Doe is an employee of Frontier Airlines whose name is unknown.

**58**

14.  In February 2003, Frontier Airlines, Inc. received about seventy million dollars

($70,000,000.00), in federal financial assistance from the U.S. Department of Transportation,

pursuant to sections 101 and 103 of the Air Transportation Safety and System Stabilization Act,

P.L. 107-42.


### FACTS GIVING RISE TO THIS ACTION

15.  In August 2013, a father and son, both clients of Plaintiff's husband, invited Plaintiff and her

husband to the wedding of the son/client. Plaintiff and her husband accepted the invitation.

Despite their workload, Plaintiff and her husband managed to eke out time and planned to use

that opportunity to visit Yellow Stone National Park, which they had never seen before. On

August 19, 2013, Plaintiff and her husband booked two-way return flights, through their travel

agent, Air World Travel, from Ronald Reagan Washington National Airport, in Arlington,

Virginia, ("Reagan Airport") to Bozeman Airport, in Bozeman, Montana (Bozeman), and back to

Reagan Airport. The flight from Reagan Airport to Bozeman Airport was on United Airlines.

The flight from Bozeman Airport to Reagan Airport, was on Frontier Airlines, Inc. There was a

stopover at Denver Airport with both flights.


16.  Plaintiff and her husband had a total of two pieces of luggage - one carry-on luggage each.

They were told by their booking agent that carry-ons were free. This was confirmed when they

arrived at the appointed date, at Reagan Airport, and United Airlines did not charge them for

their two carry-on pieces of luggage. They had a no-hassle flight to and safely arrived at Denver

Airport. They departed Denver Airport, at 9:55 pm, and again, there was no charge for their two

carry-on pieces of luggage, and they checked in with their carry-ons like the rest of the travelers

on their flight. They had a no-hassle trip from Denver Airport to Bozeman on United Airlines.

They attended the wedding, which was beautiful and had a wonderful time. They also spent a

couple of days sightseeing nature's wonders, including the Old Faithful Geyser, one of the most

spectacular and glorious gifts nature has given America, that never failed to entertain by keeping

exact time! Their trip was magnificent, and seeing Yellow Stone made it a once in a lifetime trip,

and one that especially left Plaintiff with a glorious sense of awe, appreciation and unbridled joy,

until Frontier Airlines' agent Jane Doe, at the Denver airport boarding gate, snuffed all that from

Plaintiff, by her unlawful discriminatory treatment of her, and left her an emotional wreck.


17.  On September 4, 2013, Plaintiff and her husband, joyfully and gratefully bid farewell to their

hosts, Yellow Stone National Park, and the state of Montana. Plaintiff and her husband arrived at

Bozeman Airport and went to the Frontier's counter to check in and obtain their boarding passes

to Denver Airport. Defendant's ticketing agents at the Bozeman Airport checked them in, with

their two pieces of carry-on luggage and handed them their boarding passes without more. They

were not asked to pay anything for their carry-ons, and so they paid no charges, just like others,

who were not asked to pay anything when they checked in as they did, with only carry-on

luggage. At the boarding gate, Plaintiff and her husband presented their boarding passes as was

required and as everyone did, and were allowed to board the plane, again, with their carry-on

which was stowed in the overhead cabin of their assigned seats. Mrs. Swift and her husband's

flight on Frontier Airlines, from Bozeman to Denver Airport, was a no-hassle flight. They

arrived safely without any incident and again, they went to the Defendant's counter for their final

check in for the trip to Reagan Airport.

18.   When Mrs. Swift and her husband arrived at Frontier Airline's Denver counter to check in

and get a boarding pass for the flight to Reagan Airport, the younger (Plaintiff presumes) of two

of Frontier Airline's ticketing personnel, asked both Plaintiff and her husband whether they had

any luggage to check in. Plaintiff and her husband answered, "No!" All they had was their carry-

on luggage. The young lady then asked to see their carry-ons. Plaintiff and her husband showed

the lady their two pieces of carry-on luggage. She asked Plaintiff and her husband to place, their

luggage one at a time, into a metal measuring box to ensure that they had the right size of carry-

on. Plaintiff and her husband complied, and each carry-on luggage was certified as within the

carry-on luggage size for the purpose of fitting into the overhead cabin. After measuring each

luggage, she gave Mrs. Swift and her husband "thumbs up" and said, here you go, and handed

them their boarding passes (without asking them to pay for their carry-ons because there was no

reason to do so whatsoever, so they paid nothing, as they had done so far, to that point, on both

their trip over to and back from Montana). The young lady further advised them on the

appropriate gate to board their plane for Reagan Airport. They thanked her and proceeded to the

gate for boarding.


19.   Mrs. Swift and her husband arrived at the boarding gate and waited for a while before

boarding began, and until their "zone" – zone 2 – was announced for boarding. The flight was a

completely full flight and their boarding gate was A38. Gate A38 and the surrounding gates were

full of travelers waiting in their respective boarding gates. When zone 2 was called for boarding,

Plaintiff and her husband fell in line. There were fewer than four people in front of them.

Plaintiff was in front of her husband in the line, and each was carrying their own carry-on. The

**61**

two young women who earlier, checked them in and gave them their boarding passes, were at the gate letting people on-board. However, as Plaintiff was next in line, and just as she stretched her hand to hand over her boarding pass to one of the two young women, another woman ("Jane Doe") who was definitely older than the two young ladies that dealt with Plaintiff and her husband earlier, appeared and said, "give it to me", i.e. Mrs. Swift should giver Jane Doe her boarding pass. It happened so fast that Jane Doe basically snatched Mrs. Swift's boarding pass out of her hand.

20.  When Jane Doe took the boarding pass from Mrs. Swift's hand, instead of tearing and giving Mrs. Swift the assigned seat coupon part of it, as they were doing with other passengers, and let her pass to board the plane like others before her, Jane Doe, looked at Mrs. Swift and her carry-on and asked, "Is this your luggage?" Mrs. Swift answered "yes". Then Jane Doe said to her, "You have to pay twenty-five dollars before you can board." Mrs. Swift responded and asked her why she had to pay? Instead of explaining to Mrs. Swift what the fees was for, Jane Doe loudly, rudely and dismissively replied, "I have just told you, you have to pay for your carry-on luggage before I will allow you to board." Perplexed and thinking that Jane Doe thought her carry-on will not fit into the overhead cabin, and that that, was the reason Jane Doe was asking Mrs. Swift to pay for it, because she was going to tag it and check it into the plane cargo hold as most airlines do free of charge, and as Mrs. Swift is familiar with, so that she would not have to take it in with her, Mrs. Swift explained to Jane Doe that it will fit into the cabin, because the young lady behind her had already measured it and found that it was the right size. Jane Doe then raised her voice in anger and said to Mrs. Swift, "don't you understand English and that I said you must pay for your luggage before I can let you board this plane otherwise you are going nowhere." At

**62**

that point, everyone's attention was alerted and they were all now looking at Mrs. Swift as Jane Doe was yelling at her and bullying her in front of her husband and all the other passengers there, and around the adjoining gates, as if Mrs. Swift had done something wrong when in fact she did no such thing. As surprised, confused and furious as her husband was, he kept his self-control and said nothing as his wife's ordeal continued. Even Plaintiff's husband's high exercise of control and decorum in the face of Jane Doe's horrible treatment of his wife, did not faze Frontier's Jane Doe after she knew that Stephen Swift, the man standing behind Mrs. Swift, was her husband.

21. Mrs. Swift then asked Jane Doe, if that was the case, that she must pay for her carry-on, why was she and her husband not asked to pay on the whole trip by both United Airlines and Frontier Airlines, until that last leg of their journey, and why were they not told or asked for payment by this young lady (Plaintiff pointed at her), who checked them in earlier, gave them the thumbs up after measuring their carry-ons, gave them their boarding passes and told them to go board the plane? Jane Doe angrily waived Mrs. Swift off with her left hand and said, "Take your luggage and get out of this line, move over that way" (pointing to her left). All this time, Mrs. Swift's husband was standing right behind her with his own carry-on luggage, quietly watching what was going on without saying a word. Jane Doe, who continued tormenting Mrs. Swift, said nothing to her husband, and did not ask to see his boarding pass, or ask him to pay for his carry-on luggage.

22.  As Mrs. Swift and her husband moved aside, and off from their now boarding line, Mrs. Swift watched everyone else boarding without being asked to pay for their luggage before boarding. So, she asked Jane Doe, why was she the only one with a boarding pass who is asked to pay $25 before boarding the plane? She turned at Mrs. Swift and angrily threatened, "do you want me to make you pay fifty dollars ($50) or do you want to pay twenty-five dollars ($25)?" Mrs. Swift explained to Jane Doe that she failed to understand why she was singling her out to pay for her carry-on when the rest of the passengers were allowed to board without Jane Doe or anyone else asking them to pay before boarding. Mrs. Swift then asked Frontier's agent, "If I must pay, why are you not asking my husband also to pay because we both have carry-ons, booked same flight together, have exact same boarding passes?" Jane Doe then became irate and yelled at Mrs. Swift and said, "Shut your mouth, I don't want you to talk to me again, I have already told you, if you don't pay, I will make sure you don't board this flight." Mrs. Swift further explained to her that the matter was not paying $25, but the fact that she was singling her out to pay, as a condition of her boarding a flight she had already fully paid for, and after she had already been issued a boarding pass (usually, a boarding pass will not be issued to any passenger if that passenger is required to pay for their carry-on or luggage, before boarding, until after payment has been made) like the rest of the passengers, did not make sense to her, coupled with the fact, that all through the three flights that she and her husband had already made during the trip, two on United Airlines and one on Frontier Airlines (from Bozeman to Denver), no one asked them to pay, even at Frontier's check in counter, on that stopover, until Jane Doe showed up at the boarding gate and suddenly singled out Mrs. Swift to pay for her carry-on – same carry-on she had on all the flights, as a condition for her boarding her prepaid flight and final leg of her journey.

14

**64**

23.  At this point, Jane Doe got terribly angry at Mrs. Swift, and was so irate that, with the

loudest voice that she could muster, turned to Mrs. Swift and shouted: "Can't you see that I don't

care, and I don't want to hear you say anything more to me again, you pay or I will call the

airport security police to come and arrest you." At this time, the anger, embarrassment and

humiliation Mrs. Swift was feeling because of the way she was singled out and treated so

unfairly, and without any justifiable reason, turned to fear. Mrs. Swift feared that Jane Doe, was

so obviously full of hatred for her (even though she had never seen or met her before, and hardly

knew her), could actually call the police to arrest her, even though she had not disturbed the

peace, broken any law, and certainly was not a security or safety risk to the airplane, anyone

boarding it, or anyone around the gate or anywhere for that matter and has not done anything

against anyone including Jane Doe, that warranted her calling for Mrs. Swift's arrest. Suddenly

Mrs. Swift's heart started pounding and racing, and she started shaking allover. Mrs. Swift tried

to recover and get hold of herself. But before she could, as if Jane Doe, who was bullying and

tormenting her sensed that her horrible, abusive and intimidating actions towards Mrs. Swift has

affected her emotionally, and that she was hurting, yelled out on top of her voice, "Can someone

call me an airport security police?" This was knowingly intentional and hostile but it was clear

that Jane Doe relished her treatment of Mrs. Swift and the effect it was having on her, even

though she knew or must have known that it was not warranted or justified by any account. As

Mrs. Swift looked at, and turned from her husband, her eyes caught the young lady who issued

them their boarding passes. She was flushed and looked terrified herself as Mrs. Swift was. As

their eyes met, as if she wanted to tell Mrs. Swift something, she invitingly and almost in a

whisper, asked Plaintiff: "do you want to pay now?" Mrs. Swift replied "yes", and gave the

young lady her credit card. As she took payment she whispered her apologies to Mrs. Swift,

telling her that she was a new employee and that she was sorry that she could not do anything.


24.  All Jane Doe's actions towards Mrs. Swift happened in front of everyone in line at the gate,

and the surrounding gates. Jane Doe singled her out because she was a black woman of a

different national origin, in a place Jane Doe felt she had no business being - where everyone

else was white and she ridiculed Mrs. Swift because of Jane Doe's perceived accent of Mrs.

Swift that she did not like. When Jane Doe realized that the white man behind Mrs. Swift was

her husband, it infuriated her even more, as it was visibly apparent on her face and the way she

looked down on both Mrs. Swift and her husband. She rudely and angrily bullied, intimidated,

threatened and defamed Mrs. Swift by innuendo when she yelled out for someone to call the

airport security police to arrest her, even though she knew Plaintiff had done nothing illegal and

was not a flight risk by any imagination or standard and that Mrs. Swift had not behaved in

anyway unlawful, she did not behave in anyway disorderly, or disturbed the public peace

warranting her arrest by the airport police. By calling for the police, Jane Doe insinuated that

Mrs. Swift was a flight risk, had committed a crime, or was disturbing the peace or had behaved

in a disorderly manner warranting police presence and action. Frontier's agent knew her

insinuations were false, yet she recklessly made the statement without regard to Mrs. Swift's

rights and the effect it will have on her. In this country, people do not call the police to come and

arrest someone in front of the public if they have done nothing wrong. No one in this country has

the right to call the police to arrest someone because they are angry someone asked them

questions, or even debated with them on a subject. Were that to be the case, then the notion of

freedom of speech in America, would mean nothing.

25.  Jane Doe was hostile to Mrs. Swift. She unlawfully and intentionally, with malice, set out to discriminate, intimidate, humiliate, ridicule, and inflict emotional distress on Mrs. Swift, and in fact, did so, because she was a black woman and an African and of a different national origin as the rest of the passengers, including her own husband who is a Caucasian. Jane Doe hated Mrs. Swift because of who she was, her color, and her national origin, and treated her unfairly with unprovoked hatred and malice. Jane Doe's treatment of Mrs. Swift was so abhorrent to Mrs. Swift. She felt threatened, intimidated, humiliated, degraded and vilified. Jane Doe unlawfully and intentionally discriminated against Mrs. Swift and this made her very sick in her stomach, because she could not understand why and where such hate came from this woman she had never met in her life, because she did nothing to her or anyone to warrant such treatment, except for her being a Black African woman and of a different national origin from her and the rest of the people on that flight, including her own husband, and because Jane Doe could not stand Mrs. Swift's perceived accent.

26.  After Plaintiff paid, she and her husband were allowed to board the plane after everyone else had. Although Mrs. Swift's husband was allowed to board by Jane Doe, for reasons that she did not explain, Mr. Swift did not board the plane, he stood with his wife and they boarded the plane together after everyone had been allowed to board the plane. From the time her ordeal began, she watched while all other passengers, including her own husband, were allowed to board, without being asked to pay and did not pay for their carry-ons. She was the only one who was asked to pay.  Jane Doe was incensed when Plaintiff told her that Stephen was her husband and questioned why he too was not asked to pay as a condition for boarding the plane. Not only was

**67**

Mrs. Swift the only person who was asked to pay while she was standing there and watching, she was the only Black, African and/or African American passenger onboard that airplane. The rest of the passengers on that airplane were all white Caucasian men and women, including her husband.

27.  By the time Plaintiff and her husband boarded the plane, she was very distraught and as she sat in her seat, she cried her heart out. She felt devastated by the thought that she could have been arrested, had someone called the police as Jane Doe requested, taken away in front of everybody at the gate, and adjoining gates, perhaps in handcuffs as a criminal, even though she did nothing wrong, but just because she was a black and an African woman. She thought of the detrimental effect such news of her being arrested and/or detained by police at the airport would have on her reputation and her legal career, and how it would have caused her husband unnecessary and unwarranted anguish. These thoughts became the beginning of a lingering nightmare and sleeplessness that she suffered for a long time after, as a result of the incident.

28.  As Plaintiff walked through the isle to her assigned seat and just as she was about to sit down, a Frontier Airlines flight attendant in her uniform who was seated behind her seat, but was not part of the crew for the flight, who saw her crying, asked if she was O.K. She answered, "No!" That flight attendant asked Mrs. Swift what the matter was, and Mrs. Swift explained her ordeal to her. The flight attendant told her that what Jane Doe did was awful and that she did not understand why Jane Doe asked Mrs. Swift to pay for her carry-on. She apologized to Mrs. Swift, but told her that she cannot do more for her because she was not on duty.

**68**

29.  On returning home, the next day or so, Mrs. Swift called the Frontier Airlines Customer

Complaint line and complained about her ordeal at the hand of one of their employees. The lady

she spoke to, took her e-mail address and promised to report and/or investigate the matter and get

back with her. She in fact, did write Mrs. Swift after a week or so, but all she did was apologize,

and no explanation was given to Mrs. Swift as to why their employee singled out a black woman

and made her boarding a flight that she fully prepaid for, conditional on her paying a $25 carry-

on luggage fee, when no one else who was white Caucasian, including her own husband, was

charged such fee as a condition for boarding. Now as it turned out and as Mrs. Swift later

discovered after she filed her Complaint, she should not have been asked to pay any fees for her

carry-on and because Frontier's carry-on policies as regards passengers who bought their ticket

from third party travel agent, at the time Mrs. Swift and her husband purchased and used their

ticket, did not apply to passengers whose ticket was "Economy" but to those with a "Basic"

ticket, and Mrs. Swift and her husband's ticket was "Economy" ticket as the attached **Exhibit A**

shows.


30.  By the time Plaintiff and her husband arrived home from their trip, her ordeal in the hands of

Defendant's employee Jane Doe, cast a depressing cloud over Plaintiff's memorable happy

experiences of the wedding they attended that took them to Montana in the first place, and the

once in a lifetime experience she and her husband shared of the Yellow Stone National Park

wonders, including watching Old Faithful deliver its magic at the appointed time. Plaintiff spent

the rest of the year having nightmares about what happened and what could have happened to her

had the airport police arrested her. This recurring nightmare, coupled with sleepless nights as the

**69**

whole episode kept playing repeatedly in her head, and keeping her awake, not only made her feel humiliated and vilified, it also sapped her of energy that she needed to carry out her job as a lawyer.

31.  Plaintiff and her husband have been badly affected by this incident. The experience left Plaintiff's husband with a deep sense of disgust, anger and frustration, as he watched helplessly because he did not want to escalate matters, while Defendant's employee Jane Doe discriminated against his wife because she was a black African woman, married to a white man, and of a different national origin. To wit, the thought of the whole ordeal that in 2013 in America, a person could harbor such intense hate in their minds against another, solely on the basis of their skin color, background and national origin was shocking and terrifying to Mrs. Swift.

## REQUISITES FOR RELIEF

32.  By reason of Plaintiff's factual allegations as set forth above, there is actual controversy between Plaintiff and Defendants. A declaration from this court that Defendant Frontier Airlines, Inc., and its agent Jane Doe's actions, violated Plaintiff's rights is therefore necessary and appropriate.

33.  Defendants' continued discriminatory conduct will result in irreparable harm to plaintiff, including but not limited to violations of her legal rights. Plaintiff has no adequate or complete remedy at law to address the most invidious wrong described herein.  Plaintiff therefore seeks

**70**

injunctive relief restraining Defendants from engaging in the unlawful acts and practices described above.

## CLAIMS FOR RELIEF

### COUNT I: 42 U.S.C. § 1981 DISCRIMINATION IN THE MAKING AND ENFORCEMENT OF CONTRACTS

34.  Plaintiff re-alleges paragraphs 1 through 33 and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

35.  Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981 as amended guarantees all persons the same right to make and enforce contracts as non-African-Americans. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

36. The gate agents for Frontier Airlines Flight #720 on September 4, 2013, were at all relevant times, agents and/or employees of Defendant Frontier Airlines, Inc.

37.  Defendant is liable for the unlawful acts of its agents and employees directly and/or under the doctrine of *respondeat superior*.

**71**

38.  Defendants engaged in intentional discrimination based on Mrs. Swift's perceived race, color, ethnicity, and/or origin, in singling her out and making her paying for her carry-on a condition of her boarding the airplane even though others who were all white, were not asked to pay including Plaintiff's own husband, and even though Plaintiff had been issued a boarding pass and told she was OK for boarding just like the rest of the passengers on same flight #720 on September 4, 2013. In so doing, Defendants discriminated against Plaintiff in the making and enforcement of her contract with Frontier Airlines, her prepaid ticket to travel on Frontier Airline Flight #720 on September 4, 2013. Consequently, Defendants' unlawful actions have caused Plaintiff to suffer deprivation of her right to make and enforce contracts as enjoyed by white citizens under 42 U.S.C. § 1981.

39.  Defendants' actions were intentional, malicious, willful, wanton, and showed a callous, reckless disregard for Plaintiff's civil rights, and have directly and proximately caused Plaintiff financial injury and humiliation, degradation, mental anguish, pain, and suffering.

**COUNT II: TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. § 2000D)**
**Discrimination by Recipient of Federal Financial Assistance/Funding**

40.  Plaintiff re-alleges paragraphs 1 through 39 and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

**72**

41.  Defendant Frontier Airlines is a recipient of federal financial assistance, and so, is covered by Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000D). Title VI and its implementing regulations prohibit recipients of federal assistance and monies from discriminating on the basis of, among other things, race, color, or national origin. Plaintiff is a black African and Defendants discriminated against her because of her race, color and national origin. Defendants' actions in treating Plaintiff, who is black, so brazenly different from other passengers on flight #720, who were all white, including her own husband, on the basis of Plaintiff's perceived race, color, and/or national origin, constitute discrimination against Plaintiff in violation of Title VI and its implementing regulations.

42.  Defendants' actions were intentional, malicious, willful, wanton, and showed a callous, reckless disregard for Plaintiff's civil rights, and have directly and proximately caused Plaintiff financial injury and humiliation, degradation, mental anguish, pain, and suffering.

## COUNT III: BREACH OF CONTRACT

43.  Plaintiff re-alleges paragraphs 1 through 42 and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

44.  Mrs. Swift had a contract with Frontier Airlines when she purchased her ticket and paid for it in full, and complied with all the terms of her ticket, that she and her husband bought through a third party travel agent, in August and at all times during their flights in August/September, with same ticket. On the other hand, Frontier materially breached its contract of carriage as it applied

to passengers like Mrs. Swift, who purchased an "Economy" ticket as opposed to "Basic" Ticket. The breach (charging a passenger when they are not supposed to, that as a result caused Frontier's agent to unlawfully detain and prevent Mrs. Swift from boarding the plane), is a substantial failure to perform a term that is an essential element of Mrs. Swift's contract with Frontier, to transport Mrs. Swift from Bozeman airport to Reagan National airport, without violating Mrs. Swift's legal rights in the process. Frontier's breach caused Mrs. Swift substantial harm. Mrs. Swift was falsely imprisoned by Jane Doe – unjustified loss of freedom and liberty to board the plane after having prepaid for her flight, and Defendant breached its own contract Rule 35 – Refusal to Transport, when its agent refused Mrs. Swift transportation unless she paid $25.00, which Frontier had no right to charge Mrs. Swift for. Mrs. Swift reasonably expected she would be allowed to fly as a fully paid valid ticket holder when she purchased her ticket. Mrs. Swift suffered substantial harm because Frontier's agent defamed as a result of her actions, even though they were in breach of Frontier's policies. Mrs. Swift suffered serious emotional distress as highlighted above. The cumulative effect of nonmaterial breaches may be material. As a result of its breach of its contract of carriage with Mrs. Swift, Frontier is liable to Mrs. Swift, for Consequential and Compensatory damages.

45.  Mrs. Swift later discovered after filing her initial Complaint, that Defendants breached their own "Contract of Carriage," when they charged Mrs. Swift for her carry-on, because, according to their own policy, only passengers who purchased a "Basic" ticket through third parties, were required to pay for their carry-on – economy ticket holders were allowed to board free with their carry-ons. Although Mrs. Swift and her husband purchased their ticket from a third party, their ticket, was "Economy" and not "Basic." Also, according to Defendant's own policy, as posted on

24

**74**

their own website, carry-on fees for "Economy" ticket holders came into effect on April 28, 2014 and Mrs. Swift and her husband bought their ticket and travelled in August/September, 2013. Hence, Mrs. Swift was not required to pay for her carry-on and Defendants had no right or justification to charge her any fees for her carry-on, in the first place. **See Attached Exhibits A-H.** Defendants also, breached their own policy and "Contract of Carriage" Rule 35 – Refusal to Transport, when Jane Doe, unlawfully, without just cause detained, and refused to allow Mrs. Swift to board the plane, and in fact, restricted her ability and freedom to board the plane against her will and her rights, without just cause or justifiable reason. **See Attached Exhibit I.**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

(a) Declare that the actions of Defendant described above constituted discrimination on the basis of race, color, ethnicity, alienage, ancestry, and/or national origin in violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000D;

 (b) Enter a permanent injunction directing Defendant and its management, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(c) Award Plaintiff compensatory damages in an amount to be determined at trial for Plaintiff's loss and injury including, but not limited to, economic loss, shock, humiliation, embarrassment, emotional distress, and a deprivation of Plaintiff's right to make and enforce contracts, to travel

as a passenger in air transportation and enjoy such rights as white people regardless of her race, color, ethnicity, alienage, ancestry, or national origin;

(d) Award Plaintiff exemplary and punitive damages in an amount to be determined at trial that would punish Defendant for its willful, wanton, and reckless conduct and that would effectively deter Defendant from engaging in similar conduct in the future;

(e) Order Defendant to cease and desist from all future discrimination or retaliation against Plaintiff;

(f) Award Plaintiff prejudgment interest;

(g) Award reasonable costs incurred in this action; and

(h) Award such other relief as the Court deems appropriate and just.

**76**

**TRIAL BY JURY IS DEMANDED ON ALL ISSUES TRIABLE BY JURY**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues that can be tried by jury.

Respectfully submitted this 14th day of January, 2015.

*/s/ Stephen Christopher Swift*

Stephen Christopher Swift
Virginia State Bar ID No. 38419
Swift & Swift, Attorneys at Law, P.L.L.C.
21 Eisenhower Avenue, Suite 200
Alexandria, Virginia 22314-4688
Telephone: (703) 418 – 0000
Facsimile:  (703) 535 – 8205
E-mail: steve@swift.law.pro

*Attorney for Plaintiff*
*Charity Chidinma Emeronye Swift*

**77**

## CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2015, I electronically filed the foregoing and attached

Documents with the Clerk of Court, using the Court's CM/ECF system, which will automatically

cause all counsel of record to be served therewith.

> _/s/ Stephen Christopher Swift_
> Stephen Christopher Swift

**78**

# EXHIBIT

# A

```
SALES PERSON: AH        ITINERARY/INVOICE NO. 0047365      DATE: 19 AUG 13
                                     NHYHAY               PAGE: 01


        TO: AIR WORLD TRAVEL AND TRAIN
            6969 RICHMOND HWY SUITE 102
            ALEXANDRIA VA 22306
            703-660-9160
```

*Loretto*

```
FOR: EMERONYE/CHARITY
     SWIFT/STEPHEN


29 AUG 13  -  THURSDAY
    AIR    UNITED AIRLINES      FLT:1061    UNITED ECONOMY FOOD FOR PURCHASE
           LV WASHINGTON DULLES         524P            EQP: BOEING 757-300
                                                        03HR 43MIN
           AR DENVER                    707P            NON-STOP
                                                        REF: GPL6XP

           EMERONYE/CHARIT    SEAT-39A
           SWIFT/STEPHEN      SEAT-39B
    AIR    UNITED AIRLINES      FLT:6477    UNITED ECONOMY
           OPERATED BY /SKYWEST DBA UNITED EXPRESS
           LV DENVER                    955P            EQP: CANADAIR REGIONAL
                                                        01HR 41MIN
           AR BOZEMAN                  1136P            NON-STOP
                                                        REF: GPL6XP

04 SEP 13  -  WEDNESDAY
    AIR    FRONTIER AIRLINES     FLT:272     ECONOMY
           LV BOZEMAN                   233P            EQP: AIRBUS A319
                                                        01HR 32MIN
           AR DENVER                    405P            NON-STOP
                                                        REF: NHYIRZ

           EMERONYE/CHARIT    SEAT-5A
           SWIFT/STEPHEN      SEAT-5B
    AIR    FRONTIER AIRLINES     FLT:720     ECONOMY      FOOD FOR PURCHASE
           LV DENVER                    440P            EQP: AIRBUS A320
                                                        03HR 15MIN
           AR WASHINGTON REAGAN         955P            NON-STOP
           ARRIVE: TERMINAL A                           REF: NHYIRZ
           EMERONYE/CHARIT    SEAT-10A
           SWIFT/STEPHEN      SEAT-10B

20 JUN 14  -  FRIDAY
    OTHER WASHINGTON
           TAXES AND FUELS SERVICES CHARGES
SERVICE FEE   XD0592829346       EMERONYE CHARITY
                                 BILLED TO CAXXXXXXXXXXXXX8609        41.40*

SERVICE FEE   XD0592829347       SWIFT STEPHEN
                                 BILLED TO CAXXXXXXXXXXXXX8609        41.40*
```

CONTINUED ON PAGE 2

**80**

```
SALES PERSON: AH          ITINERARY/INVOICE NO. 0047365        DATE: 19 AUG 13
                                     NHYHAY                    PAGE: 02


        TO: AIR WORLD TRAVEL AND TRAIN
            6969 RICHMOND HWY SUITE 102
            ALEXANDRIA VA 22306
            703-660-9160


FOR: EMERONYE/CHARITY
     SWIFT/STEPHEN


AIR TICKET      UA7298187066        EMERONYE CHARITY
ELEC TKT                            BILLED TO CAXXXXXXXXXXXXX8609      328.80*
AIR TICKET      UA7298187067        SWIFT STEPHEN
ELEC TKT                            BILLED TO CAXXXXXXXXXXXXX8609      328.80*
AIR TICKET      F97298187068        EMERONYE CHARITY
ELEC TKT                            BILLED TO CAXXXXXXXXXXXXX8609      221.80*
AIR TICKET      F97298187069        SWIFT STEPHEN
ELEC TKT                            BILLED TO CAXXXXXXXXXXXXX8609      221.80*
                                                                ------------------
                                    SUB TOTAL                       1,184.00
                                    NET CC BILLING                  1,184.00*

                                    TOTAL AMOUNT DUE                    0.00

..PRICE 592.00 ADL INCL TAX AGENCY SERV FEES
..CH NAME CHARITY C EMERONYE
** IT IS THE PASSENGERS RESPONSIBILITY TO BE IN **
** POSSESION OF ALL NECESSARY DOCUMENTATION FOR **
**DESTINATION COUNTRY -VALID PASSPORT/VISA/ETC- **
******    AT THE  TIME OF DEPARTURE     ************
* ANY CHANGES IN YOUR TICKETS HAVE A PENALTY OF *
--ONCE TICKET IS ISSUED FOR DOMESTIC       USD 250.00
--ONCE TICKET IS ISSUED FOR LATIN AMERICA  USD 300.00
--ONCE TICKET IS ISSUED FOR EUROPE.ASIA    USD 380.00
DIFERENCE OF FARE CAN BE APPLIED TO THE NEW TICKETS
      **** HAVE A SAFE TRIP ****

.CA5466160049668609#10/15
.CODE 449
.7503 CALDERON CT UNIT F ALEXANDRIA VA 22306
.703-717-0126-CELL
```

81

# EXHIBIT

# B



**FRONTIER.**
AIRLINES
NAME EMERONYE/CHARIT
DATE 04SEP
FQTV
FLIGHT 272
ET1 422 7298187068

GATE        SEAT
1            5A

SEQ111 DEP BZN 0233P
ARR DEN 0405P
BOARDING TIME 158P
ZONE 2



**FRONTIER.**
AIRLINES
NAME SWIFT/STEPHEN
DATE 04SEP
FQTV
FLIGHT 272
ET4 422 7298187068

GATE        SEAT
1            5B

SEQ112 DEP BZN 0233P
ARR DEN 0405P
BOARDING TIME 158P
ZONE 2

**83**

# EXHIBIT

# C

**84**

**FRONTIER**
A I R L I N E S
NAME EMERONYE/CHARIT
DATE 04SEP
FQTV
FLIGHT  720
ET2 422 7298187085

GATE        SEAT
A38   10A

SEQ166 DEP DEN 0440P
        ARR DCA 0955P
BOARDING TIME  405P
            ZONE  2

**FRONTIER**
A I R L I N E S
NAME SWIFT/STEPHEN
DATE 04SEP
FQTV
FLIGHT  720
ET2 422 7298187085

GATE        SEAT
A38   10B

SEQ167 DEP DEN 0440P
        ARR DCA 0955P
BOARDING TIME  405P
            ZONE  2

**85**

# EXHIBIT

# D

**UNITED**

NAME: SWIFT/STEPHEN
DATE: 29AUG
FF#:
    GPL6XP
FLIGHT:UA  6477Y

GATE: **B87**                    SEAT: 7C

BOARDING GROUP:  **3**

01672981870674
BZN  ETICKET        **BOARDING PASS**

NAME:SWIFT/STEPHEN
99  DATE:29AUG        99
    FF#:
B1 638221      MILEAGE:

FLIGHT:UA  6477Y

GATE: **B87** SEAT: 7C
DEPART: 955P
    DENVER
ARRIVE:1136P
    BOZEMAN
BOARD TIME:  920P
01672981870674
A STAR ALLIANCE MEMBER ✪

---

**UNITED**

NAME: EMERONYE/CHARITY
DATE: 29AUG
FF#:
    GPL6XP
FLIGHT:UA  6477Y

GATE: **B87**                    SEAT: 7D

BOARDING GROUP:  **3**

01672981870663
BZN  ETICKET        **BOARDING PASS**

NAME:EMERONYE/CHARI
98  DATE:29AUG        98
    FF#:
B1 637977      MILEAGE:

FLIGHT:UA  6477Y

GATE: **B87** SEAT: 7D
DEPART: 955P
    DENVER
ARRIVE:1136P
    BOZEMAN
BOARD TIME:  920P
01672981870663
A STAR ALLIANCE MEMBER ✪

**87**

# EXHIBIT

# E

# FRONTIER

Plan and Book   Manage Travel   Ways to Save   Travel Information

**Frontier Enhances Services for Customers Using FlyFrontier.com**

*FlyFrontier.com Offers More Choice, Perks and Value*

**Category:**

General News
Wednesday, May 1, 2013 10:00 am MDT

**Dateline:**
DENVER

EmailPDFPrintRSS

**Public Company Information:**

NASDAQ:
RJET

"said David Siegel, Frontier's chief executive officer."

DENVER--(BUSINESS WIRE)--Frontier Airlines announces forthcoming changes to further reduce fares and to improve the travel experience for its most loyal customers, including those who book through FlyFrontier.com. Frontier will further differentiate its services by charging customers only for the services they use and make FlyFrontier.com the best place to book Frontier travel. Frontier guarantees that customers will get the best value at FlyFrontier.com with our Best Fare Guarantee.

**Carry-On Baggage**

Frontier's most loyal customers have made it very clear that finding overhead bin space for carry-on bags has become unacceptably difficult. In response, Frontier will be introducing a charge for carry-on bags for customers buying Basic fares through third party sites. All tickets sold at FlyFrontier.com include a carry-on bag with the fare.

FlyFrontier.com will become the only channel through which customers will continue to enjoy free carry-on bags on all tickets. Frontier encourages customers to save time and money by booking their travel at FlyFrontier.com, where they will always be able to choose their seats, earn more miles, and enjoy more perks, now including a carry-on item in the overhead bin at no additional charge.

This change will increase overhead space for Frontier's most loyal customers and speed the boarding process for all passengers. This change will take effect in summer 2013, with the start date to be announced later this spring."

Frontier will continue to offer all customers to carry one free personal item, no more than 18" x 14" x 8", on the aircraft, provided such item fits under the seat. A list of other items that are exempt from the carry-on bag fee can be found at FlyFrontier.com.

"With this change, we are ensuring that our most loyal customers - Ascent and Summit level members of *EarlyReturns®*, those who book Economy, Classic and Classic Plus tickets, including all customers who book through **FlyFrontier.com**, will have more space onboard the aircraft for their carry-on bags," said David Siegel, Frontier's chief executive officer. "As we unbundle our product further, we ensure those customers who want the absolute lowest fares can always find them at FlyFrontier.com."

Ascent and Summit level members of Frontier's *EarlyReturns®* program will continue to receive access to the overhead bins without additional charge. With some of the lowest elite qualification rates in the U.S. airline industry, it pays to be a loyal flier with Frontier.

Once this change has been implemented, Frontier bag fees will be priced as follows:

| Fare Type | Checked | Carry-on |
|---|---|---|
| Summit & Ascent | $0 | $0 |
| Classic Plus | $0 | $0 |
| Classic | $0 | $0 |
| Economy: lowest fares at FlyFrontier.com | First bag: $20 (when checking in at FlyFrontier.com) or $25 at the airport; Second bag: $20 | $0 |
| Basic: lowest fares through outside booking channels | First bag: $20 (when checking in at FlyFrontier.com) or $25 at the airport; Second bag: $20 | $25-100 (customers enjoy the lowest price by checking in at FlyFrontier.com) |

**1st Bag Fee**

The fee to check a first bag will remain $20 when purchased during on-line check-in at FlyFrontier.com but will increase to $25 when purchased at airport check-in for all Economy and Basic tickets booked on or after June 1, 2013 for travel on or after July 11, 2013.

Second bag fees for Economy and Basic bags remain unchanged at $20. Classic and Classic Plus tickets continue to receive two free checked bags.

**Onboard Beverages**

As part of the transformation into an Ultra Low Cost Carrier, Frontier will begin charging for onboard beverages this summer. Effective July 1, 2013, customers who purchase Economy or Basic fares will be charged $1.99 for coffee, tea, soda and juice. All on-board purchases continue to require a credit or debit card.

Beverages will continue to be free for Ascent and Summit level *EarlyReturns®* members, as well as for all customers who purchase Classic and Classic Plus fares, when they show their boarding pass or *EarlyReturns®* membership card.

All customers will now receive a full can of soda or juice and customers choosing coffee will be offered free refills. In addition, Frontier will be making improvements to its beverage selection,

including introducing a premium tea brand and Boyer's Premium 100% Arabica coffee, a Colorado brand.

"Frontier continues to make it easier for customers flying with Frontier to pay only for the services they use, which allows us to continue lowering fares," said Daniel Shurz, Frontier's senior vice president, commercial.

Frontier is proud to have an extensive onboard catering selection that includes a variety of buy on board food options, alcoholic beverages, and premium beverages. As Colorado's hometown airline, Frontier features Colorado brands in its onboard menu, including Rocky Mountain Chocolate Factory fudge, Izze sparkling beverages, and several Colorado-brewed beers.

*EarlyReturns* Frequent Flyer Mileage Earn Changes

FlyFrontier.com customers always earn a minimum of 100% of frequent flyer miles flown. Economy, Classic and Classic Plus ticket-holders will continue to receive 100%, 125% and 150% of miles flown, respectively, regardless of where booked. However, beginning July 1, 2013, Frontier will be changing its *EarlyReturns*® mileage accrual rate on Basic fares from 50% to 25% of miles flown.

Sign up for email updates at FlyFrontier.com/email-alert to receive special discounts and promotions only available to Frontier's email subscribers. Special offers are also available by following us on Twitter at Twitter.com/FlyFrontier or by liking us on Facebook at Facebook.com/FlyFrontier.

Frontier Airlines is a wholly owned subsidiary of Republic Airways Holdings, Inc. (NASDAQ:RJET).

*Frontier will charge a fee for carry-on luggage (larger than a personal item) for those who book Basic tickets after the announced date. Basic tickets are Frontier's lowest fare sold for travel through outside booking channels, including other travel websites. Basic fares are not sold through FlyFrontier.com, where Frontier sells its lowest fares as Economy tickets that include a carry-on bag, an advanced seat assignment, lower change fees, and more *EarlyReturns*® miles than Basic fares. Classic tickets include additional amenities including two free bags and no change fees prior to the day of travel. Classic Plus fares offer our maximum flexibility, including being fully refundable.

About Frontier Airlines

Frontier Airlines is a wholly owned subsidiary of Republic Airways Holdings, Inc. (NASDAQ: RJET), an airline holding company that also owns Chautauqua Airlines, Republic Airlines and Shuttle America. Currently in its 19th year of operations, Frontier offers service to more than 75 destinations in the United States, Mexico, Costa Rica, Jamaica and the Dominican Republic. The airline employs more than 4,000 aviation professionals, operating from its hub at Denver International Airport. For in-depth information on Frontier Airlines and to book tickets, visit FlyFrontier.com.

Contact:

Frontier Airlines
Kate O'Malley, 720-374-4560
media@flyfrontier.com

**FRONTIER**

Copyright 2014 Frontier Airlines Business Wire NewsHQ℠

—3—

# EXHIBIT

# F



Plan and Book    Manage Travel    Ways to Save    Travel Information

# Travel Information

## Baggage

- Carry-on Baggage
- Checked Baggage
- Special/Fragile Items
- Firearms & Ammunition
- Damaged/Lost Baggage

## Carry-On Baggage

Learn all about our carry-on baggage policies and requirements by selecting from the links below.

*Save Money by checking your bag — your 1st checked bag is cheaper than a carry-on bag!*

**Carry-On Baggage Allowances**

**Carry-On Bag Fees and Policies**

**Personal Item Policies**

**Exempted Items**

**TSA Carry-On Regulations**

## Carry-On Baggage Allowances

*Everyone, regardless of your **Fare Option**, is allowed to carry on one personal item for free.*

*To take a larger carry-on bag, you always pay our lowest fees at the time of purchase on FlyFrontier.com!*

Frontier offers two **Fare Options** that give you the ability to purchase travel that includes the amenities you need or want. **Classic Plus** fares include one carry-on bag and one personal item. **Economy** fares must pay a fee to take a carry-on bag on all domestic and international itineraries. This fee varies based on the point of purchase and is waived for Ascent and Summit level members of *EarlyReturns*.

Read below to learn more about **Carry-On Bag** and **Personal Item** requirements. We also allow all passengers to carry **Exempted Items** on our flights for free that do not count toward the carry-on allowance.

**93**

## Carry-On Bag Fees and Policies

### Carry-On Fees

Carry-On Baggage Fees vary based on the type of **Fare Option** you purchase and for *EarlyReturns* members with **Summit** and **Ascent** level status. Carry-On Bag fees also vary based on the point where a carry-on bag is purchased.

*For tickets purchased on or after April 28, 2014.*

The table below outlines our carry-on baggage fees for one-way directional travel wholly on Frontier Airlines for tickets purchased on or after **April 28, 2014.** For tickets purchased prior to **April 27, 2014,** please see the chart below.

|  |  | Classic Plus | Summit |
|---|---|---|---|
| **FlyFrontier.com — at time of initial travel purchase** | $25<br>Frontier's Discount Den members pay only $20 | Free | Free |
| **FlyFrontier.com — when Managing existing Reservations prior to travel** | $25 | Free | Free |
| **Frontier Reservations Call Centers — at time of initial travel purchase** | $25 | Free | Free |
| **FlyFrontier.com — during online check-in** | $30 | Free | Free |
| **Frontier Reservations Call Centers — when Managing existing Reservations prior to travel** | $35 | Free | Free |
| **Airport check-in — available** | $35 | Free | Free |

**94**

-2-

| Airport departure gate* | $50 | Free | Free |

\* If you are on an *Economy Fare* and arrive at the gate with a carry-on bag that exceeds the allowable dimensions (10" height x 16 width x 24" length), you will be charged $50 to gate check the bag. If you are on a **Classic Plus** Fare Option or if you are an **Ascent** or **Summit** level member of EarlyReturns and arrive at the gate with a carry-on bag that exceeds the allowable dimensions, you will be charged $35 to gate check the bag.

*Note: Active duty military personnel with ID (not including family members or traveling companions) will not be assessed carry-on bag fees.*

Standard *EarlyReturns* **Award Redemption Tickets** have the same baggage allowance and fees as Economy Fares. CHOICE and Last Seat Available *EarlyReturns* **Award Redemption Tickets** have the same baggage allowance and fees as Classic Plus Fares.

Note: All fees for a carry-on bag are non-refundable once paid, even if you later decide not to take a carry-on bag.

### For tickets purchased prior to April 27, 2014

The table below outlines our carry-on baggage fees for one-way directional travel wholly on Frontier Airlines for tickets purchased prior to **April 27, 2014**.

Carry-On Bag fees vary based on the point where a carry-on bag is purchased.

| Point of Purchase (for domestic and international travel) | Classic Plus | Economy Ascent | Summit Available |
|---|---|---|---|
| **FlyFrontier.com —available when managing a booking at My Flights or during online check-in** | Free | Free | Free |
| **Frontier Reservations Call Centers** | Free | Free | Free |
| **Airport check-in — available at ticket counter or self-service kiosk** | Free | Free | Free |

- 3 -

**95**

| Airport departure gate* | Free | Free | Free |
| --- | --- | --- | --- |

*\* Any customer on an Economy, Classic, or Classic Plus Fare Option and any Ascent or Summit level member of EarlyReturns who arrives at the gate with a carry-on bag that exceeds the allowable dimensions will be charged $35 to gate check the bag.*

*Note: Active duty military personnel with ID (not including family members or traveling companions) will not be assessed carry-on bag fees.*

Standard *EarlyReturns* Award Redemption Tickets have the same baggage allowance and fees as Economy Fares. CHOICE and Last Seat Available *EarlyReturns* Award Redemption Tickets have the same baggage allowance and fees as Classic Plus Fares.

Note: All fees for a carry-on bag are non-refundable once paid, even if you later decide not to take a carry-on bag.

### Sizes and Restrictions



A carry-on bag must not exceed 10" height x 16" width x 24" length, inclusive of all handles, wheels, and straps, and the bag can't weigh more than 35 pounds. A carry-on bag must fit underneath the seat or in an enclosed overhead bin.

If you have an **Economy Fare** and arrive at the gate with a carry-on bag that exceeds the allowable dimensions (10" height x 16" width x 24" length), you will be charged $50 to gate check the bag.

If you have a **Classic Plus Fare** or if are an **Ascent** or **Summit** level member of *EarlyReturns* and arrive at the gate with a carry-on bag that exceeds the allowable dimensions, you will be charged $35 to gate check the bag.

All carry-on baggage is subject to inspection by airport security and our personnel. We recommend that you put your name and contact information on each carry-on item.

**Personal Item Policies**

**96**

<u>Allowance</u>

Everyone is allowed to take one personal item onboard every Frontier flight on any **Fare Option** with no additional fee.

<u>Sizes and Restrictions</u>



You may carry-on one personal item that fits under the seat. This item must not exceed 18" x 14" x 8" in dimension, inclusive of all handles, wheels, and straps.

Personal items include:

- Handbag, purse, or pocketbook
- Backpack
- Briefcase
- Laptop computer, with or without a bag

All personal items are subject to inspection by airport security and our personnel.

## Exempted Items

A few items may be allowed to be carried on a flight for free by all passengers in addition to their one personal item. These items include:

- Assistive devices for qualified passengers with special needs
- Canes, crutches, braces, Portable Oxygen Concentrators, respiratory devices or other assistive devices
- A coat or wrap
- Infant/child diaper bag
- Infant/child safety seat used to transport an infant/child (if the child has a ticket and will be using the seat in flight, it must be an FAA approved safety seat)**
- A reasonable amount of reading material
- A foot rug (3' x 2' maximum) for use during prayer

*\*\*Approved car seats with a Federal Aviation Administration (FAA) red label stating: "This restraint device is approved for motor vehicle and aircraft use" are allowed on the aircraft. The approved seat should be no wider than 16 inches to fit in most seats. Strollers may be used to transport the child to the gate but will then be gate checked in the departing city. The stroller will be returned to the gate at your final destination.*

## TSA Carry-On Regulations

We're bound by some legal rules regarding carry-on bags. As stated by the Transportation Security Administration (TSA), "Prohibited items are weapons, explosives, incendiaries, and include items that

are seemingly harmless but may be used as weapons — the so-called 'dual use' items. You may not bring these items to security checkpoints without authorization."

Review a list provided by the TSA of permitted and prohibited items which may be included in carry-on baggage.

Review the 3-1-1 Liquids Rule.



Optional Fees  |  Terms of Use  |  Privacy  |  Contract of Carriage  |  Sitemap  |  Contact Us
FLYFRONTIER

Copyright 2014 Frontier Airlines

**98**

—6—

# EXHIBIT

# G

USCA4 Appeal: 12-1149    Filed: 05/11/2015    Pg: 103 of 216

Case 1:14-cv-01139-AJT-IDD    Document 45-7    Filed 01/14/15    Page 2 of 5 PageID# 374





**FRONTIER**     Plan and Book    Manage Travel    Ways to Save    Travel Information

## Plan and Book

Fees below apply to travel through April 27, 2014. Information for tickets purchased on or after April 28, 2014 can be found here.

### FARE OPTIONS

Select the level of flexibility and amenities that best suit your travel needs. Our Fare Options are available on all Frontier flights.

### EARLYRETURNS® TIERS

When you fly Frontier regularly, we reward your loyalty with valuable amenities.

| Available on all Frontier Flights | CLASSIC PLUS — Includes STRETCH seating, 1 checked bag, beverage, and fully refundable fare | CLASSIC — Includes STRETCH seating, 1 checked bag, and beverage | ECONOMY — Our lowest fare booked at FLYFRONTIER.COM | BASIC — Our lowest fare booked through other travel agencies | SUMMIT — 25,000 miles or 30 segments annually | ASCENT — 15,000 miles or 20 segments annually |
|---|---|---|---|---|---|---|
| **Free Advanced Seat Assignment** | STRETCH Seating | STRETCH Seating | STANDARD Seating | Seats assigned at check-in | STRETCH Seating | SELECT Seating |
| **STRETCH Seating Upgrade** (limited by capacity and availability) | **$0** Eligible at purchase or at check-in | from **$0** Eligible at purchase or at check-in | from **$15\*** Eligible at purchase or at check-in | from **$15\*** Eligible at purchase or at check-in | **$0** Eligible at purchase or at check-in | **$0** Eligible at purchase (follows fare option for advance assignment) |
| **Advanced SELECT Seating Upgrade** (limited by capacity and availability) | **$0** | **$0** | **$5** | **$15** Through Manage Reservations | **$0** Eligible at purchase or at check-in | **$0** Eligible at purchase or at check-in |
| **Advanced STANDARD Seating Upgrade** (limited by capacity and availability) | **$0** | **$0** | **$0** | **$8** Through Manage Reservations | **$0** Eligible at purchase or at check-in | **$0** Eligible at purchase or at check-in |
| **Fully Refundable Fare** | ✓ | | | | Follows fare option purchased | Follows fare option purchased |
| **Priority Services** (check-in, security access, and boarding where available) | ✓ | ✓ | | | ✓ | ✓ |
| **On-board Beverages** | ✓ Unlimited non-alcoholic drinks and one alcoholic drink | ✓ Unlimited non-alcoholic drinks and one alcoholic drink | From $1.99 | From $1.99 | ✓ Unlimited non-alcoholic and alcoholic drinks | ✓ Unlimited non-alcoholic drinks |
| **1st Checked Bag** | ✓ | ✓ | $20 at check-in on FlyFrontier.com / $25 for check-in at airport | $20 at check-in on FlyFrontier.com / $25 for check-in at airport | ✓ | ✓ |

USCA Case #14-5196    Document #1571069    Filed: 05/11/2015    Pg: 104 of 216

| | | | | | | |
|---|---|---|---|---|---|---|
| **2nd Checked Bag** | **$30** | **$30** | **$30** | **$30** | ✓ | ✓ |
| **Carry-On Bag** | ✓ | ✓ | ✓ | $0 for all tickets purchased through August 5, 2013<br><br>$25-$100** for all tickets purchased on or after August 6, 2013 | ✓ | ✓ |
| **Personal Item** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Same-day Standby** | ✓ | ✓ | | | ✓ | ✓ |
| **Itinerary Change Fee** (made prior to day of travel, fare difference may apply) | **$0** | $0 for tickets purchased through July 7, 2013<br><br>$25 for tickets purchased on or after July 8, 2013, through Sept. 30, 2013<br><br>$75 for tickets purchased on or after Oct. 1, 2013 | $50 for tickets purchased through July 7, 2013<br><br>$75 for tickets purchased on or after July 8, 2013 | $100 for tickets purchased through July 7, 2013<br><br>$125 for tickets purchased on or after July 8, 2013 | **$0** | Follows fare option purchased |
| **Confirmed Alternate Flight Change** (made on same day of travel) | **$0** | **$25** | **$50** | **$100** | **$0** | Follows fare option purchased |
| **Name Change Fee** (plus fare difference if applicable) | **$0** | $0 for tickets purchased through Sept. 30, 2013<br><br>$50 for tickets purchased on or after Oct. 1, 2013 | **$50** | **$100** | | Follows fare option purchased |
| **Unaccompanied Minor Fee** | **$100** | **$100** | **$100** | **$150** | **$0** | **$0** |
| **Pet In Cabin Fee** | **$75** | **$75** | **$75** | **$125** | Follows fare option purchased | Follows fare option purchased |
| **EarlyReturns® Mileage Credit / Elite Qualification Miles** | **150%** | **150%** | **100%** | **25%** | **50%** BONUS on all fare options [1,2] | **25%** BONUS on all fare options [1,2] |

\* Price listed is per segment.

** Price varies depending upon point of purchase: $25 at FlyFrontier.com, $35 through Frontier's Reservation Call Centers, $50 at airport check-in counters and kiosks, and $100 at the airport gate.

[1] Ascent and Summit members receive 100% of mileage credit when purchasing the Basic Fare plus applicable bonus miles.
[2] Ascent and Summit bonus miles do not count toward elite status qualification.





**Available on Great Lakes Codeshare Flights**

| | | | | | Follows fare option purchased | Follows fare option purchased |
|---|---|---|---|---|---|---|
| Fully Refundable Fare | ✓ | | | | | |
| 1st Checked Bag | ✓ | ✓ | $20 at check-in on FlyFrontier.com / $25 for check-in at airport | $20 at check-in on FlyFrontier.com / $25 for check-in at airport | ✓ | ✓ |
| 2nd Checked Bag | $30 | $30 | $30 | $30 | ✓ | ✓ |
| Carry-On Bag | ✓ | ✓ | ✓ | $0 for all tickets purchased through August 5, 2013 — $25-$100** for all tickets purchased on or after August 6, 2013 | ✓ | ✓ |
| Personal Item | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Same-day Standby | ✓ | ✓ | | | ✓ | ✓ |
| Itinerary Change Fee (made prior to day of travel, fare difference may apply) | $0 | $0 for tickets purchased through July 7, 2013 — $25 for tickets purchased on or after July 8, 2013 through Sept. 30, 2013 — $75 for tickets purchased on or after Oct. 1, 2013 | $50 for tickets purchased through July 7, 2013 — $75 for tickets purchased on or after July 8, 2013 | $100 for tickets purchased through July 7, 2013 — $125 for tickets purchased on or after July 8, 2013 | $0 | Follows fare option purchased |
| Confirmed Alternate Flight Change (made on same day of travel) | $0 | $25 | $50 | $100 | $0 | Follows fare option purchased |
| Name Change Fee (plus fare difference if applicable) | $0 | $0 for tickets purchased through Sept. 30, 2013 — $50 for all tickets purchased on or after Oct. 1, 2013 | $50 | $100 | $0 | Follows fare option purchased |
| Unaccompanied Minor Fee | $100 | $100 | $100 | $150 | $0 | $0 |
| Pet In Cabin Fee | $75 | $75 | $75 | $125 | Follows fare option purchased | Follows fare option purchased |
| EarlyReturns® Mileage Credit / Elite Qualification Miles | 150% | 150% | 100% | 25% | 50% BONUS on all fare options [1,2] | 25% BONUS on all fare options [1,2] |

** Price varies depending upon point of purchase: $25 at FlyFrontier.com, $35 through Frontier's Reservation Call Centers, $50 at airport check-in counters and kiosks, and $100 at the airport gate.

[1] Ascent and Summit members receive 100% of mileage credit when purchasing the Basic Fare plus applicable bonus miles.
[2] Ascent and Summit bonus miles do not count toward elite status qualification.

USCA Case #14-1139    Document #1547398    Filed: 05/11/2015    Pg: 106 of 216

| FREQUENT FLYER | CUSTOMER SERVICE | PROGRAMS & SERVICES | CAREERS | WHO WE ARE |
|---|---|---|---|---|
| My Account | Customer Commitment | Corporate Programs | Ongoing Opportunities | Company Profile |
| How It Works | Lost and Found | Groups & Charters | Why Frontier | Corporate Responsibility |
| Get Miles | FAQs | Frontier Cards | About the Process | Press Kit |
| Use Your Miles | Contact Us | Travel Agents | Benefits | Our Fleet |
| Hot Offers | | | Our Culture | |
| Join EarlyReturns | | | | |



Sign up today and get savings on top of savings!

[                    ]  SUBSCRIBE

Optional Fees  |  Terms of Use  |  Privacy  |  Contract of Carriage  |  Sitemap  |  Contact Us

FLYFRONTIER    

Copyright 2014 Frontier Airlines

# EXHIBIT

# H

USCA4 Appeal: 15-1261   Doc: 14   Filed: 05/11/2015   Pg: 108 of 216

# FRONTIER

**CONTRACT OF CARRIAGE**

## Rule 180 - Stopovers

A. A Stopover, as defined in _Definitions_, is not permitted except as otherwise provided in the Fare Rules.

B. Where a routing or fare specifically excludes a Stopover or the passenger's ticket does not include an interruption in the trip, and a Stopover at an intermediate point occurs, a higher fare is collected based on the sum of the local fares.

## Rule 185 - Routings

Each fare applies only to transportation via the cities specified on the ticket in connection with a specific fare. Transportation between any two cities must meet routing requirements as specified by the fare filing.

## Rule 190 - Baggage Acceptance

A. General – The Airline will accept for transportation as baggage such personal property necessary or appropriate for the wear, use, comfort, or convenience of the passenger for the purpose of the trip, subject to the following:

   1. An item for transportation not suitably packaged to withstand ordinary handling, or of a size, weight or character that renders it unsuitable for transportation will not be accepted.
   2. All baggage is subject to inspection by the Airline. However, the Airline is not obligated to perform an inspection. The Airline will refuse to transport or will remove baggage if the passenger refuses to submit the baggage for inspection.
   3. The Airline has the right to refuse to transport baggage on any flight other than the one carrying the passenger.
   4. The Airline will not accept baggage or other personal property for storage.
   5. The Airline will check baggage only when the passenger presents a valid ticket for transportation on the Airline, or on the Airline and one or more other carriers with whom the Airline has a ticketing and baggage agreement.
   6. The Airline will not accept any item that contains or has contained any type of flammable liquid (e.g., gas, propane, butane) used as fuel. This does not include personal smoking material.
   7. The passenger's name, address and telephone number must appear on the baggage.
   8. Baggage will not be checked:
      a. To a point that is not reflected in the passenger's routing.
      b. Beyond the passenger's next point of stopover; or if there is no stopover, beyond the final destination designated on the ticket.
      c. Beyond a point at which a passenger wants to reclaim all or a portion of the baggage.
      d. Beyond the point to which all applicable charges have been paid.
      e. Beyond the point at which the passenger is to transfer to a connecting flight, if that flight is scheduled to depart from an airport different from the one at which the passenger is scheduled to arrive.

B. Live Animals – Live animals are accepted for transport in the cabin only. For provisions on acceptance and transportation of animals, see _Rule 55 - Service Animals_ and _Rule 195 - Conditions and Charges for Special Items_.

---

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

# FRONTIER

## CONTRACT OF CARRIAGE

C. International Operations – Agricultural items, perishable items, or products that do not conform with Customs and/or Agricultural government entities on any flights to or from a foreign destination will not be accepted.

D. Restricted Items – Excepted restricted/hazardous materials as defined in the DOT Hazardous Materials Regulations (49 CFR 175.10) and IATA Dangerous Goods Regulations may be accepted. Refer to _Rule 195 - Conditions and Charges for Special Items_.

E. Fragile and Perishable Items – Items must be packaged properly such that they cannot leak through the packaging and are checked in cardboard boxes. Perishable items required to maintain temperature cannot use wet-ice, defined as ice made only from water. The Airline will accept liability for the loss of items that are packaged and checked in cardboard boxes, including boxes provided by the Airline in accordance with _Rule 230 - Claim Limits And Procedures_. However, fragile or perishable items without appropriate packaging are accepted only upon execution of a Limited Release Baggage Tag, relieving the Airline from liability for damage or loss of items. Refer to _Rule 195 - Conditions and Charges for Special Items_.

## Rule 195 - Conditions and Charges for Special Items

The following items are accepted as checked or carry-on baggage, subject to the conditions specified and payment of applicable charges. Refer to _Rule 220 - Baggage Allowance_ for baggage requirements including dimensions (linear inches = height + width + length). Carry-on items may not exceed the baggage allowance dimensions.

Refer to the Sports Equipment and Special/Fragile Items chart hosted at www.FlyFrontier.com for other items which have specific packaging or other requirements which need to be met in order to be transported by air. All items listed on the Sports Equipment and Special/Fragile Items chart are subject to baggage fees. Baggage fees for excess, oversize, and overweight are cumulative and all may be assessed on one item.

NOTE : _The Airline does not allow unaccompanied baggage in the cabin of the aircraft._

The following items have specific transport requirements and may incur a special fee as needed:

A. Shooting Equipment – Items of shooting equipment are accepted as checked baggage on flights within the United States. Carriage of any firearm is subject to the conditions specified below:

1) In accordance with federal law, a passenger who presents baggage that contains a firearm must:

   a) Ensure the firearm is unloaded.

   b) Pack the firearm in a lockable, hard-sided container.

   c) Declare the firearm unloaded at the time of check-in and sign a "Firearms Unloaded" declaration.

      i. If the firearm is in a locked, hard-sided container INSIDE a piece of checked baggage, the declaration must be placed inside the checked baggage and proximate to, but not inside of, the locked, hard-sided container containing the firearm.

      ii. If the firearm is in a locked, hard-sided container, but NOT INSIDE a piece of checked baggage, the declaration must be placed inside the locked, hard-sided container containing the firearm.

   d) After screening, the passenger must lock the firearm container and retain the key or combination.

   e) The passenger must make arrangements and assume full responsibility for complying with any applicable laws, customs and government regulations, or restrictions of the state or territory to which the firearm is being transported.

---

**Rule 195 - Conditions and Charges for Special Items**

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

# FRONTIER

## CONTRACT OF CARRIAGE

Rev48 10/01/13

2) Ammunition must be securely packed in the original manufacturer's packaging, fiber (such as cardboard), wood or metal boxes or other sturdy and durable packaging providing sufficient cartridge separation.

   a) Each passenger is allowed up to 11 pounds of ammunition.

   b) Loaded ammunition clips and magazines must also be securely boxed

   c) Ammunition may be packed with the firearm.

3) International Operations – Firearms, ammunition, or archery shooting equipment are not accepted on flights to or from a foreign destination.

   EXCEPTION:  Passengers traveling between the United States and Canada are allowed to transport hunting rifles and shotguns only. See paragraphs 1, 2, and 3 under A. *Shooting Equipment* in this rule for conditions of acceptance.

B. Live Animals – The Airline accepts live animals in the cabin of the aircraft only. Seat restrictions apply depending on the aircraft type. The transportation of live animals is subject to fees for carriage and the terms and conditions below.

   EXCEPTION:  This rule does not apply to transportation of service animals referred to in *Rule 55 - Service Animals*.

1) Carriage in the cabin – Live animals may be transported in the cabin according to the following conditions:

   a) A one-way, directional fee will be assessed at check-in based on the fare option purchased.

| | **Basic** | **Economy** | **Classic** | **Classic Plus** |
|---|---|---|---|---|
| **Service Fee** | USD 125 | USD 75 | USD 75 | USD 75 |

   b) Live animals allowable for carriage in the cabin are:

      i. Domesticated dogs, cats, rabbits, guinea pigs, hamsters, or small household birds on flights within the United States. No exceptions.

      ii. Domesticated dogs and cats only may be carried to or from foreign destinations.

   c) Passengers are responsible for:

      i. Making arrangements and assuming full responsibility for complying with any applicable laws, customs and other governmental regulations, requirements or restrictions of the country, state or territory to which the animal is being transported.

      ii. Providing required health documents when traveling to/from a foreign destination as described in *Documentation*.

      iii. Making advance reservations as no more than ten pet containers will be accepted per flight and no more than one pet container may be carried per person.

   d) A pet in its container counts toward the carry-on baggage allowance. Refer to *Rule 220 - Baggage Allowance*.

   e) The travel container must be large enough for the pet to stand, turn around, and lie down in a natural position and fit underneath the seat in front of the passenger.

---

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

USCA4 Appeal: 15-1261    Doc: 14    Filed: 05/11/2015    Pg: 111 of 216

# FRONTIER

**CONTRACT OF CARRIAGE**

f) The pet must remain in the travel container at all times and may not be fed while onboard the aircraft. A pet may not disrupt other passengers; the owner must be able to quiet the pet without removing it from the container.

g) No oxygen will be administered to a pet in the event of an emergency.

2) Documentation

Each country has different entry requirements. It is the passenger's responsibility to ensure compliance with any applicable laws, customs and other governmental regulations, requirements or restrictions of the country, state or territory to which the animal is being transported. In addition, some countries have import/export fees.

a) A veterinary health certificate is required for all pets traveling to a foreign destination:

   i. Dated within 10 days of entry into the United States.

   ii. Dated within 2 weeks of entry into Costa Rica.

   iii. Dated within 5 days of entry into Mexico.

   iv. Dated within 15 days of entry into the Dominican Republic.

   v. Pets are not accepted to/from Jamaica.

b) A Vaccination Certificate is required for all adult dogs and cats traveling to a foreign destination. If vaccination information is not included on the health certificate, a separate vaccination certificate must be dated following the health certificate guidelines:

   i. Adult pets are three months of age or older for all destinations except Costa Rica. Costa Rica defines adult pets as 4 months of age and older.

   ii. The certificate must prove the pet has been vaccinated against rabies no more than one year and no less than 30 days prior to international travel. If a pet received a rabies booster less than 30 days before an international flight, proof of the prior rabies shot is required

   iii. Each country has vaccination requirements beyond rabies. Consulates can provide more information regarding other diseases for which your pet must be vaccinated.

   NOTE:   Puppies and kittens do not require a vaccination certificate as stated above; however, the pet must be in good health.

c) Large enough to allow the animal to stand up and turn around and to lie in a natural position.

C. Wheelchairs – In compliance with federal law, wheelchairs or other types of mobility devices are accepted as checked baggage in addition to the passenger's baggage allowance at no additional charge. Some passengers may have more than one device to check. There is no additional fee.

The wheelchair is carried in the cargo compartment of the aircraft and is subject to the liability described in *Rule 230 - Claim Limits And Procedures*. Refer to www.FlyFrontier.com for more information regarding the carriage of wheelchairs.

Some types of aircraft flown by Frontier and regional affiliates cannot accommodate wheelchair stowage in the cabin. Two types of aircraft that can accept wheelchairs can accept the following types: manually powered, collapsible or non-collapsible, and electric-powered with spillable or non-spillable batteries. The two types of aircraft that can accept wheelchairs have the following requirements:

1) Airbus aircraft (319, 320) can accommodate one wheelchair in the cabin of the aircraft on a first-come, first-served basis.

---

**Rule 195 - Conditions and Charges for Special Items**                  Pg. 24 of 39

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document

USCA4 Appeal: 15-1261    Doc: 14    Filed: 05/11/2015    Pg: 112 of 216

# FRONTIER

**CONTRACT OF CARRIAGE**

a) The device may not exceed a height of 40 inches, a length of 50 inches, a width of 13 inches, and must weigh no more than 70 pounds. A larger device is accepted provided it collapses or folds to meet the maximum dimensions.

b) The device is placed and stowed in the last row of seats and will be brought to the front of the aircraft after all the other passengers have deplaned.

2) ERJ-190 aircraft can accommodate one wheelchair in the cabin of the aircraft on a first-come, first-served basis.

    a) The device may not exceed the following dimensions: 13 inches by 36 inches by 42 inches and must weigh no more than 90 pounds. A larger device is accepted provided it collapses or folds to meet the maximum dimensions.

    b) The device is placed and stowed between the forward bulkhead and Row 1 aircraft right and the passenger can receive the wheelchair at arrival after all the other passengers have deplaned.

    c) If the device is battery powered, the battery must be removed, placed in a wheelchair battery box, and stowed in the cargo compartment.

D. Human Remains – May be transported under certain conditions as follows:

1) Crematory remains (human or animal) may be transported as carry-on or checked baggage.

    a) The container must be made of a material such as wood or plastic that can be successfully screened by the Transportation Security Administration (TSA).

    b) TSA will not open the container under any circumstances.

    c) If the container cannot be screened, it will not be allowed.

    d) If the urn is checked, it must be sufficiently packaged in a well-insulated and sturdy container. If the urn is carried on, it must meet carry-on baggage dimensions. Refer to *Rule 220 - Baggage Allowance*

2) Human remains in caskets are not accepted.

E. Dry Ice (Carbon Dioxide, solid) – May be transported under certain conditions as follows:

1) A maximum of 5.5 lbs of dry ice per passenger is accepted in checked or carry-on baggage.

2) The cooler or package must permit the release of carbon dioxide gas. Styrofoam containers are not accepted.

3) Dry ice in checked baggage is subject to a special handling fee of $50 in addition to any other applicable baggage fees.

F. Bicycle - May be transported under certain conditions as follows:

1) Bicycles must have the handlebars fixed sideways and the pedals removed and encased in a protective, durable case or box.

2) Pedals do not need to be removed if wrapped in plastic foam or similar material.

3) Frontier is only liable for damage if the bicycle is packaged in a hard-sided case.

4) A $75 fee applies for each bicycle checked as baggage. The fee applies for tickets purchased on or after December 15, 2013 for travel on or after June 13, 2014.

---

        **Rule 195 - Conditions and Charges for Special Items**

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

# FRONTIER
## CONTRACT OF CARRIAGE

Rev 50 12/15/13

## Rule 205 - Checked Baggage and Carry-On Baggage

A. Checked Baggage – The Airline will check a passenger's baggage subject to the conditions specified below:

1) Minimum cut-off times:
   a. For domestic flights, check-in must be completed at least 45 minutes prior to departure.
   b. For international flights, check-in must be completed at least 60 minutes prior to departure.

2) Baggage must be checked at the airport prior to the minimum cut-off time. Due to government regulations that require 100% baggage screening, a passenger checking baggage at a ticket counter after the minimum cut-off time prior to the flight's departure may be denied boarding.

3) The passenger's name, address, and telephone number must appear on the baggage.

4) The Transportation Security Administration (TSA) website contains a list of items that passengers are not permitted to check in baggage. Visit www.tsa.gov for a complete list of Prohibited Items.

B. Carry-On Baggage

1) TSA limits carry-on items to one bag plus one smaller personal item per passenger. Refer to *Rule 220 - Baggage Allowance*.

2) TSA's website contains a list of items that passengers are not permitted to carry on board an aircraft. Visit www.tsa.gov for a complete list of Prohibited Items.

3) The passenger is responsible for all items brought on board the aircraft. Items must be stored under a seat or in the overhead compartment approved for carriage of such baggage.

   a) Portable Electronic Devices – All electronic devices must be turned off and stowed for taxi, take-off, and landing. To avoid disturbances to the aircraft's electronic navigation equipment, certain portable electronic devices that receive and transmit an electronic signal cannot be used onboard the aircraft at any time. Devices that have an airplane-safe mode or do not transmit an electronic signal may be used onboard the aircraft once the flight attendant has confirmed that it is safe to use them.

      EXCEPTION:    It is permissible to use cellular and mobile phones and paging devices on the aircraft once the flight attendant has announced that it is safe.

## Rule 215 - Cabin-Seat Baggage

Cargo stowed inside the main cabin of the aircraft and occupying a passenger seat is referred to as Cabin-Seat Baggage or Cargo in the Cabin.

A. Cabin-Seat Baggage – May be transported on flights operated by Frontier, regional affiliates, and Codeshare flights. Cabin-seat baggage is not accepted on flights operated by Great Lakes Aviation. The following restrictions apply:

1) The Airline charges 100% of the full adult fare for that portion of the trip on which the extra seat is used.
   • Additional baggage cannot be checked in under the Cabin Seat Baggage ticket.

2) The item needs to be packaged or covered in a manner to avoid possible injury to passengers and crew.

3) Cabin-seat baggage must be carried aboard the aircraft by the passenger.

4) The item must fit in the seat without blocking aircraft signage or extending into the aisle and be secured with a seatbelt or other approved method.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

USCA4 Appeal: 15-1261    Doc: 14    Filed: 05/11/2015    Pg: 114 of 216

# FRONTIER

**CONTRACT OF CARRIAGE**

5) Certain seats may not accommodate cabin seat baggage. The Airline will assign seats as appropriate.
   - If the item must be accommodated into a STRETCH seat due to its size or at the passenger's request, the STRETCH seat fee applies.

6) The Airline is not responsible for damage to cabin seat baggage carried in the passenger compartment of the aircraft.

7) Cabin-seat baggage is not included as part of the passenger's baggage allowance and is not subject to excess baggage charges.

## Rule 220 - Baggage Allowance

Standard checked baggage may not exceed 62 inches in linear dimension or weigh more than 50.0 pounds. Additional fees apply to items which exceed size and weight limitations. Refer to *Rule 225 - Excess, Oversize, and Overweight Baggage Charges*.

A. The cost for each checked bag varies by the type of ticket purchased.

   1) Basic Tickets – There is no free baggage allowance included with Basic tickets. Baggage fees apply to each checked bag. Refer to *Rule 225 - Excess, Oversize, and Overweight Baggage Charges*.

   2) Economy Tickets – There is no free baggage allowance included with Economy tickets. Baggage fees apply to each checked bag. Refer to *Rule 225 - Excess, Oversize, and Overweight Baggage Charges*.

   3) Classic Tickets – Passengers receive two free bags for tickets purchased on or before July 20, 2013 for travel on or before January 5, 2014. Passengers receive one free bag for tickets purchased on or after July 21, 2013 for travel on or after January 6, 2014.

   4) Classic Plus Tickets – Passengers receive two free bags for tickets purchased on or before September 30, 2013 for travel on or before March 23, 2014. Passengers receive one free bag for tickets purchased on or after October 1, 2013 for travel on or after March 24, 2014.

   5) *EarlyReturns®* Summit members traveling with passengers in the same PNR or with immediate family members not in the same PNR may check two bags each at no charge for all types of tickets.

   6) *EarlyReturns®* Ascent members only may check two bags each at no charge for all types of tickets. Traveling companions whether or not in the same PNR are subject to all baggage fees.

   7) Active duty military personnel, reservists traveling with orders, and military personnel traveling in uniform may check bags at no charge for all types of tickets. This policy is for active duty military personnel only and does not extend to family members or traveling companions.

   NOTE: *Special/Fragile Item fees do apply.*

B. Baggage Allowance Exceptions – The following items may be checked or carried on at no charge.

   1) Medical Assistive Devices: Canes, crutches, braces, wheelchairs, etc. There is no limit to the number of mobility aids a passenger may check.

   2) Essential Infant or Child Items: Child restraint devices, car seats, strollers, and diaper bags when the infant is traveling.

C. Carry-On – A passenger may take one piece of carry-on baggage onto the aircraft. A charge may apply for the carry-on bag depending on the ticketed Fare Option.

   1) Airbus Aircraft:

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

USCA4 Appeal: 15-1261    Doc: 14    Filed: 05/11/2015    Pg: 115 of 216

# FRONTIER

**CONTRACT OF CARRIAGE**

- – Carry-on Baggage: Maximum dimensions are 10"H x 16"W x 24"L
- – Weight: Maximum 35 lbs
- – Items which exceed these dimensions or are in excess of the allowance will be gate checked. A gate check fee applies.

2) Embraer Aircraft: The carry-on bag may not exceed dimensions of 11" in height x 16" in width x 24" in length.

   EXCEPTION:   Refer to _Rule 195 - Conditions and Charges for Special Items_ for exceptions.

D. Personal items – In addition to the maximum allowances provided above, each passenger may carry one personal item on board the aircraft without charge.

   1) Personal items must fit underneath the seat in front of the passenger.

   2) Personal Item: Maximum dimensions are 8"H x 14"W x 18"L

## Rule 225 - Excess, Oversize, and Overweight Baggage Charges

All baggage is subject to charges in Paragraphs A, B, and C.

A. Excess Baggage Charges – Baggage in excess of the maximum allowances specified in _Rule 220 - Baggage Allowance_ are accepted for transportation only upon payment of charges described below.

| Charges based on ticket purchase date and travel date | | | | |
|---|---|---|---|---|
| | **Basic & Economy** | **Classic** | **Classic Plus** | **Summit & Ascent** |
| 1st Checked item | USD 20 at FlyFrontier.com online check-in USD 25 at airport check-in | Free | Free | Free |
| 2nd item for tickets purchased on or after June 2, 2013 for travel on or after November 14, 2013 | USD 30 | Free | Free | Free |
| 2nd item for tickets purchased on or after July 21, 2013 for travel on or after January 6, 2014 | USD 30 | USD 30 | Free | Free |
| 2nd item for tickets purchased on or after October 1, 2013 for travel on or after March 24, 2014 | USD 30 | USD 30 | USD 30 | Free |
| 3 or more items for tickets purchased on or after February 17, 2013 for travel on or after July 11, 2013* | USD 75 | USD 75 | USD 75 | USD 75 |
| * Charge applies per item | | | | |

B. Oversize – A fee of USD 75 applies to baggage exceeding 62 inches in linear dimension.

C. Overweight – A fee of USD 75 applies to baggage weighing more than 50.0 pounds. Baggage weighing 100.00 pounds or more is not accepted.

---

Uncontrolled copy when downloaded or printed
Refer to the Controlled Document Library for the most current version of this document

USCA4 Appeal: 15-1261     Doc: 14     Filed: 05/11/2015     Pg: 116 of 216

# FRONTIER

**CONTRACT OF CARRIAGE**

3) Processing Fee – A processing fee will be applied and deducted from the refund amount.

## Rule 392 - Returned Check Service Charge

Personal checks not accepted on or after October 28, 2013.

A service charge will be assessed for each returned check. The amount of the service charge is dependent upon which state the check was written in and the amount charged will be the maximum allowed by each respective state. This charge is nonrefundable and is not subject to any discount.

## Rule 394 - Codeshare Service

A portion of travel for some itineraries marketed by Frontier may be provided by a codeshare partner If any carrier other than Frontier is operating a flight sold under the Frontier, the carrier will be identified in schedules and in written or oral communications during the booking process. Except where specifically noted, all terms of transportation applicable to Frontier specified in these conditions of carriage apply to Frontier flights operated by Frontier and to codeshare flights when marketed by Frontier.

Various fees (e.g., change fees, baggage fees) and policies based on aircraft restrictions are dependent on the operating carrier. In the event that the operating carrier's terms differ from anything stated in this Contract of Carriage, the more restrictive set of rules will apply.

Uncontrolled copy when downloaded or printed
Refer to the Controlled Document Library for the most current version of this document

# EXHIBIT

# I

# FRONTIER. Contract of Carriage

**Effective Date:**    12/15/13

# FRONTIER

**CONTRACT OF CARRIAGE**                                              Rev 50 12/15/13

## TABLE OF CONTENTS

| Section | Subject | Page |
| --- | --- | --- |

Introduction .................................................................. 2
Definitions .................................................................. 2
Rule 1 - Tariff Application .................................................. 7
Rule 35 - Refusal to Transport .............................................. 8
Rule 40 - Electronic Surveillance of Passengers and Baggage ................. 11
Rule 45 - Administrative Formalities – Passports, Visas, and Tourist Cards ... 11
Rule 50 - Child Passengers................................................... 12
Rule 55 - Service Animals.................................................... 15
Rule 99 - Smoking ........................................................... 16
Rule 100 - Tickets .......................................................... 16
Rule 105 - Ticket Validity .................................................. 17
Rule 115 - Confirmation of Reservations ..................................... 18
Rule 120 - Reservation and Ticketing Time Limits ............................ 19
Rule 135 - Cancellation of Reservations ..................................... 19
Rule 140 - Itinerary Changes ................................................ 20
Rule 150 - Fares (General) .................................................. 20
Rule 160 - Currency.......................................................... 20
Rule 180 - Stopovers......................................................... 21
Rule 185 - Routings.......................................................... 21
Rule 190 - Baggage Acceptance ............................................... 21
Rule 195 - Conditions and Charges for Special Items.......................... 22
Rule 205 - Checked Baggage and Carry-On Baggage.............................. 25
Rule 215 - Cabin-Seat Baggage ............................................... 26
Rule 220 - Baggage Allowance ................................................ 27
Rule 225 - Excess, Oversize, and Overweight Baggage Charges.................. 28
Rule 230 - Claim Limits And Procedures ...................................... 29
Rule 240 - Failure to Operate on Schedule or Failure to Carry................ 31
Rule 245 - Denied Boarding Compensation ..................................... 33
Rule 260 - Involuntary Refunds .............................................. 35
Rule 265 - Refunds .......................................................... 36
Rule 270 - Voluntary Refunds (Passenger Requested) .......................... 37
Rule 392 - Returned Check Service Charge..................................... 39
Rule 394 - Codeshare Service ................................................ 39

Uncontrolled copy when downloaded or printed
Refer to the Controlled Document Library for the most current version of this document

# FRONTIER

## CONTRACT OF CARRIAGE

Rev48 10/01/13

G. Waiver/Modification of Terms – No employee or authorized agent of the Airline has the authority to waive, modify, or alter any provisions of these terms of transportation or any applicable fares/charges unless authorized by a corporate officer of the Airline. Appointed agents and representatives are only authorized to sell tickets for air transportation on the Airline, pursuant to terms of transportation and applicable fares and/or charges. This rule supersedes any conflicting provisions contained in the Contract of Carriage.

H. Remedies for Violation of Rules – Where a ticket is purchased and used in violation of this Contract of Carriage or any fare rule (refer to *Rule 100 - Tickets*), the Airline has the right, in its sole discretion, to take all actions permitted by law, including but not limited to the following:

  1) Invalidate the tickets

  2) Cancel any remaining portion of the passenger's itinerary

  3) Confiscate any unused portions of the ticket (not valid for refund)

  4) Refuse to board the passenger and to carry the passenger's baggage, unless the difference between the fare paid and the fare for transportation used is collected prior to boarding

  5) Assess the passenger for the actual value of the ticket which shall be the difference between the lowest fare applicable to the passenger's actual itinerary and the fare actually paid

  6) Take legal action with respect to the passenger

I. Fares/Charges – Specific fares and charges information is available through Frontier reservations offices and at www.FlyFrontier.com.

## Rule 35 - Refusal to Transport

14 CFR 121.586(d)

Passengers may be refused transport or removed from a flight for the following reasons:

A. Government Request – To comply with any government regulation or with government requisition of space or request for emergency transportation in connection with national defense or natural disaster (actual, threatened or reported).

B. Force Majeure Event – In the event of a force majeure event, the Airline may, without notice, cancel, terminate, divert, postpone, or delay any flight or the right of carriage or reservation of traffic accommodations without liability.

C. Property Search – Refusal by a passenger to permit a search of person or property for explosives or for deadly or dangerous weapons, articles or substances.

D. Identification – Refusal by a passenger to produce identification (ID) upon request for the purpose of boarding an aircraft.

  NOTE:    *Acceptable identification means a photo ID issued by a government authority or two other forms of ID, at least one of which must be issued by a government authority.*

E. Passports/Visas – Failure of a passenger traveling across any international boundary to possess all valid documents (passports, visas, certificates, etc.) required by the laws of the countries from, over or into which the passenger will fly. The Airline is not responsible for any failure or inability of a passenger to comply with government laws, regulations, orders, demands, and requirements, which are subject to change without notice. For any reason, such passenger's embarkation from, transit through or entry into any country from, through, or to which such passenger desires transportation would be unlawful.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

USCA4 Appeal: 15-1261    Doc: 14    Filed: 05/11/2015    Pg: 121 of 216

# FRONTIER

**CONTRACT OF CARRIAGE**                                           Rev48 10/01/13

F. **Special Medical Requirements** – A passenger will be refused transport when he or she requires the following medical equipment or services, which either are not authorized or cannot be accommodated on the Airline's aircraft: medical oxygen for use on board the aircraft, incubators, respirators that must receive power from the aircraft's electrical power supply, or a person who must travel on a stretcher.

1) **Respiratory Devices**

   a) A respiratory device (e.g., ventilator, respirator, CPAP machine or Portable Oxygen Concentrator) is considered an assistive device and is permitted as carry-on or checked baggage at no charge.

   b) A passenger should carry enough fully-charged batteries to power the device throughout the entire journey including all ground time (between connections), the duration of the flight and for unexpected delays.

   c) All batteries must be transported in carry-on baggage and must be packaged in a manner that protects them from physical damage and short circuits.

   d) Aircraft electrical outlets (plugs) are not available for use with any electronic device, including respiratory devices.

   e) All respiratory devices intended for use onboard the aircraft must be approved by the FAA.

      i. Respiratory devices including, but not limited to, ventilators, respirators or CPAP machines must have stickers indicating they meet FAA requirements and are safe for use onboard.

      ii. Specific Portable Oxygen Concentrators (POCs) are approved by the FAA. Frontier allows only these POCs to be used on the aircraft. In addition, prior to traveling, a passenger must complete the Portable Oxygen Concentrator Medical Authorization form (30881) available on Frontier's website or obtain a medical statement from his/her physician addressing the points on the POC Medical Authorization form.

   NOTE:   *Contact Frontier for approved POCs accepted for onboard transport and use (Ref: 14 CFR 121, SFAR No. 106).*

G. **Qualified Individual with a Disability** – Qualified individuals with a disability will be transported in accordance with the conditions and requirements of 14 CFR 382 unless the carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. However, pursuant to 14 CFR 382.113, the Airline does not provide certain extensive inflight special services such as assistance in actual eating, assistance within the lavatory or at the individual's seat with elimination functions, or provision of medical services. Moreover, pursuant to 14 CFR 382.29, a qualified individual with a disability may be required to be accompanied by a safety assistant as a condition of being provided air transportation in any of the following circumstances:

1) When the individual, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from employees, including the required safety briefing.

2) When the individual has a mobility impairment so severe that the individual is unable to assist in his/her own evacuation of the aircraft.

3) When the individual has both severe hearing and severe vision impairments, if the individual cannot establish some means of communication with employees adequate to permit transmission of the required safety briefing.

4) On the day of departure, if it is determined that an individual meeting the criteria of 1, 2 or 3 must travel with a safety assistant, contrary to the individual's self-assessment that he/she is capable of traveling independently, the safety assistant will not be charged to accompany the individual with a disability.

---

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

USCA4 Appeal: 15-1261     Doc: 14     Filed: 05/11/2015     Pg: 122 of 216

# FRONTIER

## CONTRACT OF CARRIAGE

Furthermore, if because there is not a seat available on a flight for a safety assistant, the individual with a disability having a confirmed reservation will be unable to travel on the flight. In this case such individual is eligible for denied boarding compensation under *Rule 245 - Denied Boarding Compensation*. For purposes of determining whether a seat is available for a safety assistant, the safety assistant is deemed to have checked in at the same time as the individual with the disability.

H. Frontier accepts up to two "low risk" prisoners with hand restraints per flight.

   1) If the flight is 4 hours or less, at least one armed or unarmed law enforcement officer must accompany up to two prisoners.

   2) If the flight is more than 4 hours, at least two armed or unarmed law enforcement officers must accompany up to two prisoners.

   3) Frontier regional affiliates require one escort for every one prisoner.

I. Comfort and Safety – For reasons of comfort and safety, a passenger may be refused transport:

   1) Who is barefoot and over 5 years of age, unless they are required to be barefoot for medical reasons.

   2) Who appears to be intoxicated or under the influence of drugs.

   3) Who has a communicable disease or infection that is known or reasonably believed to pose a direct threat to the health or safety of others in the course of flight. If a qualified individual with a disability with such communicable disease or infection presents a medical certificate (dated within 10 days of the date of the flight for which it is being presented) with specific conditions under which the individual can travel and not pose a direct threat to the health and safety of other persons, transportation will be provided to such individual unless it is not feasible to implement the conditions set forth in the medical certificate as necessary to prevent the transmission of the disease or infection to other persons in the normal course of flight.

   4) Who is ill and cannot or refuses to provide a physician's written permission to fly.

   5) Who is unable to sit in an upright position during takeoff and landing with the seat belt fastened.

   6) Who refuses to obey instructions from an employee or crewmember.

   7) Who refuses to comply with instruction given by employees or representatives prohibiting the solicitation of items for sale or purchase, including airline tickets, passes, or travel award certificates.

   8) Who attempts or has attempted to interfere with any member of the flight crew in pursuit of their duties.

   9) Who, in the past, has disrupted airline operations, mistreated employees, or has not complied with the Airline's rules.

   10) Who is unwilling or unable to abide by the non-smoking rules (refer to *Rule 99 - Smoking*).

   11) Who has intentionally committed a fraudulent act against the Airline.

   12) Whose conduct is or has been disorderly, abusive, violent, belligerent and/or irrational so as to be a hazard or potential hazard to employees or other passengers.

   13) Who fails or refuses to comply with the Airline's rules and regulations.

   14) Who wears or has on or about their persons concealed or unconcealed, deadly or dangerous weapons. However, passengers who meet qualifications and conditions established in 49 CFR 1544.219, Carriage of Accessible Weapons will be transported.

   15) Who, while in the custody of law enforcement personnel, whether or not the passenger is manacled, has resisted or may reasonably be believed capable of resisting his/her escort.

---

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

USCA4 Appeal: 15-1261    Doc: 14    Filed: 05/11/2015    Pg: 123 of 216

# FRONTIER

**CONTRACT OF CARRIAGE**                                      Rev48 10/01/13

NOTE:    The Airline is not liable for its refusal to transport any passenger in accordance with the circumstance listed above. However, the Airline will, at the request of the passenger, provide a refund in accordance with <u>Rule 260 - Involuntary Refunds</u>. The Airline also reserves the right to ban an individual from traveling for any of these offenses.

J. Customer of Size – The following policy applies to passengers traveling on aircraft configured with seats that have moveable center armrests.

   1) If, in the Airline's sole judgment, a passenger is unable to sit in an aircraft seat without lifting either armrest and occupying a portion of or the entire adjoining seat, or encroaching into the aisle, the passenger will be required to purchase a ticket for the additional seat. If no flights in the itinerary are oversold (i.e., the denied boarding of at least one confirmed, revenue passenger), the passenger will, upon request to the applicable Customer Relations department, receive a refund of the ticket for the additional purchased seat after travel has been completed.

   2) If the flight is full, volunteers will be solicited to relinquish their seat. If no volunteers are received, the customer of size will be accommodated on an alternate flight.

   3) When a customer of size purchases a ticket for an additional seat, it will be sold to the passenger at the lowest available fare or at the same fare as the first ticket the passenger purchased for the flight, whichever is less.

K. International Check-In Restrictions – Passengers traveling into or out of a foreign country are advised to arrive at the ticket counter with their baggage no less than 60 minutes prior to departure. Every effort will be made to accommodate passengers who do not present themselves one or more hours prior to departure; however, due to international travel requirements, the passenger may be refused travel.

L. Allergy (Peanut, Pet, or Chemical) – Items are not removed from the aircraft to accommodate a passenger's allergy to a particular food, substance, or chemical. A variety of snacks are served on board many flights, including products that may contain peanuts or other nuts. A "peanut-free" or "chemical-free" environment cannot be provided to passengers onboard the aircraft. Consult a healthcare professional regarding risks of onboard exposure to any allergen.

## Rule 40 - Electronic Surveillance of Passengers and Baggage

Passengers and their baggage are subject to inspection with an electronic detector, with or without the passenger's consent or knowledge.

## Rule 45 - Administrative Formalities – Passports, Visas, and Tourist Cards

A. Compliance with Regulations – The passenger shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over, and with all rules, regulations, and instructions of the Airline. The Airline is not liable for any aid or information given by any agent or employee to any passenger in connection with obtaining necessary documents or complying with such laws, regulations, orders, demands, requirements, or instructions, whether given orally, in writing, or otherwise, or the consequences to any passenger resulting from his/her failure to obtain such documents or to comply with such laws, regulations, orders, demands, requirements, or instructions.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **CHARITY CHIDINMA EMERONYE SWIFT,** | |
| **Plaintiff,** | **Civil Action No. 1:14-CV-1139** |
| **v.** | **Hon. Judge Anthony J. Trenga** |
| | **Hon. Magistrate Judge Ivan D. Davis** |
| **FRONTIER AIRLINES, INC. (a Colorado corporation), and JANE DOE,** | |
| **Defendants.** | |

**FRONTIER AIRLINES, INC.'S MOTION TO ENFORCE**
**THE SETTLEMENT AGREEMENT AND FOR OTHER RELIEF**

Defendant Frontier Airlines, Inc. ("Frontier"), by counsel and pursuant to Federal Rule of Civil Procedure 41(b) and Local Rule 7(e), moves this Court to enforce the Settlement Agreement reached between the parties, dismiss the case in its entirety and with prejudice, and award to Frontier all costs and fees incurred in bringing this motion.

Plaintiff and Frontier reached a complete settlement agreement regarding this litigation. The terms and conditions of that agreement are not disputed and can be determined by this Court. For the reasons more fully set forth in the accompanying memorandum of law, Frontier's Motion to Enforce the Settlement is warranted.

Dated: January 26, 2015                    Respectfully submitted,


                                           /s/ _____
                                           Sarah E. Moffett (VA Bar No. 72208)
                                           LeClairRyan, A Professional Corporation

**121**

2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
Telephone: (703) 647-5930
Facsimile:  (703) 647-5980
Email:  sarah.moffett@leclairryan.com

- and –

Paula L. Wegman (admitted *pro hac vice*)
Steven L. Boldt (*admitted pro hac vice*)
ADLER MURPHY & MCQUILLEN LLP
20 South Clark Street, Suite 2500
Chicago, Illinois 60603
Telephone: (312) 345-0700
Facsimile:  (312) 345-9860
Email: sboldt@amm-law.com
Email: pwegman@amm-law.com

**Attorneys for Frontier Airlines, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that, on January 26, 2015, I served the following via U.S. Mail, postage

prepaid, and via electronic case filing:

Stephen Swift, Esq.
Swift & Swift, Attorneys at Law, P.L.L.C.
21 Eisenhower Avenue
Suite 200
Alexandria, VA 22314

/s/_____ _____
Sarah E. Moffett

**122**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **CHARITY CHIDINMA EMERONYE SWIFT,** | |
| **Plaintiff,** | **Civil Action No. 1:14-CV-1139** |
| **v.** | **Hon. Judge Anthony J. Trenga** |
| | **Hon. Magistrate Judge Ivan D. Davis** |
| **FRONTIER AIRLINES, INC. (a Colorado corporation), and JANE DOE,** | |
| **Defendants.** | |

**FRONTIER AIRLINES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO ENFORCE THE SETTLEMENT AGREEMENT AND FOR OTHER
RELIEF**

Defendant Frontier Airlines, Inc. ("Frontier"), pursuant to Federal Rule of Civil

Procedure 41(b) and Local Rule 7(e), submits this memorandum of law in support of its Motion

to Enforce the Settlement Agreement and for Other Relief.

## I.    INTRODUCTION

This case arises out of a $25.00 baggage fee Plaintiff Charity Chidinma Emeronye Swift

("Plaintiff") claims she was wrongfully charged due to her race and/or national origin by a gate

agent employed by Frontier.  On September 4, 2014, Plaintiff filed the present complaint,

alleging discrimination under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964, 42

U.S.C. § 2000d, as well as claims for defamation and intentional inflection of emotional distress

("IIED") under Virginia law.  (Dkt. 1.)  Upon Frontier's Motion to Dismiss (Dkt. 10), this Court

dismissed Plaintiff's claims for Defamation and IIED on December 31, 2014.   (Dkt. 38.)

**123**

Thereafter, Plaintiff's complaint was amended to add a count for breach of contract. (Dkt. 43, 45.)

On January 9, 2015, the parties reached a mutual agreement to settle all of Plaintiff's claims against Frontier in exchange for a certain monetary settlement amount[1] and confidentiality. Plaintiff now seeks to improperly disavow the Settlement Agreement. Accordingly, Frontier requests that this Court enforce the Settlement Agreement, dismiss Plaintiff's Complaint with prejudice, and award Frontier its costs and fees incurred in filing the instant Motion.

## II.    STATEMENT OF FACTS

**THE PARTIES' SETTLEMENT AGREEMENT**

On January 9, 2015, the parties appeared before Magistrate Judge Ivan D. Davis for hearing on Plaintiff's Motion for Leave to Amend the Complaint. (Dkt. 42.) After the hearing, counsel for the parties, as well as Plaintiff herself, agreed to sit down and discuss the case and the potential for resolution. (Ex. A, Wegman Decl., ¶3.) Plaintiff, Charity Swift, her counsel/husband Stephen Swift and counsel for Frontier, Paula Wegman and Sarah Moffett, walked together to the LeClairRyan law firm, located across the street from the courthouse, where a private conference room was available. *Id.* at ¶4. All the lawyers, as well as Plaintiff (who is also a lawyer) sat together in that conference room to discuss the case. *Id.* at ¶5. After some preliminary discussions, attorney Moffett excused herself from the meeting to attend to another matter. *Id.* at ¶6. Plaintiff's counsel, Plaintiff and Frontier attorney Wegman continued

---

[1] The monetary settlement amount agreed upon was subject to confidentiality, and, as such, is redacted from this and the supporting materials, all of which are filed electronically and now publicly available.

2

**124**

their discussions regarding the case, including their respective positions and the potential for resolution for approximately two hours. *Id.* at ¶7.

Near the end of those two hours, Plaintiff and her counsel provided a settlement demand. Specifically, they advised Attorney Wegman that Plaintiff would dismiss her claims against Frontier in their entirety in exchange for a certain monetary figure. *Id.* at ¶8. Attorney Wegman asked Plaintiff and her counsel whether they would be willing to wait while she contacted her client with respect to their demand and they agreed. *Id.* at ¶9. Attorney Wegman temporarily excused herself from the meeting to make the necessary phone calls. *Id.* at ¶9. Approximately 10 minutes later, Attorney Wegman returned to the conference room and advised Plaintiff and her counsel that Frontier would agree to pay the monetary amount demanded in exchange for a complete dismissal of Plaintiff's claims against Frontier and confidentiality as to the agreement. *Id.* at ¶10. Plaintiff and her counsel agreed. *Id.* at ¶10. Attorney Wegman shook hands with Plaintiff and her counsel in consummation of the Agreement, thanked them for their time and cooperation and advised that a written Settlement Agreement would be provided early the next week. *Id.* at ¶11.

Within an hour of reaching the Settlement Agreement, Attorney Wegman sent Plaintiff's counsel an e-mail confirming the Settlement Agreement which stated as follows:

> Dear Mr. Swift, please let this confirm that plaintiff, Ms. Charity Swift, has agreed to release and dismiss all her claims against Frontier, as more fully set forth in her complaint, in exchange for $[2]. The settlement terms include confidentiality. We will forward a Release and Settlement agreement to you early next week.

---

[2] The monetary settlement figure has been redacted.

My thanks to both you and Charity for your time today. It was a pleasure meeting you both in person. Have a good weekend.

Paula Wegman

(*Id.* at ¶12, Ex. A - Wegman email dated January 9.)

Plaintiff did not dispute, question or object to that confirmation of the Settlement Agreement and its terms. *Id.* at ¶12. On Monday, January 12, Frontier's counsel sent a written Full Release and Settlement Agreement, reflecting the terms mutually agreed upon, to Plaintiff's counsel via e-mail. (Id. at ¶13, Wegman email dated January 12.)

The next day, Plaintiff's counsel responded to the e-mail from Frontier's counsel forwarding the Full Release and Settlement Agreement. (Id. at ¶14.) Plaintiff's counsel did not dispute, contest or object to any of the terms contained in the Full Release and Settlement Agreement. *Id.* The only modification requested by Plaintiff's counsel was the addition of a signature line for Frontier. *Id.* Specifically, Plaintiff's counsel requested as follows:

> Could you please add a line for a Frontier Airlines, Inc. officer/agent who has a binding authority to sign? We were hoping that your client will sign their part and send it to us for Charity to sign. As soon as we receive this, we will do our part and return it to you.

(*Id.,* Exhibit C – Swift email dated January 13.)

Frontier was amenable to this addition, added a signature line as requested and obtained the necessary signature. (Wegman Decl., ¶15.) The next day, January 14, Plaintiff's counsel sent another email, claiming that he "now had the time to fully and properly evaluate" the case and that he has "advised his client that she should not go ahead with the agreement at this time, because the settlement is not fair and not in her best interest, and she has accepted my advice." (Wegman Decl., ¶16, Exhibit D – Swift email dated January 14.)

4

**126**

Counsel for Frontier subsequently forwarded the Full Release and Settlement Agreement, which had been signed by an authorized Frontier agent, and asked that Plaintiff and her counsel comply with the Agreement, and counsel's explicit promise, namely, to obtain Plaintiff's signature and return it to Frontier's counsel upon receipt of same.  (Wegman Decl., ¶17, Exhibit E – Wegman email dated January 16.)   Undersigned counsel further advised that if Plaintiff refused to comply with the Settlement Agreement, Frontier would be forced to file a Motion to Enforce the Settlement and seeks its attorneys' fees and costs for doing so.  (*Id.*)  Plaintiff's counsel did not respond to this correspondence.[3]

To date, Plaintiff has refused to sign the Agreement.  Counsel for Frontier has spoken with Plaintiff's counsel on the telephone twice subsequent to the January 16 email.  During those teleconferences, Frontier's counsel specifically asked Plaintiff's counsel the basis for the attempt to renege, and attempted to resolve this matter in accordance with Local Rule 7(e).   Plaintiff's counsel stated that the Settlement Agreement is not effective because Plaintiff did not sign it and indicated that, instead, they are willing to entertain "another settlement offer" from Frontier for a monetary amount higher to which they previously agreed.  (Exhibit E, Wegman Decl., ¶18.)

## III.   ARGUMENT

**ENFORCEMENT OF THE SETTLEMENT AGREEMENT AGAINST PLAINTIFF IS REQUIRED BECAUSE A BINDING AND ENFORCEABLE AGREEMENT WAS REACHED BETWEEN THE PARTIES.**

District courts have, pursuant to federal law, the inherent authority, to enforce settlement agreements.  *Millner v. Nortolk & w. Ry. Co.,* 643 F.2d 1005, 1009 (4th Cir. 1981).  "If an

---

[3] Instead, on January 20, 2015, Plaintiff filed untimely objections, which she concedes were due on January 5, 2015 (Dkt. 47, Memo, p. 2.), and responses to Frontier's first set of discovery requests.  This matter is being separately addressed with the Court.  (Dkt. 46 – 47.)

**127**

agreement for complete settlement of the underlying litigation, or part of it, has been reached and

its terms and conditions can be determined, the court may enforce the agreement summarily as

long as the excuse for non-performance of the agreement is 'comparatively insubstantial.'"

*Hensley v. Alcon Laboratories, Inc.* 277 F.3d 535 (4th Cir. 2002)*, citing Millner*, 643 F.2d at

1009. "Having second thoughts about the results of a valid settlement agreement does not justify

setting aside an otherwise valid agreement, and the fact that the agreement is not in writing does

not render it unenforceable." *Id.,* citing *Young v. FDIC,* 103 F.3d 1180, 1195 (4th Cir. 1997) and

*Alexander v. Industries of the Blind, Inc.,* 901 F.2d 40, 41 (4th Cir. 1990); *Petty v. Timken Corp.,*

849 F.2d 130, 133 (4th Cir. 1988)(enforcing an oral settlement in a Title VII case).  In order to

enforce a settlement agreement, a district court must: (1) find that the parties reached a complete

agreement, and (2) must be able to determine its terms and conditions.  *Hensley* at 541; *Moore v.*

*Beaufort County,* 936 F.2d 159, 162 (4th Cir. 1991).

      The requirements needed to enforce the Settlement Agreement reached between the

parties here have been met.  The Wegman Declaration, and the exhibits thereto, demonstrate that

a complete Settlement Agreement had been reached between Plaintiff and Frontier.  Plaintiff

agreed to release and dismiss all her claims against Frontier, as set forth in her complaint, in

exchange for the monetary amount demanded and confidentiality.  (Wegman Decl., ¶10.)  The

Settlement Agreement was confirmed in writing by Frontier.  (Wegman Decl., ¶12.)  Plaintiff did

not question or contest the confirmation of the Settlement Agreement.  *Id.*  A written Full

Release and Settlement Agreement was provided to Plaintiff.  (Wegman Decl., ¶13.)  Plaintiff

did not question or contest the written Settlement Agreement or any of its terms.  (Wegman

Decl., ¶14.) Rather, the single modification requested by Plaintiff was the addition of a signature

line for Frontier, to which counsel for Frontier agreed.   (Wegman Decl., ¶14, 15.)  Indeed, the

fact that a complete Settlement Agreement had been reached is conceded in Plaintiff's counsel's

subsequent correspondence (attempting to renege) which specifically states that "I have advised

my client that she should not go ahead *with the agreement* at this time."   (Wegman Decl., ¶16,

Exhibit D.)

        Nor is there any question regarding the settlement terms and conditions that were agreed

upon.  As set forth above, the terms were confirmed in writing and not contested.  Those terms

were captured in a written Confidential Full Release and Settlement Agreement, which was

provided to Plaintiff.  Indeed, Plaintiff's counsel reviewed the written Confidential Full Release

and Settlement Agreement, did not contest any of its terms and explicitly agreed that upon

receipt of such document signed by Frontier, counsel and Plaintiff "will do our part and return it

to you" with Plaintiff's signature.   (Wegman Decl., ¶14, Exhibit C.)  Plaintiff is in possession of

that exact agreement containing Frontier's signature and now apparently has had second thoughts

and refuses to sign.   (Wegman Decl., ¶17, 18.)  As noted by the Fourth Circuit in *Young*,

"having second thoughts about the results of a valid settlement agreement does not justify setting

aside an otherwise valid agreement."  *Young,* 103 F.3d at 1195.   A complete Settlement

Agreement was reached, the terms and conditions of that agreement are clear, and the settlement

should be enforced.  Plaintiff cannot renege on the agreement simply because she now wants

more money.

### III.   <u>CONCLUSION</u>

        WHEREFORE, Defendant Frontier Airlines, Inc. respectfully moves for entry of an

Order compelling Plaintiff to comply with the parties' Settlement Agreement, dismiss the case in

its entirety and with prejudice, and, given Plaintiff's unmerited refusal to comply with the

Settlement Agreement, assess against Plaintiff all costs and fees incurred by Frontier in bringing

this Motion.

Dated: January 26, 2015                    Respectfully submitted,


                                           /s/_____
                                           Sarah E. Moffett (VA Bar No. 72208)
                                           LECLAIRRYAN, A PROFESSIONAL CORPORATION
                                           2318 Mill Road, Suite 1100
                                           Alexandria, Virginia 22314
                                           Telephone: (703) 647-5930
                                           Facsimile:  (703) 647-5980
                                           Email:  sarah.moffett@leclairryan.com

                                           - and –

                                           Paula L. Wegman (*pro hac vice pending*)
                                           Steven L. Boldt (*admitted pro hac vice*)
                                           ADLER MURPHY & MCQUILLEN LLP
                                           20 South Clark Street, Suite 2500
                                           Chicago, Illinois 60603
                                           Telephone: (312) 345-0700
                                           Facsimile:  (312) 345-9860
                                           Email: sboldt@amm-law.com
                                           Email: pwegman@amm-law.com

                                           ***Attorneys for Frontier Airlines, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that, on January 26, 2015, I served the following via U.S. Mail, postage prepaid, and via electronic case filing:

Stephen Swift, Esq.
Swift & Swift, Attorneys at Law, P.L.L.C.
21 Eisenhower Avenue
Suite 200
Alexandria, VA 22314


_/s/_____
Sarah E. Moffett

9

**131**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| CHARITY CHIDINMA EMERONYE SWIFT, | |
| Plaintiff, | Civil Action No. 1:14-CV-1139 |
| v. | Hon. Judge Anthony J. Trenga |
| | Hon. Magistrate Judge Ivan D. Davis |
| FRONTIER AIRLINES, INC. (a Colorado corporation), and JANE DOE, | |
| Defendants. | |

---

### AFFIDAVIT OF PAULA L. WEGMAN

COMES NOW, Paula L. Wegman, and states, under penalty of perjury, as follows:

1.      I am over the age of eighteen, competent to testify, and under no legal disability and, if called and sworn as a witness, would testify to the following facts, which are based upon my own personal knowledge and for which I verily believe are true and correct.

2.      I am a partner with the law firm Adler Murphy & McQuillen LLP, who has been retained as legal counsel, along with the law firm LeClairRyan, for Frontier Airlines, Inc. ("Frontier") in the above-captioned matter.

3.      On January 9, 2015, the parties appeared before Magistrate Judge Ivan D. Davis for hearing on Plaintiff's Motion for Leave to Amend the Complaint.  After the hearing, counsel for the parties, as well as Plaintiff herself, agreed to sit down and discuss the case and the potential for resolution.

**132**

4.      Plaintiff, Charity Swift, her counsel/husband Stephen Swift and counsel for Frontier, Paula Wegman and Sarah Moffett, walked together to the LeClair Ryan law firm, located across the street from the courthouse, where a private conference room was available.

5.      All the lawyers, as well as Plaintiff (who is also a lawyer) sat together in that conference room to discuss the case.

6.      After some preliminary discussions, attorney Moffett excused herself from the meeting to attend to another matter.

7.      Plaintiff's counsel, Plaintiff and Frontier attorney Wegman continued their discussions regarding the case, including their respective positions and the potential for resolution for approximately two hours.

8.      Near the end of those two hours, Plaintiff and her counsel provided a settlement demand. Specifically, they advised Attorney Wegman that Plaintiff would dismiss her claims against Frontier in their entirety in exchange for a certain monetary figure.

9.      Attorney Wegman asked Plaintiff and her counsel whether they would be willing to wait while she contacted her client with respect to their demand and they agreed.  Attorney Wegman temporarily excused herself from the meeting to make the necessary phone calls.

10.     Approximately 10 minutes later, Attorney Wegman returned to the conference room and advised Plaintiff and her counsel that Frontier would agree to pay the monetary amount demanded in exchange for a complete dismissal of Plaintiff's claims against Frontier and confidentiality as to the agreement.  Plaintiff and her counsel agreed.

11.     Attorney Wegman shook hands with Plaintiff and her counsel in consummation of the Agreement, thanked them for their time and cooperation and advised that a written settlement agreement would be provided early the next week.

**133**

12.    Within an hour of reaching the Settlement Agreement, Attorney Wegman sent Plaintiff's counsel an e-mail confirming the Settlement Agreement.  A true and accurate copy of that email is attached hereto as Exhibit A[1].  Plaintiff did not dispute, question or object to that confirmation of the Settlement Agreement and its terms.

13.    On Monday, January 12, Frontier's counsel sent a written Full Release and Settlement Agreement, reflecting the terms mutually agreed upon, to Plaintiff's counsel via e-mail.  A true and accurate copy of that email, including the attachment thereto, is attached hereto as Exhibit B.

14.    The next day, Plaintiff's counsel responded to the e-mail from Frontier's counsel forwarding the Full Release and Settlement Agreement.  Plaintiff's counsel did not dispute, contest or object to any of the terms contained in the Full Release and Settlement Agreement. The only modification requested by Plaintiff's counsel was the addition of a signature line for Frontier.  A true and accurate copy of that email is attached hereto as Exhibit C.

15.    Frontier was amenable to this addition, added a signature line as requested and obtained the necessary signature.

16.    The next day, Plaintiff's counsel sent another email, claiming that he "now had the time to fully and properly evaluate" the case and that he has "advised his client that she should not go ahead with the agreement at this time, because the settlement is not fair and not in her best interest, and she has accepted my advice."  A true and accurate copy of that email is attached hereto as Exhibit D.

17.    I subsequently forwarded the Full Release and Settlement Agreement which had been signed by an authorized Frontier agent, and asked that Plaintiff and her counsel comply

---

[1] All references to the monetary settlement amount in all Exhibits attached hereto have been redacted as the Settlement Agreement included confidentiality as part of its terms.

**134**

with the Agreement, and counsel's explicit promise, namely, to obtain Plaintiff's signature and

return it to Frontier's counsel upon receipt of same.  A true and accurate copy of that email is

attached hereto as Exhibit E.

18.      To date, Plaintiff has refused to sign the Agreement.  Counsel for Frontier has

spoken with Plaintiff's counsel on the telephone twice subsequent to the January 16 email.

During those teleconferences, Frontier's counsel specifically asked the basis for the attempt to

renege and attempted to resolve this matter in accordance with Local Rule 7(e).    Plaintiff's

counsel stated that the Settlement Agreement is not effective because Plaintiff did not sign it and

indicated that, instead, they are willing to entertain "another settlement offer" from Frontier for a

monetary amount higher to which they previously agreed.

I declare under penalty of perjury that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NAUGHT

Dated: January 26, 2015

PAULA L. WEGMAN

SUBSCRIBED AND SWORN to before me

this 26th day of JANAURY , 2015.

NOTARY PUBLIC

Official Seal
Diane Idukovich
Notary Public State of Illinois
My Commission Expires 03/20/2017

**135**

USCA4 Appeal: 15-1261    Doc: 14    Filed: 05/11/2015    Pg: 139 of 216

**Paula L. Wegman**

| | |
|---|---|
| **From:** | Paula L. Wegman |
| **Sent:** | Friday, January 09, 2015 12:31 PM |
| **To:** | steve@swift.law.pro |
| **Cc:** | Sarah E. Moffett; douglas.amster@leclairryan.com; charity@swift.law.pro; Maiko U. Davidson; Rita M. Siwinski; Steven L. Boldt |
| **Subject:** | Re: Swift v. Frontier Airlines, et al., AMM 14AZ0260 |

Dear Mr. Swift, please let this confirm that plaintiff, Ms. Charity Swift, has agreed to release and dismiss all her claims against Frontier, as more fully set forth in her complaint, in exchange for          The settlement terms include confidentiality. We will forward a Release and Settlement agreement to you early next week.

My thanks to both you and Charity for your time today.  It was a pleasure meeting you both in person.  Have a good weekend.

Paula Wegman



**EXHIBIT**

A

**136**

## Paula L. Wegman

| | |
|---|---|
| **From:** | Paula L. Wegman |
| **Sent:** | Monday, January 12, 2015 4:20 PM |
| **To:** | steve@swift.law.pro |
| **Cc:** | Sarah E. Moffett; douglas.amster@leclairryan.com; charity@swift.law.pro; Maiko U. Davidson; Rita M. Siwinski; Steven L. Boldt |
| **Subject:** | RE: Swift v. Frontier Airlines, et al., AMM 14AZ0260 |
| **Attachments:** | Swift Confidential Full Release and Settlement Agreement Final.pdf |

Dear Mr. Swift,

As mentioned below, attached please find a Release and Settlement Agreement. The settlement check will be requested upon receipt of a signed and notarized copy. (pdf with hard copy to follow via U.S. Mail is fine.) Feel free to contact me with any questions.

Thanks.

Paula Wegman

**From:** Paula L. Wegman
**Sent:** Friday, January 09, 2015 12:31 PM
**To:** steve@swift.law.pro
**Cc:** Sarah E. Moffett; douglas.amster@leclairryan.com; charity@swift.law.pro; Maiko U. Davidson; Rita M. Siwinski; Steven L. Boldt
**Subject:** Re: Swift v. Frontier Airlines, et al., AMM 14AZ0260

Dear Mr. Swift, please let this confirm that plaintiff, Ms. Charity Swift, has agreed to release and dismiss all her claims against Frontier, as more fully set forth in her complaint, in exchange for          The settlement terms include confidentiality. We will forward a Release and Settlement agreement to you early next week.

My thanks to both you and Charity for your time today. It was a pleasure meeting you both in person. Have a good weekend.

Paula Wegman



**EXHIBIT**

B

**137**

## CONFIDENTIAL FULL RELEASE AND SETTLEMENT AGREEMENT

FOR AND IN CONSIDERATION OF the payments and mutual covenants set forth herein, CHARITY CHIDINMA EMERONYE SWIFT, personally, and for her next of kin, spouse, heirs, successors, agents, representatives and assigns thereof, (the "Releasor"), to the fullest extent allowed by law, expressly intends to release, and by execution of this Confidential Full Release and Settlement Agreement does hereby release and forever discharge FRONTIER AIRLINES, INC., JANE DOE, REPUBLIC AIRWAYS HOLDINGS, INC., INDIGO PARTNERS LLC, FALCON ACQUISITION GROUP, INC., FRONTIER AIRLINES HOLDINGS, INC., AIR WORLD TRAVEL & TRAINING CORP., WORLDWIDE FLIGHT SERVICES, INC., ALLIANZ GLOBAL CORPORATE AND SPECIALTY, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY and ALLIANZ AVIATION MANAGERS, LLC, each and every respective co-insurer, and any other entities having code sharing agreements and any and all other entities related to, or otherwise affiliated or associated with the below-described incident, and all of their affiliates and all of their predecessor, successor, parent and subsidiary corporations, and all of their owners, officers, directors, employees, agents, attorneys, insurers and representatives, and all of the heirs, successors and assigns of any of them (the "Released Parties"), of and from any and all liabilities, claims, demands, actions or causes of action which the Releasor may have had or claimed to have had, may now have or claim to have, or may hereafter have or claim to have, known or unknown, including but not limited to physical injuries, mental injuries, discrimination, disability, loss of consortium, property losses, loss of profits, loss of income, loss of earning potential, loss of the value of any business, punitive damages, or other losses or expenses which the Releasor may have sustained or may hereafter sustain arising out of, resulting from, or in any way related to alleged injuries and/or damages claimed by Releasor in relation to her travel via Frontier Airlines, Inc. on September 4, 2013, including, but not limited to Frontier Flight 272, traveling from Denver International Airport (DEN) to Arlington, Virginia (DCA), (the "incident"), which is the subject of the lawsuit entitled, *Swift v. Frontier Airlines, Inc. et al.*, Civil Action No. 1:14-CV-1139, pending in the United States District Court for the Eastern District of Virginia, Alexandria Division ("the Litigation").

FOR AND IN CONSIDERATION OF the compromise and full settlement of these various claims, contentions and disputes between and among the parties herein, related directly or indirectly to the incident, and the full release of all said claims by the Releasor, the Released Parties agree to pay                                        AND ZERO CENTS                          in the form of a check payable to CHARITY CHIDINMA EMERONYE SWIFT and her attorneys SWIFT & SWIFT P.L.L.C., within forty-five (45) days after receipt of the original copy of this Confidential Full Release and Settlement Agreement and the entry of an order dismissing all claims in the Litigation with prejudice.

MEDICARE COMPLIANCE.  It is not the purpose of this settlement agreement to shift responsibility of medical care in this matter to the Medicare system.  Instead, this release is intended to resolve a dispute between the Releasor and the Released Parties.  In order to ensure compliance with Medicare and applicable federal regulations, the Releasor acknowledges that Medicare will be reimbursed (to the extent reimbursement is appropriate) out of these settlement proceeds for any and all payments made in the past or that may be made in the future related to the incident.

The Releasor shall further hold the Released Parties harmless from any and all adverse consequences in the event this settlement results in the loss of rights to Social Security benefits and/or Medicare benefits to the extent the Releasor would have been entitled to those benefits in the absence of this agreement.

**138**

IN FURTHER CONSIDERATION OF the payments and mutual covenants set forth in this Confidential Full Release and Settlement Agreement, the parties agree as follows:

A.    The parties acknowledge that this settlement has been agreed to solely for the purpose of compromising disputed claims, and any payments made pursuant to this settlement are not to be construed as an admission of liability.

B.    Releasor understands and agrees that the payments specifically identified and set forth herein are the entire and only consideration for this Confidential Full Release and Settlement Agreement, and it is intended by Releasor and the Released Parties, and each of them, that this release shall be complete and shall not be subject to any claim of mistake of fact or law by the Releasor, and that it expresses a full and complete settlement of liability claimed and denied; and that this release is intended to be full, final and complete.

C.    As part of the consideration for the payments to Releasor of the amounts hereinabove mentioned, Releasor is releasing all claims, including all those for known or unknown and anticipated or unanticipated injuries and damages.  Releasor recognizes and acknowledges that there is a risk that subsequent to the execution of this Confidential Full Release and Settlement Agreement, Releasor will claim or suffer monetary or other loss, damage, injury or any of these which are in some way caused by or related to the incident, but which are unknown and unanticipated at the time this Confidential Full Release and Settlement Agreement is signed; and further, that there is a risk that the damages presently known may be or may become more extensive than Releasor now expects or anticipates. Releasor accepts the above-mentioned risk, and this Confidential Full Release and Settlement Agreement shall apply to all unknown and unanticipated results of the incident as well as those known and anticipated.

D.    Releasor further understands and agrees that she shall be responsible for the payment of any attorneys' fees and legal expenses (if any), as well as all past, present or future medical, hospital, health care, Medicare, Medicaid, insurance carrier, medical service organization, mental health care, and any other fees and expenses arising from and in connection with any matters related to the incident, regardless of whether any of said fees and expenses were submitted to the Released Parties for payment.

E.    Releasor further agrees to hold the Released Parties harmless from all claims, liens or actions, which arise out of or are in any way related to any damages the Releasor may have sustained in, or as a result of, the incident, which may be brought against any of the Released Parties, including but not limited to claims, liens or actions for payment or reimbursement for attorneys' fees and expenses, hospital or medical expenses, or workmen's compensation or other benefits.  Releasor agrees that all liens have been or will be satisfied from the proceeds of this settlement.

F.    Releasor acknowledges that she is executing this Release solely in reliance upon her knowledge, belief and judgment and not upon any representations made by any party released or others on their behalf.

G.    Releasor acknowledges that she has had the opportunity to consult with her own legal counsel with regard to the matters arising out of the incident and this Confidential Full Release and Settlement Agreement.  Releasor attests that she has read and understands the content and legal effect of this Confidential Full Release and Settlement Agreement and has freely executed it.

**139**

H.    Releasor and the Released Parties further agree that this Confidential Full Release and Settlement Agreement shall be confidential and that they will not disclose the content of any terms of this Confidential Full Release and Settlement Agreement to anyone except as necessary for tax reporting purposes or as otherwise required by law.

I.    All parts of this Confidential Full Release and Settlement Agreement are separate and severable from each other. Should any part of this Confidential Full Release and Settlement Agreement be deemed or declared to be invalid or illegal, Releasor and the Released Parties agree that the validity of other parts or the remainder of this Confidential Full Release and Settlement Agreement shall not be affected thereby.

**CAUTION!   READ BEFORE SIGNING.**

Dated this _____ day of _____, 2015.


_____
CHARITY CHIDINMA EMERONYE SWIFT


WITNESS:


STATE OF _____  )
                          )  SS
COUNTY OF _____  )


I, _____, a Notary Public in and for said County in the State aforesaid, do hereby certify that CHARITY CHIDINMA EMERONYE SWIFT who is personally known to me to be the same persons whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that she signed, sealed and delivered the said instrument as her free and voluntary acts, for the uses and purposes therein set forth.


My seal:                                    _____


**STATEMENT OF COUNSEL**

The undersigned, as counsel for CHARITY CHIDINMA EMERONYE SWIFT, acknowledges and represents that all fees and expenses incurred in connection with our representation will be paid from the settlement funds of the foregoing Confidential Full Release and Settlement Agreement.

_____
Stephen Christopher Swift
SWIFT & SWIFT P.L.L.C.

**140**

## Paula L. Wegman

| | |
|---|---|
| **From:** | Stephen Christopher Swift <steve@swift.law.pro> |
| **Sent:** | Tuesday, January 13, 2015 5:46 PM |
| **To:** | Paula L. Wegman |
| **Cc:** | Charity C. Emeronye Swift |
| **Subject:** | RE: Swift v. Frontier Airlines, et al., AMM 14AZ0260 |

Dear Paula:

Although the document that you e-mailed to us is entitled CONFIDENTIAL FULL RELEASE AND **SETTLEMENT AGREEMENT**, and an agreement requires two parties to make it, there is only space for Charity to sign, and no space is provided for any of the "Released Parties" to sign, even though it says that they are agreeing to pay and send her a check for          Could you please add a line for a Frontier Airlines, Inc. officer/agent who has a binding authority to sign? We were hoping that your client will sign their part and send it to us for Charity to sign. As soon as we receive this, we will do our part and return it to you.

Sincerely,

Stephen Christopher Swift
Swift & Swift, Attorneys at Law, P.L.L.C.
2121 Eisenhower Avenue, Suite 200
Alexandria, Virginia  22314-4688

Telephone: (703) 418-0000
Facsimile: (703) 535-8205
E-Mail: steve@swift.law.pro
Website: swift.law.pro

This e-mail message from Swift & Swift, Attorneys at Law, P.L.L.C. is intended only for named recipients.  It contains information that may be confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law.  If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message or its contents is strictly prohibited.  Please notify us immediately at webmaster@swift.law.pro that you have received this message in error, and delete this message.  Thank you.

---

**From:** Paula L. Wegman [mailto:pwegman@AMM-LAW.com]
**Sent:** Monday, January 12, 2015 5:20 PM
**To:** steve@swift.law.pro
**Cc:** Sarah E. Moffett; douglas.amster@leclairryan.com; charity@swift.law.pro; Maiko U. Davidson; Rita M. Siwinski; Steven L. Boldt
**Subject:** RE: Swift v. Frontier Airlines, et al., AMM 14AZ0260

Dear Mr. Swift,

As mentioned below, attached please find a Release and Settlement Agreement.  The settlement check will be requested upon receipt of a signed and notarized copy.  (pdf with hard copy to follow via U.S. Mail is fine.)  Feel free to contact me with any questions.

Thanks.

EXHIBIT

C    141

1

## Paula L. Wegman

| | |
|---|---|
| **From:** | Stephen Christopher Swift <steve@swift.law.pro> |
| **Sent:** | Wednesday, January 14, 2015 10:36 AM |
| **To:** | Paula L. Wegman |
| **Cc:** | Charity C. Emeronye Swift |
| **Subject:** | Re: Settlement Agreement |

Dear Paula:

As Charity's attorney, I have now had the time to fully and properly evaluate her case after Judge Davis' decision to allow her to partly amend her complaint.  On the basis on my review, I have advised my client that she should not go ahead with the agreement at this time, because the settlement is not fair and not in her best interest, and she has accepted my advice. In view of this, we are not prepared to settle at this time for

We regret the inconvenience this may cause you, but as her counsel I believe that I am obligated to do this.

Sincerely,

Stephen Christopher Swift
Swift & Swift, Attorneys at Law, P.L.L.C.
2121 Eisenhower Avenue, Suite 200
Alexandria, Virginia  22314-4688

Telephone: (703) 418-0000
Facsimile: (703) 535-8205
E-Mail: steve@swift.law.pro
Website: swift.law.pro

This e-mail message from Swift & Swift, Attorneys at Law, P.L.L.C. is intended only for named recipients.  It contains information that may be confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law.  If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message or its contents is strictly prohibited.  Please notify us immediately at webmaster@swift.law.pro that you have received this message in error, and delete this message.  Thank you.



EXHIBIT

D

142

## Paula L. Wegman

| | |
|---|---|
| **From:** | Paula L. Wegman |
| **Sent:** | Friday, January 16, 2015 2:02 PM |
| **To:** | 'steve@swift.law.pro' |
| **Cc:** | Charity C. Emeronye Swift; Steven L. Boldt; Moffett, Sarah E. (Sarah.Moffett@leclairryan.com); douglas.amster@leclairryan.com; Davidson, Maiko U. (Maiko.Davidson@leclairryan.com); Rita M. Siwinski |
| **Subject:** | RE: Swift v. Frontier Airlines, et al., AMM 14AZ0260 |
| **Attachments:** | Swift v Frontier Confidential Full Release and Settlement Agreement executed by Frontier.pdf |

Dear Mr. Swift,

As both you and Ms. Swift are aware, we reached a settlement regarding the above-referenced litigation on Friday, January 9. I personally met with you and Ms. Swift after the hearing on Plaintiff's Motion to Amend. We collectively discussed the lawsuit, including Ms. Swift's and Frontier's respective positions, for over two hours, at the end of which you, Ms. Swift and I, on behalf of Frontier, reached a mutual agreement to settle the case. I shook both your and Ms. Swift's hands, respectively, upon reaching our agreement and sent you an email confirming the settlement terms we agreed upon within the hour. (See below.) You were provided with a Release Agreement reflecting the settlement agreement terms on Monday, as promised. (See below.) The only modification you requested to the Release Agreement was the addition of a signature line for a Frontier officer or agent, which we added and have signed. (See below and attached.) You confirmed that Ms. Swift would sign the Release Agreement once that modification occurred. (See below.) We request that you obtain Ms. Swift's signature and return an executed copy of the Release Agreement to us as promised.

Your attempt to renege on the settlement agreement now is not well taken and does not repudiate our valid and enforceable settlement agreement. If Plaintiff refuses to comply with her end of the agreement, we will be required to expend additional time and resources to file a motion to enforce the settlement. Please understand that if we are forced to file such a motion, we will seek our attorneys' fees and costs related to doing so.

Regards,

Paula L. Wegman
ADLER MURPHY & McQUILLEN LLP
20 S. Clark Street, Suite 2500
Chicago, Illinois 60603
Main: (312) 345-0700
Direct: (312) 422-5776
Mobile: (312) 953-0035
Facsimile: (312) 345-9860

-----Original Message-----
From: Stephen Christopher Swift [mailto:steve@swift.law.pro]
Sent: Wednesday, January 14, 2015 10:36 AM
To: Paula L. Wegman
Cc: Charity C. Emeronye Swift
Subject: Re: Settlement Agreement

Dear Paula:

As Charity's attorney, I have now had the time to fully and properly evaluate her case after Judge Davis' decision to allow her to partly amend her complaint. On the basis on my review, I have advised my client that she should not go ahead with the agreement at this time, because the settlement is not fair and not in her best interest, and she has accepted my advice. In view of this, we are not prepared to settle at this time for

EXHIBIT
**143**

E

1

## CONFIDENTIAL FULL RELEASE AND SETTLEMENT AGREEMENT

FOR AND IN CONSIDERATION OF the payments and mutual covenants set forth herein, CHARITY CHIDINMA EMERONYE SWIFT, personally, and for her next of kin, spouse, heirs, successors, agents, representatives and assigns thereof, (the "Releasor"), to the fullest extent allowed by law, expressly intends to release, and by execution of this Confidential Full Release and Settlement Agreement does hereby release and forever discharge FRONTIER AIRLINES, INC., JANE DOE, REPUBLIC AIRWAYS HOLDINGS, INC., INDIGO PARTNERS LLC, FALCON ACQUISITION GROUP, INC., FRONTIER AIRLINES HOLDINGS, INC., AIR WORLD TRAVEL & TRAINING CORP., WORLDWIDE FLIGHT SERVICES, INC., ALLIANZ GLOBAL CORPORATE AND SPECIALTY, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY and ALLIANZ AVIATION MANAGERS, LLC, each and every respective co-insurer, and any other entities having code sharing agreements and any and all other entities related to, or otherwise affiliated or associated with the below-described incident, and all of their affiliates and all of their predecessor, successor, parent and subsidiary corporations, and all of their owners, officers, directors, employees, agents, attorneys, insurers and representatives, and all of the heirs, successors and assigns of any of them (the "Released Parties"), of and from any and all liabilities, claims, demands, actions or causes of action which the Releasor may have had or claimed to have had, may now have or claim to have, or may hereafter have or claim to have, known or unknown, including but not limited to physical injuries, mental injuries, discrimination, disability, loss of consortium, property losses, loss of profits, loss of income, loss of income, loss of earning potential, loss of the value of any business, punitive damages, or other losses or expenses which the Releasor may have sustained or may hereafter sustain arising out of, resulting from, or in any way related to alleged injuries and/or damages claimed by Releasor in relation to her travel via Frontier Airlines, Inc. on September 4, 2013, including, but not limited to Frontier Flight 272, traveling from Denver International Airport (DEN) to Arlington, Virginia (DCA), (the "incident"), which is the subject of the lawsuit entitled, *Swift v. Frontier Airlines, Inc. et al.*, Civil Action No. 1:14-CV-1139, pending in the United States District Court for the Eastern District of Virginia, Alexandria Division ("the Litigation").

FOR AND IN CONSIDERATION OF the compromise and full settlement of these various claims, contentions and disputes between and among the parties herein, related directly or indirectly to the incident, and the full release of all said claims by the Releasor, the Released Parties agree to pay                          AND ZERO CENTS                          in the form of a check payable to CHARITY CHIDINMA EMERONYE SWIFT and her attorneys SWIFT & SWIFT P.L.L.C., within forty-five (45) days after receipt of the original copy of this Confidential Full Release and Settlement Agreement and the entry of an order dismissing all claims in the Litigation with prejudice.

MEDICARE COMPLIANCE. It is not the purpose of this settlement agreement to shift responsibility of medical care in this matter to the Medicare system. Instead, this release is intended to resolve a dispute between the Releasor and the Released Parties. In order to ensure compliance with Medicare and applicable federal regulations, the Releasor acknowledges that Medicare will be reimbursed (to the extent reimbursement is appropriate) out of these settlement proceeds for any and all payments made in the past or that may be made in the future related to the incident.

The Releasor shall further hold the Released Parties harmless from any and all adverse consequences in the event this settlement results in the loss of rights to Social Security benefits and/or Medicare benefits to the extent the Releasor would have been entitled to those benefits in the absence of this agreement.

IN FURTHER CONSIDERATION OF the payments and mutual covenants set forth in this Confidential Full Release and Settlement Agreement, the parties agree as follows:

A.    The parties acknowledge that this settlement has been agreed to solely for the purpose of compromising disputed claims, and any payments made pursuant to this settlement are not to be construed as an admission of liability.

B.    Releasor understands and agrees that the payments specifically identified and set forth herein are the entire and only consideration for this Confidential Full Release and Settlement Agreement, and it is intended by Releasor and the Released Parties, and each of them, that this release shall be complete and shall not be subject to any claim of mistake of fact or law by the Releasor, and that it expresses a full and complete settlement of liability claimed and denied; and that this release is intended to be full, final and complete.

C.    As part of the consideration for the payments to Releasor of the amounts hereinabove mentioned, Releasor is releasing all claims, including all those for known or unknown and anticipated or unanticipated injuries and damages. Releasor recognizes and acknowledges that there is a risk that subsequent to the execution of this Confidential Full Release and Settlement Agreement, Releasor will claim or suffer monetary or other loss, damage, injury or any of these which are in some way caused by or related to the incident, but which are unknown and unanticipated at the time this Confidential Full Release and Settlement Agreement is signed; and further, that there is a risk that the damages presently known may be or may become more extensive than Releasor now expects or anticipates. Releasor accepts the above-mentioned risk, and this Confidential Full Release and Settlement Agreement shall apply to all unknown and unanticipated results of the incident as well as those known and anticipated.

D.    Releasor further understands and agrees that she shall be responsible for the payment of any attorneys' fees and legal expenses (if any), as well as all past, present or future medical, hospital, health care, Medicare, Medicaid, insurance carrier, medical service organization, mental health care, and any other fees and expenses arising from and in connection with any matters related to the incident, regardless of whether any of said fees and expenses were submitted to the Released Parties for payment.

E.    Releasor further agrees to hold the Released Parties harmless from all claims, liens or actions, which arise out of or are in any way related to any damages the Releasor may have sustained in, or as a result of, the incident, which may be brought against any of the Released Parties, including but not limited to claims, liens or actions for payment or reimbursement for attorneys' fees and expenses, hospital or medical expenses, or workmen's compensation or other benefits. Releasor agrees that all liens have been or will be satisfied from the proceeds of this settlement.

F.    Releasor acknowledges that she is executing this Release solely in reliance upon her knowledge, belief and judgment and not upon any representations made by any party released or others on their behalf.

G.    Releasor acknowledges that she has had the opportunity to consult with her own legal counsel with regard to the matters arising out of the incident and this Confidential Full Release and Settlement Agreement. Releasor attests that she has read and understands the content and legal effect of this Confidential Full Release and Settlement Agreement and has freely executed it.

H.      Releasor and the Released Parties further agree that this Confidential Full Release and Settlement Agreement shall be confidential and that they will not disclose the content of any terms of this Confidential Full Release and Settlement Agreement to anyone except as necessary for tax reporting purposes or as otherwise required by law.

I.      All parts of this Confidential Full Release and Settlement Agreement are separate and severable from each other. Should any part of this Confidential Full Release and Settlement Agreement be deemed or declared to be invalid or illegal, Releasor and the Released Parties agree that the validity of other parts or the remainder of this Confidential Full Release and Settlement Agreement shall not be affected thereby.

## CAUTION!  READ BEFORE SIGNING.

Dated this _____ day of _____, 2015.

_____
CHARITY CHIDINMA EMERONYE SWIFT

WITNESS:

STATE OF _____  )
                          ) SS
COUNTY OF _____  )

I, _____, a Notary Public in and for said County in the State aforesaid, do hereby certify that CHARITY CHIDINMA EMERONYE SWIFT who is personally known to me to be the same persons whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that she signed, sealed and delivered the said instrument as her free and voluntary acts, for the uses and purposes therein set forth.

My seal:                                    _____

## STATEMENT OF COUNSEL

The undersigned, as counsel for CHARITY CHIDINMA EMERONYE SWIFT, acknowledges and represents that all fees and expenses incurred in connection with our representation will be paid from the settlement funds of the foregoing Confidential Full Release and Settlement Agreement.

_____
Stephen Christopher Swift
SWIFT & SWIFT P.L.L.C.

Dated: January 14, 2015

FRONTIER AIRLINES, INC.

*Paula L. Wegman*

Paula L. Wegman, Esq.
Counsel for Frontier Airlines, Inc.


WITNESS:


STATE OF _Illinois_ )
                                       ) SS
COUNTY OF _Cook_ )


I, _Mary F. Domagalski_ , a Notary Public in and for said County in the State aforesaid, do hereby certify that PAULA L. WEGMAN who is personally known to me to be the same persons whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that she signed, sealed and delivered the said instrument as her free and voluntary acts, for the uses and purposes therein set forth.

My seal:                              *Mary F. Domagalski*


```
 "OFFICIAL SEAL"
 Mary F Domagalski
 Notary Public, State of Illinois
 My Commission Expires 12/4/2018
```

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

---

| |
|---|
| |

CHARITY CHIDINMA
EMERONYE SWIFT,    |

       **Plaintiff,**    |     **Civil Action No. 1:14-cv-1139**

       **v.**    |     **Hon. Anthony J. Trenga**
            |     **Hon. Magistrate Judge Ivan D. Davis**

**FRONTIER AIRLINES, INC.**    |
**(a Colorado corporation),**    |
**and JANE DOE,**    |

       **Defendants.**    |

---

### PLAINTIFF'S OPPOSITION TO
### FRONTIER AIRLINES, INC.' MOTION TO ENFORCE
### THE SETTLEMENT AGREEMENT AND FOR OTHER RELIEF

Plaintiff Charity Chidinma Emeronye Swift ("Mrs. Swift"), through her undersigned

attorney, opposes Defendant Frontier Airlines, Inc.'s motion to enforce an alleged "settlement

agreement". The facts are given in the attached Affidavit of Charity C. Emeronye Swift.

### I. THIS COURT DOES NOT HAVE JURISDICTION.

The United States District Court does not have jurisdiction over the subject matter of the

motion herein opposed, because it is a breach of contract action that is governed by state law,

over which only state courts have jurisdiction, except in cases arising under the federal courts

diversity jurisdiction, or where the federal courts have ancillary jurisdiction. (The present case

arises only under a federal questions, not under diversity.) The federal courts have ancillary

jurisdiction over an action to enforce a settlement agreement only when a court order has

-1-

**148**

incorporated the settlement agreement.  "[W]e think the court is authorized to embody the

settlement contract in its dismissal order (or, what has the same effect, retain jurisdiction over

the settlement contract) if the parties agree.  Absent such action, however, enforcement of the

settlement agreement is for state courts, unless there is some independent basis for federal

jurisdiction."  *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375, 114

S.Ct. 1673, 128 L.Ed.2d 391 (1994).  See *In re Phar-Mor, Inc. Securities Litigation, 172 F.3d*

*270* (3rd Cir., 1999).  In *Trans States Airlines, Inc. v. Commonwealth Aviation Service, Inc.*

(unpublished Memorandum Opinion in the U.S. District Court for the Eastern District of

Virginia, Richmond Division, Case 3:08-cv-00112-JRS, Document 97, attached as Exhibit A),

the Court said:

> The subject matter jurisdiction of a court to enforce a settlement
> agreement was determined by the Supreme Court in Kokkonen v. Guardian Life
> Ins. Co. of Am., 511 U.S. 375 (1994). The Court determined that the court may
> employ ancillary jurisdiction to enforce a settlement agreement for two reasons:
> "(1) to permit disposition by a single court of claims that are, in varying respects
> and degrees, factually interdependent, ... and (2) to enable a court to function
> successfully, that is to manage its proceedings, vindicate its authority, and
> effectuate its decrees." Id. at 379-80. As to the first prong, the Court in Kokkonen
> found no jurisdiction existed because the claim that brought the original action to
> court was breach of agency, and the enforcement action was a breach of contract
> claim-two distinct actions. Id. at 380. For the second prong, the Court stated that
> had the parties' obligation to comply with the settlement agreement been made
> part of the Order, then breach of the agreement would be a violation of the Order
> and the Court would have ancillary jurisdiction to effectuate its decree. rd.
> However, in Kokkonen, the settlement agreement was in no way incorporated into
> the Court's Order, and the Court did not specifically retain jurisdiction over the
> case within the Order, therefore ancillary jurisdiction was not proper.  Id.at
> 381-82.

> The Fourth Circuit employed the Kokkonen rationale in Smyth v. Rivero
> by requiring that "the obligation to comply with a settlement's terms must be
> expressly made part of a court's order for jurisdiction to enforce the settlement
> after dismissal of the action to exist." 282 F.3d 268,283 (4th Cir. 2002). The
> Fourth Circuit stated that this rule is "adhered to strictly," id. at 283 (quoting In re

Phar-Mor. Inc. Sec. Litig., 172 F.3d 270, 273 (3d Cir. 1999», and requires that in order to retain jurisdiction, the court must "give a clear indication that it is incorporating the terms of the agreement into that order or retaining jurisdiction" in order to have jurisdiction over an enforcement action. l&L; see also Columbus-America Discovery Group v. Atl. Mut. Ins. Co., 203 F.3d 291,299 (4th Cir. 2000) (holding that the provision included in the Order stating" [tlhe Court retains jurisdiction to enforce the settlement of the parties and the prior Orders in this case" satisfied the Kokkonen requirement to maintain jurisdiction). In Smvth, the Court held that the mention of the settlement agreement in the Order did not require the parties to comply with the terms of the agreement and therefore the settlement agreement was not incorporated into the Order.

In the present case, the court has not even had any knowledge of the alleged settlement agreement before the opposed motion was filed.  "Generally, a district court may not enforce a Settlement Agreement unless 'the agreement has been approved and incorporated into an order of the court, or, at the time the court is requested to enforce the agreement, there exists some independent ground upon which to base federal jurisdiction."  *Columbus-Am. Discovery Group v. Atlantic Mutual Ins. Co.*, 203 F.3d 291, 299 (4th Cir., 1999).

## II.  PLAINTIFF HAS THE RIGHT TO HAVE THIS MATTER DECIDED BY A JURY.

Assuming *arguendo* that the U.S. District Court has jurisdiction, a proper demand for jury trial has been made (by both sides), and there is a disputed issue of material fact as to whether or not there is a settlement agreement, so the Plaintiff is entitled to have the issue decided by a jury, rather than by the court in summary judgement or the equivalent.  As the court stated in *Millner v. Norfolk & Western Railway Company*, 643 F.2d 1005, 1010 (4th Cir., 1981):

> [Plaintiff] had made timely demand for jury trial in his complaint, making no specification of the issues to which his demand ran.  Under these circumstances, he is "deemed to have demanded trial by jury for all the issues so triable," . . . and this demand extends even to issues raised by the opposing party . . . . [Plaintiff's] demand must therefore be treated as running to all issues, including the issue of enforcement of the settlement agreement.  (Citations omitted.)

**150**

*Young v. F.D.I.C.*, 103 F.3d 1180 (4th Cir. 1997), cited in Frontier Airlines'

Memorandum, is distinguishable, because in that case there was "no doubt as to the existence of

a settlement agreement . . . ." *Id.* at 1194. *Alexander v. Industries of the Blind, Inc.*, 901 F.2d

40, 41 (4th Cir. 1990),  cited in Frontier Airlines' Memorandum, held that there must be a

"plenary evidentiary hearing" on the issue of whether or not there was an oral settlement

agreement, but did not address the right to trial by jury.  In *Petty v. Timken Corp.*, 849 F.2d 130

(4th Cir., 1988), cited in Frontier Airlines' Memorandum, the Plaintiff's attorney confirmed in

court the existence of an oral settlement agreement reached at a pre-trial conference in the judges

chambers.  By contrast, in the present case there was no court involvement in the alleged

settlement agreement.

### III.  THERE IS NO LEGALLY BINDING SETTLEMENT AGREEMENT.

Assuming *arguendo* that the court can decide the matter without a jury, the court should

find that there was no contract for a settlement agreement, because there was no meeting of the

minds between Mrs. Swift and Frontier Airlines, nor any complete settlement agreement.  A

settlement agreement is enforceable only if it is a complete settlement of all disputed issues

between the parties.  After the meeting between Mrs. Swift, her counsel and counsel for Frontier

Airlines on Friday, January 9, 2015, the "Confidential Full Release and Settlement Agreement"

that counsel for Frontier Airlines e-mailed on Monday, January 12, 2015 added provisions that

they had not discussed in the meeting, including a long list of parties to be released from all

liability.  Even if Mrs. Swift's counsel's e-mailed request on the night of Tuesday, January 13,

2015 to add a signature line for Frontier Airlines was an offer to make a contract, the offer was

revoked the next morning on Wednesday, January 14, 2015 by her counsel's e-mail, before it

was "accepted" by Frontier Airlines' counsel's e-mail of Friday, January 16, 2015 adding

counsel's signature, so no contract was formed.  Furthermore, the signature of counsel for

Frontier Airlines, rather than that of a corporate officer, was not the requisite signature, and as

such was inadequate.

"Because exercise of the authority to enforce settlement agreements depends on the

parties' agreement to a complete settlement, the court cannot enforce a settlement until it

concludes that a complete agreement has been reached and determines the terms and conditions

of that agreement." *Hensley v. Alcon Laboratories*, 277 F.3d 535, 540 (4th Cir., 2001).  In *Moore*

*v. Beaufort County, N.C.*, 936 F.2d 159 (4th Cir., 1991),  cited in Frontier Airlines'

Memorandum, the court found that there was a complete settlement agreement, where the

Plaintiffs' attorney signed a document drafted by the Defendants' attorney.  In the present case,

no one has signed a document drafted by the other side.

## IV.  IT IS IMPOSSIBLE TO CARRY OUT THE ALLEGED SETTLEMENT AGREEMENT ACCORDING TO ITS TERMS.

Assuming *arguendo* that there was a contract, paragraph H of the "Confidential Full

Release and Settlement Agreement" provides, "Releasor and the Released Parties further agree

that this Confidential Full Release and Settlement Agreement shall be confidential and that they

will not disclose the content of **any terms** of this Confidential Full Release and Settlement

Agreement to anyone except as necessary for tax reporting purposes or as otherwise required by

law."  (Emphasis added.)  Thus, it is not merely the redacted dollar amount that was supposed to

be kept confidential, but the entire agreement.  By not redacting any other terms, and filing it and

publishing it on PACER for all the world to see (not under seal, and with no protective order in

place), Frontier Airlines has made the agreement impossible to carry out.

-5-

**152**

## V.  BY ITS TERMS, THE ALLEGED SETTLEMENT AGREEMENT IS INVALID IF IT IS NOT SIGNED VOLUNTARILY.

The "Confidential Full Release and Settlement Agreement" by its own terms implies that it will not be an enforceable contract until Mrs. Swift signs it.  The last line before the date and signatures states in bold type, "**CAUTION!  READ BEFORE SIGNING.**"  The second sentence of Paragraph F states, "Releasor attests that she has read and understands the content and legal effect of this Confidential Full Release and Settlement Agreement and has **freely executed** it."  (Emphasis added.)  The statement to be signed by a Notary Public states that Mrs. Swift, ". . . acknowledged that she signed, sealed and delivered the said instrument as her free and voluntary acts . . . ."  If the Court orders her to sign this document, it will be ordering her to commit perjury, contrary to public policy.

## VI.  ATTORNEYS FEES AND COSTS

While the "American Rule" provides that each party should generally bear its own costs (*Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 274 (4th Cir., 2002)), the Court has the inherent power to impose sanctions for bad faith.  *Chambers v. Nasco, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). "[U]nder its inherent powers, the district court has authority to shift attorneys fees, but again only in the extraordinary circumstances where bad faith or abuse can form a basis for doing so." *Hensley v. Alcon Laboratories*, 277 F.3d 535, 540 (4th Cir., 2001). There are such extraordinary circumstances in the present case, for instance, counsel for Frontier Airlines knew that Mrs. Swift was overwhelmed emotionally, but unreasonably pushed forward for an agreement that Plaintiff would not agreed to but for her emotional state that she was in during the discussion, and is now trying to enforce that alleged agreement, despite its own requirement that it be freely signed.

-6-

**153**

## **CONCLUSION**

Mrs. Swift respectfully requests the court to enter an Order denying the opposed motion, because the court does not have jurisdiction, should not decide the matter without a jury, there has been no meeting of the minds required for a valid settlement agreement, it is impossible to carry out the alleged settlement agreement, and by its terms it cannot be signed involuntarily. Plaintiff also asks the Court to assess against Defendant Frontier Airlines, Inc. all costs and fees incurred by her in opposing said motion, because it was made in bad faith.

Dated: February 9, 2015                    Respectfully submitted,


                                           */s/ Stephen Christopher Swift*
                                           Stephen Christopher Swift
                                           Virginia State Bar ID No. 38419
                                           Swift & Swift, Attorneys at Law, P.L.L.C.
                                           2121 Eisenhower Avenue, Suite 200
                                           Alexandria, Virginia  22314-4688
                                           Telephone: (703) 418-0000
                                           Facsimile: (703) 535-8205
                                           E-Mail: steve@swift.law.pro

                                           *Attorney for Plaintiff*
                                           *Charity Chidinma Emeronye Swift*

**154**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 9, 2015, I electronically filed the foregoing and

attached documents with the Clerk of the Court, using the Court's CM/ECF system, which will

automatically cause all counsel of record to be served therewith.


<u>/s/ Stephen Christopher Swift</u>
Stephen Christopher Swift

**155**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

_____

**CHARITY CHIDINMA**            )
**EMERONYE SWIFT,**             )
                                )
      **Plaintiff,**           )
**v.**                          )     **Civil Action No. 1:14-cv-1139**
                                )     **Hon. Judge Anthony J. Trenga**
**FRONTIER AIRLINES, INC.**     )     **Hon. Magistrate Judge Ivan D. Davis**
**(a Colorado Corporation),**   )
**and JANE DOE**                )
                                )
                                )
      **Defendants.**          )
                                )
_____)

## AFFIDAVIT OF CHARITY C. EMERONYE SWIFT

COMES NOW, Charity Chidinma Emeronye Swift, and states, under oath, as follows:

1.  I am over the age of eighteen, competent to testify, and under no legal disability and, if called and sworn as a witness, would testify to the following facts, which are based upon my own personal knowledge, and which I believe to be true and accurate.

2.  I am a lawyer, admitted to practice law in the state of New York, since June 21, 2011.

3.  I am the Plaintiff in the above captioned case, and my husband, Stephen Christopher Swift, is presently my attorney.

**156**

4. Sarah Moffett did not take part in any settlement discussion on January 9, 2015.


5. At all times during the discussions, my husband and my attorney, Stephen Swift, did not take

part in any settlement discussions, even though he was present, as he had no authority from me,

to do so for me, or on my behalf.


6. On January 9, 2015, both parties, appeared before Magistrate Judge Ivan D. Davis for hearing

on Plaintiff's Motion for Leave to amend her Complaint – a motion Defendant opposed. After

the hearing, and the Judge's decision partly in favor of Plaintiff, allowing her breach of contract

count, I informed Paula Wegman ("Ms. Wegman"), counsel for the Defendant that my husband

and I were leaving unless she still wants to talk to me as she previously indicated to me, during

our telephone conversation about a week before the hearing (during that telephone conversation,

she had asked me whether I would "like to talk" then on the phone, or after the hearing, and I

told her that I would talk to her when I see her after the hearing), she said yes, that she still wants

to talk to me. I asked if we could sit somewhere in the courthouse but she suggested that we go

sit down and talk at the offices of the local counsel for Defendant, LeClair Ryan. So, the four of

us, Ms. Wegman, Sarah Moffett, my husband Stephen Swift and I, went to the law offices of

LeClair Ryan, which is about a three-to-five-minute walk from the court house.


7. At LeClair Ryan's office, the four of us sat in a conference room. Sarah offered us water and

coffee, and for the best of about fifteen minutes, had some discussions, that did not relate to or

refer to the case. Sara Moffett asked about the areas of law that I and my husband practiced and

the state we were licensed to practice. I told her I was licensed to practice in the state of New

**157**

York. That I worked for a contractor at the Department of Justice for three years on the Savings and Loans cases, and that I did Antitrust Law for almost six years as a Legal Consultant, but that at present do Employment Law, and General Practice, while my husband told her he is a Patent attorney. Sarah then suggested that I should waive into the D.C. Bar or other states to which I informed her that it was not that easy for me to do, because I am classified as "foreign educated" attorney because I obtained my law degree from the United Kingdom. I explained to her that because I did not obtain my law degree from an "ABA approved law school" I cannot waive in because the rules are different. After these general discussions over coffee and water, Sarah excused herself and left the conference room, leaving the three of us, Ms. Wegman, my husband Stephen Swift and me.

8.  After Sarah's exit from the conference room, the three of us remained there for about another hour, making the total time we were there to about one hour and fifteen minutes.

9.  After filing my initial complaint, I received telephone calls and e-mail from Ms. Wegman asking if I could call her to discuss my case. When I called her, the first thing she said to me, after introducing herself as the attorney for the Defendant, was that when she got my case, she immediately thought it was one of those cases that should be settled, and that what was done to me was horrible! It was very comforting for me to hear her say those words, I thanked her and told her she was a nice person, as I believed she genuinely meant what she said. We even talked on a personal level that I told her my sister and her family live in Chicago, that I attended DePaul University and that whenever next I visited Chicago, I will contact her and she said sure, that will be nice. Because I have been so emotionally impacted by what happened to me on

3

**158**

September 4, 2013, in retrospect, I was naively but honestly drawn into taking Ms. Wegman and

dealing with her as a friend, instead of as an adversary - the attorney for the Defendant, who was

doing everything and anything possible, to defeat my case all along, albeit in a deceptively

seemingly friendly way, until it suddenly dawned on me, that she actually was not my friend, at

the end of our discussion and immediately after I informed her, as part of the discussion, that I

would also like a written apology from an official from Frontier, to which Ms. Wegman

furiously shot back at me, in a heightened and remarkably unpleasant and different tone from the

seemingly friendly tone that she had used throughout the discussion, and told me that no such

apology was going to be made unless she, herself, apologized to me on behalf of Frontier. I was

stunned! And I said nothing further.

10.  During the January 9, 2015 discussion, Ms. Wegman spoke for most of the time. She began

by saying that she wanted to discuss possible settlement and went on to explain to me, where she

sees Defendant's position in the case. She also talked about the weakness of my case and cons

for me, should I decide to take the case to trial.

11.  I explained to Ms. Wegman that I have been emotionally drained by the incident that

precipitated my action against Frontier, and would like the whole matter to go away if I could,

because each time I discussed it, as I was doing then, I become so emotional that I wanted to cry.

I also told her, that I also did not like dragging my husband into the whole matter, and Ms.

Wegman encouragingly enthused: "think also that you will have to go to Denver, for deposition

of Defendant's witnesses and this will cost you time, and money and a lot of hassle."

12.  I also explained to Ms. Wegman, during the discussion that the reason I engaged attorney

Doug Coleman earlier, was to see if he can settle the case as when I attempted to do so and could

not, when Ms. Wegman called me for the first time and I attempted to do so in an emotional

state, and that attempt failed. Unfortunately, Mr. Coleman would also fail in his attempt to settle

the case partly because Frontier believed they had a very strong case to go to trial with, and at

every opportunity she had, Ms. Wegman continued to tell me how strong Defendant's case

against me was.


13.  Ms. Wegman was well aware of the emotional effect the unwarranted treatment from

Frontier's agent on September, 4, 2013, had on me, and specifically during the discussions when

I started reliving the whole episode in my mind, as I tried to retell my story to Ms. Wegman. She

knew I was not in the required emotional state of mind, to legally effectuate a binding agreement,

but she pushed forward, for it in a way and in circumstances I believe is indicative of bad faith.


14.  During an attempted telephone settlement discussion, initiated by and with Ms. Wegman,

immediately after I filed my action and prior to Defendant's filing their motion to dismiss my

initial complaint, I had told Ms. Wegman that I would not accept a certain amount, which is

twice greater than the amount of my counter offer on January 9, 2015, during the discussion and

part of what Ms. Wegman calls a "valid settlement agreement" between the parties. Also, the

settlement discussions my former attorney had with Ms. Wegman, I believe during a period close

to three weeks if not more, failed also, partly because I refused to accept anything less than a

certain amount (which is also several times more than my counter offer during the discussion and

part of what Ms. Wegman calls a "valid settlement agreement" between the parties).

**160**

15. In my emotional state (which I expressed to Ms. Wegman at least three times during the discussion including telling her that I was feeling like I would cry, and then apologized for), I was so blindsided by emotion, and had no reasonable time or opportunity after Judge Davis' decision to reflect on the ramifications of his decision, and weigh it to see how it relates to the strength or weakness of my case, as was necessary before entering into any reasonable settlement discussions, that in the circumstances, I made a counter offer that was so unfair and unreasonably and in no way reflects the reality of the state of the case, and which did not make sense not only to me, but also to Ms. Wegman, I believe, who knew, or had reason to know in the circumstances, that I would never had made, or agreed to, given my past stand on the settlement issue, had I not been so emotionally overwhelmed as I was mentally reliving the experience as I retold my story to Ms. Wegman during the discussion, and such that would make it unconscionable for any reasonable person in good faith and in the circumstances, to hold such decision to be in part or whole, a "valid settlement agreement" between the parties.

16. I started my part of the discussion, by telling Ms. Wegman that the whole thing is very emotional for me. Surely, as I started retelling her what happened to me on the day of the incident (as in my complaint), I became emotional and at some point, told her that I am almost about to cry, but will try not to, but it was very difficult for me. During the whole discussion, I mentioned the fact that I was emotional several times as I truly was. Ms. Wegman knew that I was emotional. Several times, I paused to gather myself before continuing, and during those times, Ms. Wegman just looked at me and said nothing.

**161**

17.  Throughout the discussion, including when I made a counter offer, I never once thought about the Judge's decision that morning or how it strengthened or weakened my case, because as I narrated what happened to me on the day of the incident, to Ms. Wegman my thoughts became crowded with overwhelming emotions that prevented me to fully grasp what was going on until the angry voice of Ms. Wegman, telling me that no apologies was going to be made by Frontier, as I requested as part of the discussions, stunned me, and I quietly and sheepishly said good-bye to Ms. Wegman and left with my husband.

18.  During the discussion, Ms. Wegman said that Frontier would not settle for more than a certain amount and that the way they see it was to calculate how much it will cost for them to make a motion and if it was going to cost them less, they won't settle for an amount more than that, and that litigation is what she does, that she was ready to go to trial if I did not settle.

19.  Ms. Wegman informed me that she had no authority to offer anything up to certain amount and did not see how Frontier would go beyond a certain amount. So she offered me an amount to which I made a counter offer. The result, I believe, in retrospect, as it seemed to me, was that in effect, Ms. Wegman, taking advantage of my emotional state of mind, set for me the perimeter of the amount I must ask for, and in my emotional state, and without time to think properly, I made a counter offer, that only someone in an emotional funk could have made in the circumstances, without any thought or consideration of the strength of my case, whatsoever, in light of the Judge's decision that morning, because I was so emotional at the time of the discussion, and taking advantage of that fact, Ms. Wegman immediately and swiftly accepted it, because it fell

**162**

into the perimeter, it seems to me, Ms. Wegman had predesigned for me as she was clearly

discussing with me on a very different wavelength as I was with her, in my emotional stupor.


20.  At some point during the discussion, Ms. Wegman asked me how many carry-on's I and my

husband had at the time of our flight, i.e. whether we had anything in addition to our carry-ons. I

told her that I had a small tote bag where I put the newspapers that I was reading and that my

husband held my cultural head-tie that was in a Macy's plastic bag that I used for the wedding

that took us to Montana and our flight on Frontier Airlines. I explained to her that we were

carrying those items back on the flight the same way we brought them on our flights to

Bozeman, Montana. To this, Ms. Wegman responded, that the small tote bag I had and my head-

tie that my husband was carrying, was the reason I was charged for my carry-on. I responded and

said, that still does not explain why my husband was not charged, and she said nothing further.


21.  On no occasion whatsoever, during all the discussion, was anything said or mentioned by

anyone including Ms. Wegman, about informing the court that the parties have entered into a

settlement agreement or have settled the case, or anything whatsoever, about informing the court

that the case has been settled, and thus, should dismiss the case. No discussion ever was made or

suggested that the parties was going to do so at any time. I would not have agreed to such, until

after there has been an executed and legally binding settlement agreement, because during all the

discussions, and at all times, I intended and believed that both parties had the right to change

their minds at any time until they executed the written release. Under no circumstances would I

have accepted to be bound by any agreement that I did not have a reasonable time to think over

and freely execute, and in the present situation, it was never my belief or intention to be bound

**163**

by the discussions, until I had reasonable time to think it over, and freely execute Defendant's release agreement sent to me.

22.  After leaving my husband and I very briefly, about two to three minutes, apparently to call someone with authority to accept my counter offer, Miss Wegman returned almost immediately back to the conference room, stretched her hand out first to shake with my husband, who took no part whatsoever, during the whole discussion, as he had no authority to do so, and then next to me. My husband and I politely shook her hand.

23.  Immediately after the handshakes, Miss Wegman asked, if there was any other thing I wanted? I said yes, that I would also like to have an official written apology from an officer from Frontier, but Ms. Wegman emphatically said No! That there will be no such apology, unless it was an apology from her, on behalf of Frontier. She then added, I will be sending you the release agreement, to which I responded, "we'll see."

24. As I left LeClair Ryan's office and Ms. Wegman, it became clear to me that my emotional state of mind during the discussion, overwhelmed and clouded my judgment, and prevented me from making a rational, reasonable decision during that period, which caused me to be angry and embarrassed, but relieved, because I knew and believed that the parties were free to change their minds at any time prior to signing of any release document. I was so embarrassed that I did not share my thoughts or feelings with my husband until later. I pleaded with my husband not to discuss anything about the case unless I raised the issue, and he sympathetically agreed.

**164**

25.  During the discussion, references were made only to my case against Frontier. At no time whatsoever, did anyone including Ms. Wegman, expressly mention, imply or allude to: REPUBLIC AIRWAYS HOLDINGS, INC., INDIGO PARTNERS LLC, FALCON ACQUISITION GROUP, INC., FRONTIER AIRLINES HOLDINGS, INC, AIR WORLD TRAVEL & TRAINING CORP., WORLDWIDE FLIGHT SERVICES, INC., ALLIANZ GLOBAL CORPORATE AND SPECIALTY, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY,  AND ALLIANZ AVIATION MANAGERS, LLC, as part of the discussion, or are they in anyway part of the suit I filed, which is pending in the District Court.

26.  I have no suit pending against any of the above listed institutions, although I may have independent legal causes of action against, and the right to sue, some of them, should I decide to do so, and reserve the right to do so. I have not heard the names of most of them, nor did I know of their existence, until I surprisingly saw their names in Defendant's attached document titled "Confidential Full Release and Settlement Agreement." I certainly did not discuss nor have them in contemplation during my discussion with Ms. Wegman, as it was humanly impossible for me to discuss release of institutions I did not sue or know existed prior to, or during, an apparent settlement discussion, or after, until I began reading the Release.

27.  My husband did not read the Release document e-mailed to him by Ms. Wegman at the time he sent her the e-mail that requested added signature page for Defendant's signature. In fact, he read the document after I read it and refused to sign it. He printed it out, flipped through it and saw there was only a signature place for me, the Plaintiff, and none for the Defendant to sign,

**165**

USCA4 Appeal: 15-1261    Doc: 14        Filed: 05/11/2015    Pg: 169 of 216

and thinking it was a mistake (which we later realized was deliberate),  without thinking much of it, sent Ms. Wegman an email to add Defendant's signature line.

28.  My husband Stephen Swift, sent the email requesting the added signature line, without telling me, and without me seeing the document itself. After he sent the email, he later gave me the printed document to read. I did not read it then, and nothing further was said or discussed until Wednesday, when I finally read it. It was after reading it, that I explained to my husband how I felt about the whole matter since we left LeClair Ryan's office on January 9, and that I had already made up my mind not to sign the Release under any circumstances. It was then he told me about the email he sent Ms. Wegman regarding their signature line. I immediately asked him to inform Ms. Wegman that I was not going to sign her Release document, and after reading the release himself, he then agreed with my decision and advised me that he too, after careful review did not think it was in my best interest to sign the Release, and he immediately informed Ms. Wegman accordingly, via email.

29.  That Friday, two days later, Ms. Wegman sent another copy of same release document she had sent earlier, with her signature.

30. My suit, which is pending in the District Court, is against Frontier Airlines, Inc., and not their attorney, Ms. Wegman.

I declare under oath and penalty of perjury, that to the best of my recollection, the foregoing is true and accurate.

**166**

Dated: February, 9, 2015

_____
Charity C. Emeronye Swift

SUBSCRIBED AND SWORN to before me

This  9th  day of  February  , 2015

_____
NOTARY PUBLIC

Stephen Christopher Swift
NOTARY PUBLIC
Commonwealth of Virginia
Reg. # 253103
My Commission Expires 1/31/2017

**167**

# EXHIBIT

# A

**168**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

TRANS STATES AIRLINES, INC.,

                                 Plaintiff,

        v.                                        Action No. 3:08–CV–112

COMMONWEALTH AVIATION
SERVICE, INC. D/B/A/ MILLION AIR,

                                 Defendant.

MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiff's Motion to Enforce the

Settlement Agreement (Docket No. 93).  After due consideration and for the reasons

discussed below, this Motion is DISMISSED because this Court lacks subject matter

jurisdiction.


I.  BACKGROUND

On July 21, 2008, Plaintiff Trans States Airlines ("Trans States") and Defendant

Commonwealth Aviation Service, Inc. ("Commonwealth") agreed to settle the matter

before this Court for $350,000.  On July 23, 2008, the parties filed a Stipulation of

Dismissal with Prejudice.  (Pl. Ex. A.)  On July 30, 2008, the Court entered an Order

dismissing the case with prejudice pursuant to the Stipulation of Dismissal

("Stipulation") filed by the parties.  (Pl. Ex. B.)  On August 4, 2008, Trans States

provided Commonwealth with a signed Full Release and Settlement Agreement

document.  (Pl. Ex. C.)  On these facts, the parties agree.

**169**

However, the issue of timing of payment is where the parties' understanding of the terms of settlement diverge.  Trans States asserts that the settlement agreed to on July 21, 2008 included an oral agreement that the payment from Commonwealth was due thirty (30) days from the date of the settlement—i.e. August 20, 2008.  (Pl. Mem. in Supp. of Mot. to Enforce Settlement 1.)  Defendant asserts that the Full Release and Settlement Agreement signed on August 4th was the final agreement between the parties and included no such timeline.  (Def. Mem. in Opp'n to Pl. Mot. to Enforce Settlement 5.)  Defendant states that it has "worked diligently to obtain the settlement funds from its insurer," and they informed Trans States that it could not issue payment until "all funds had been collected."  (Id. at 2; Pl. Ex. F.)  Trans States and Commonwealth communicated several times between August 26, 2008 and September 24, 2008 about when the payment was due.  (Pl. Mem. in Supp. 2–3.)  On September 23, 2008, Trans States notified Commonwealth by letter that if they did not receive payment by September 26, 2008, they would be forced to file the current motion in court.  (Pl. Ex. E.)  Defendant responded stating that they were still awaiting a payment from an insurer and could not dispense with the payment until all the funds had been collected.  (Pl. Ex. F.)  Defendant expressed a desire to resolve the matter shortly, "without the necessity for further motions."  (Id.)

Plaintiff filed the current Motion before this Court on September 26, 2008 asking that the Court enforce the Settlement Agreement and for interest from August 20, 2008.  Defendant states that they informed Plaintiff's counsel on October 2, 2008 that the check was being issued, but the check was issued to the wrong party, and a

2

**170**

few days later the check was sent to the proper party. (Def. Mem. in Opp'n 2–3.)

Plaintiff asserts that by the date of their Reply memorandum, October 15, 2008, the

funds had not been received. (Pl.'s Reply to Def. Resp. to Pl. Mot. to Enforce

Settlement 1.)

## II. DISCUSSION

The subject matter jurisdiction of a court to enforce a settlement agreement

was determined by the Supreme Court in Kokkonen v. Guardian Life Ins. Co. of Am.,

511 U.S. 375 (1994). The Court determined that the court may employ ancillary

jurisdiction to enforce a settlement agreement for two reasons: "(1) to permit

disposition by a single court of claims that are, in varying respects and degrees,

factually interdependent, . . . and (2) to enable a court to function successfully, that is

to manage its proceedings, vindicate its authority, and effectuate its decrees." Id. at

379–80. As to the first prong, the Court in Kokkonen found no jurisdiction existed

because the claim that brought the original action to court was breach of agency, and

the enforcement action was a breach of contract claim—two distinct actions. Id. at

380. For the second prong, the Court stated that had the parties' obligation to comply

with the settlement agreement been made part of the Order, then breach of the

agreement would be a violation of the Order and the Court would have ancillary

jurisdiction to effectuate its decree. Id. However, in Kokkonen, the settlement

agreement was in no way incorporated into the Court's Order, and the Court did not

specifically retain jurisdiction over the case within the Order, therefore ancillary

3

**171**

jurisdiction was not proper. Id. at 381–82.

The Fourth Circuit employed the Kokkonen rationale in Smyth v. Rivero by requiring that "the obligation to comply with a settlement's terms must be expressly made part of a court's order for jurisdiction to enforce the settlement after dismissal of the action to exist." 282 F.3d 268, 283 (4th Cir. 2002). The Fourth Circuit stated that this rule is "adhered to strictly," id. at 283 (quoting In re Phar-Mor, Inc. Sec. Litig., 172 F.3d 270, 273 (3d Cir. 1999)), and requires that in order to retain jurisdiction, the court must "give a clear indication that it is incorporating the terms of the agreement into that order or retaining jurisdiction" in order to have jurisdiction over an enforcement action. Id.; see also Columbus-America Discovery Group v. Atl. Mut. Ins. Co., 203 F.3d 291, 299 (4th Cir. 2000) (holding that the provision included in the Order stating "[t]he Court retains jurisdiction to enforce the settlement of the parties and the prior Orders in this case" satisfied the Kokkonen requirement to maintain jurisdiction). In Smyth, the Court held that the mention of the settlement agreement in the Order did not require the parties to comply with the terms of the agreement and therefore the settlement agreement was not incorporated into the Order. Id. at 284.[1]

---

[1]    Plaintiff relies on an unpublished decision from the Western District of Virginia, Payman v. Mirza, where the Court held that because the parties "properly removed to [the] court based on diversity of citizenship" there was an "independent basis for federal jurisdiction." No. 2:03CV00023, 2005 WL 1668273, *2 (W.D. Va., Jul. 18, 2005). However, the case in Kokkonen was also a state claim case that was removed from state court on the basis of diversity jurisdiction. See 511 U.S. at 376. If the Kokkonen Court intended for diversity jurisdiction to be enough to confer ancillary jurisdiction on the Court to enforce a settlement agreement, the parties in Kokkonen would have met this requirement. Furthermore, the decision in Payman is not binding, and this Court must follow Fourth Circuit and Supreme Court precedent, so

In the present case, the Stipulation sent by the parties did not request any specific terms to be included in the Court's Order. (Pl. Ex. A.) Moreover, the Order of Dismissal was made without mention, or integration of the settlement agreement between the parties. (Pl. Ex. B.) Because the present case presents no valid basis for ancillary jurisdiction, Plaintiff's Motion is DENIED.

## III. CONCLUSION

For the reasons stated above, Plaintiff's Motion to Enforce Settlement is DENIED.

It is SO ORDERED.

/s/
_____
James R. Spencer
Chief United States District Judge

ENTERED this 30th day of October 2008

---

for this reason, Plaintiff's reliance on Payman is misplaced.

Plaintiff also attempts to rely on the principle that courts have "inherent authority, derived from their equity power" to enforce settlement agreements. Hensley v. Alcon Labs., Inc., 277 F.3d 535, 540 (4th Cir. 2002); Millner v. Norfolk & W. Ry. Co., 643 F.2d 1005, 1009 (4th Cir. 1981). However, the similar doctrine of equity was proposed by the Respondent in Kokkonen, and there the Court found that the doctrine of maintaining jurisdiction based on equity principles was dicta and did not apply because in the case cited by Respondent, the court had "expressly reserved jurisdiction." Kokkonen, 511 U.S. at 379. Similarly, equity does not apply here, because this Court did not expressly reserve jurisdiction in the Dismissal Order.

5

**173**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| |
| --- |

**CHARITY CHIDINMA**
**EMERONYE SWIFT,**

        **Plaintiff,**

      **v.**

**FRONTIER AIRLINES, INC. (a Colorado**
**corporation), and JANE DOE,**

        **Defendants.**

**Civil Action No. 1:14-CV-1139**

**Hon. Judge Anthony J. Trenga**
**Hon. Magistrate Judge Ivan D. Davis**

**FRONTIER AIRLINES, INC.'S REPLY IN SUPPORT OF ITS**
**MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

Defendant Frontier Airlines, Inc. ("Frontier") submits this reply memorandum of law in support of its Motion to Enforce the Settlement Agreement, and states as follows:

**ARGUMENT**

**A.**     **ENFORCEMENT OF THE SETTLEMENT AGREEMENT AGAINST PLAINTIFF IS REQUIRED BECAUSE A BINDING AND ENFORCEABLE AGREEMENT WAS REACHED BETWEEN THE PARTIES.**

Plaintiff's opposition and supporting affidavit only confirm, not dispute, that Plaintiff and Frontier reached a complete, enforceable settlement agreement regarding this litigation. Plaintiff's claim that Frontier's counsel was "deceptively" friendly and somehow "[took] advantage of [her] emotional state of mind" is ludicrous and not well taken. (ECF Dkt. 54-2 at ¶¶ 9, 19.) Plaintiff's own affidavit demonstrates that she is a well-educated lawyer who was represented by her husband, who is also an attorney, for the negotiations and consummation of the settlement. (ECF Dkt. 54-2 at ¶¶ 2 – 3, 7.) They were both present for the duration of the

**174**

settlement discussions, Plaintiff herself participated in negotiating the settlement, and both Plaintiff, as well as her counsel, agreed to the settlement agreement ultimately reached. (ECF Dkt. 54-2 at ¶¶ 8, 19.)  The settlement was confirmed in writing and the terms were not contested. According to Plaintiff's Affidavit, however, the settlement agreement should be disregarded because she was "in an emotional stupor" and that "only someone in an emotional funk" could have possibly asked for the settlement amount that she requested, and to which Frontier and she ultimately agreed. (ECF Dkt. 54-2 at ¶ 19.)  Plaintiff is simply attempting to renege on the agreement because she has changed her mind and wants more money. As noted in Frontier's opening brief, "having second thoughts about the results of a valid settlement agreement does not justify setting aside an otherwise valid agreement." *Young v. FDIC,* 103 F.3d 1180, 1195 (4th Cir. 1997). Indeed, this is the very reason why courts must look to the objective words and actions of the parties to determine whether there was a meeting of the minds; Plaintiff's "contrary unexpressed state of mind is immaterial" for this purpose. *Sengal v. Fakouri Elec. Eng'g, Inc.*, 2011 U.S. Dist. LEXIS 134820, at *7 (E.D. Va. Nov. 22, 2011).

In sum, and as further set forth below, Plaintiff's arguments to avoid the settlement she admits was reached on January 9, 2015 have no basis in law or fact, and must be rejected.

### 1.    *This Court Has Jurisdiction to Enforce the Settlement.*

Plaintiff's contention that this Court does not have jurisdiction over Frontier's motion to enforce the settlement agreement is flat wrong. Indeed, the Fourth Circuit has consistently recognized that "[a]lthough resolution of a motion to enforce a settlement agreement draws on standard contract principles, it may be accomplished within the context of the underlying litigation without the need for a new complaint. To this extent, district courts have inherent

**175**

authority, deriving from their equity power, to enforce settlement agreements." *Hensley v. Alcon Labs.*, 277 F.3d 535, 540 (4th Cir. 2002). The cases cited by Plaintiff – *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375 (1994); *In re Phar-Mor, Inc. Sec. Lit.,* 172 F.3d 270 (3d Cir. 1999) and *Trans States Airlines, Inc. v. Commonwealth Aviation Serv., Inc.*, 2008 U.S. Dist. LEXIS 88396 (E.D. Va. Oct. 31, 2008) – are wholly irrelevant to the present motion, as those cases only address the issue of whether a district court has the ability to reassert jurisdiction to enforce a settlement <u>after the litigation has already been dismissed</u>. None of those cases apply here, as this case is actively pending before this Court and has not been dismissed. As such, there is no question this Court has jurisdiction over the pending motion, as it does with the litigation in its entirety, and Plaintiff's argument must be ignored.

### 2.    *Plaintiff's Jury Trial Demand Is Irrelevant.*

Plaintiff's claim that she filed a jury demand in her initial complaint does not obviate the settlement to which she agreed to several months *after* she instituted the case. Nor does this claimed right relinquish this Court of its inherent authority to enforce settlement agreements, and her citation to *Millner* is inapposite. *Millner v. Norfolk & W. Ry. Co.,* 643 F.2d 1005, 1009 (4th Cir. 1981). Unlike Plaintiff Swift, the *Millner* plaintiff produced substantial evidence that his attorney did not have the authority to settle his FELA case, and that there was never a meeting of the minds between his counsel and the employer. *Id.* at 1009-10. Unlike the present case, "in an FELA action, even the questions whether an employer should be estopped to plead limitations, or whether an employee is entitled to rescission of a release because of fraud, are triable to a jury as of right." *Id.* at 1010 (internal citations omitted). This is not the situation here. Plaintiff Swift, a sophisticated attorney, does not dispute that she, along with her own attorney, personally reached

**176**

a settlement agreement with Frontier's counsel following a long, in-person meeting to discuss resolution of her case. In fact, Plaintiff admits that she herself "made a counter offer" and that counsel for Frontier "accepted it." (ECF Dkt. 54-2, ¶19). There is simply no dispute, let alone a substantial dispute, as to the authority Plaintiff's counsel had when Plaintiff herself agreed to settle her own case on January 9, 2015. *See, e.g.*, *Petty v. Timken Corp.*, 849 F.2d 130, 132 (4th Cir. 1988) ("Trial courts possess the inherent authority to enforce a settlement agreement and to enter judgment based on an agreement without a plenary hearing. Although summary enforcement is inappropriate when there is a material dispute about the existence of a settlement agreement or the authority of an attorney to enter a settlement agreement on behalf of his client, [plaintiff's] effort to bring his case within that context is thoroughly unpersuasive." (citing *Millner*, 643 F.2d at 1009)).

As such, the circumstances in this case are more akin to the Fourth Circuit's more recent decision in *Topiwala v. Wessell*, 509 Fed. Appx. 184 (4th Cir. 2013). There, the defendants attempted to renege on a settlement, claiming there was no meeting of the minds, since "they were rushed into the agreement because they had a plane to catch, and that they mistakenly agreed to certain terms that they later discovered would be more difficult to satisfy than anticipated." *Id.* at 186-87. Noting that "[a] settlement agreement may be enforceable notwithstanding the fact that it is not yet consummated" and "the fact that a party has 'second thoughts' about the agreement's results does not render the agreement unenforceable," the Fourth Circuit, while citing *Millner*, found that a plenary evidentiary hearing was unnecessary because if "a settlement agreement exists and its terms and conditions can be determined, as long as the excuse for nonperformance is comparatively unsubstantial, the court may enforce the

4

**177**

agreement summarily." *Id.* (citing *Millner*, 643 F.2d at 1009). As such, the court rejected defendants' "catch-a-plane" and "mistake" arguments, finding that such excuses "expose their true motivations for avoiding the agreement," and held that these reasons were "not merely comparatively, but wholly unsubstantial." *Id.* (citing *Millner*, 643 F.2d at 1009).

Like in *Wessell*, Plaintiff's arguments here fail because her claim that she was very emotional when she admittedly agreed to the settlement does not create a substantial issue of material fact that can unwind the undisputed agreement reached between the parties. Simply wanting more money after agreeing to an amount certain is exactly the type of "second thoughts" that courts look to avoid. *See id.* at 186 (citing *Hensley*, 277 F.3d at 540). There exist no factual dispute here about the authority of the parties to enter into the agreement, and this Court may therefore summarily enforce the settlement agreement. *See, e.g.*, *Hensley*, 277 F.3d at 541.

### 3.    *Plaintiff Fails to Identify Any Disputed Terms of the Settlement Agreement.*

Plaintiff's argument that there is no legally binding settlement agreement because she did not sign a written agreement, which she claims contained "provisions that were not discussed in the meeting," is unavailing. Plaintiff does not even dispute any of these terms, let alone claim they are material. Indeed they are not. It is undisputed that the only term Plaintiff requested to be added after receiving the written release was a signature line for a Frontier representative to sign (which was done). This does not excuse Plaintiff of her breach, and enforcement remains proper.

The issue for the Court here is to determine: (1) did the parties reach a complete agreement, and (2) can the terms and conditions be ascertained? *Hensley*, 277 F.3d 535 (4th Cir. 2002) (citing *Millner*, 643 F.2d at 1009). Here, it simply is not, and cannot be, disputed that Plaintiff and Frontier reached a complete settlement agreement. (ECF Dkt. 54-2, ¶19). The

**178**

confirming documentation between Plaintiff's counsel and Frontier's counsel further support the existence of a complete settlement agreement. The excuse given by Plaintiff is that she changed her mind, which does not justify setting aside the agreement.

The Virginia Supreme Court in *Snyder-Falkinham v. Stockburger*, for example, held that a plaintiff's oral agreement to a proposed settlement agreement, despite the fact that a later writing was contemplated, was sufficient to bind her to that agreement. 457 S.E.2d 36, 41 (Va. 1995) ("Contrary to the plaintiff's contention on appeal, the settlement was binding even though these parties contemplated that a formal, written 'Mutual Release and Settlement Agreement' memorializing the compromise would be executed."). There, like here, the plaintiff had a change of heart and decided that the settlement amount she orally agreed to was insufficient. *Id.* The *Stockburger* Court flatly rejected plaintiff's attempt to renege on the settlement, finding that "[o]nce a competent party makes a settlement and acts affirmatively to enter into such settlement, her second thoughts at a later time upon the wisdom of the settlement do not constitute good cause for setting it aside. That is what occurred here." *Id.* (citing *Moreland v. Suttmiller*, 397 S.E.2d 910, 914 (W.Va. 1990).

Likewise, this Court in *Patel v. Barot*, recently followed *Stockburger* and held that settlement terms outlined in a party's email were enforceable, because "neither the inclusion of the additional terms in the Agreement, nor the requirement that the Agreement be fully executed before taking effect, defeat the enforceability of the settlement as expressed in the January 27 e-mail." 15 F. Supp. 3d 648, 655 (E.D. Va. 2014); *see also Campbell v. Adkisson*, 546 Fed. Appx. 146, 153 (4th Cir. 2013) (finding that the parties never expressly stated that their agreement was

**179**

dependent on the execution of a writing, and later dissatisfaction of the settlement amount was not grounds to void the oral settlement agreement).

Putting the attestations of Plaintiff and Frontier's counsel aside for a moment, the Wegman Declaration contains the correspondence that transpired between Frontier's counsel and Plaintiff's counsel after the settlement agreement was reached. It is unrefuted. As in *Stockburger* and *Patel*, the communications here – authored in part by Plaintiff's counsel – are an objective reflection of Plaintiff's intention to be bound by the settlement agreement. Plaintiff agreed to release and dismiss all her claims set forth in her complaint in exchange for the monetary amount demanded and confidentiality. (Wegman Decl., ¶10.) The Settlement Agreement was confirmed in writing by Frontier. (Wegman Decl., ¶12.) Plaintiff did not question or contest the confirmation of the Settlement Agreement. *Id.* A written Full Release and Settlement Agreement was provided to Plaintiff. (Wegman Decl., ¶13.) Plaintiff did not question or contest the written Settlement Agreement or any of its terms. (Wegman Decl., ¶14.) Indeed, the fact that a complete Settlement Agreement had been reached is conceded in Plaintiff's counsel's subsequent correspondence (attempting to renege), which specifically states that "I have advised my client that she should not go ahead *with the agreement* at this time." (Wegman Decl., ¶16, Exhibit D (emphasis added).) In sum, a complete agreement was reached between the parties and Plaintiff's counsel's own correspondence confirmed that the terms and conditions were deemed acceptable. They must be enforced here.

Additionally, Plaintiff's claim that the settlement agreement cannot be enforced because the written agreement was attached, in redacted form, to Frontier's motion to enforce the judgment, and thus the parties cannot "carry out its terms," is baseless. In other words, Plaintiff

7

**180**

argues that, by filing the present motion, Frontier breached the settlement agreement she claims did not exist in the first place, and therefore, this Court should not hold Plaintiff to her initial material breach of the agreement. Such a legally unsupported and circular argument must be rejected, as the present motion was necessitated by <u>Plaintiff's</u>, not Frontier's, wrongful attempt to renege on the settlement agreement, and the terms became at issue as a direct result. As noted in Plaintiff's opposition, the written agreement specifically states that the content shall not be disclosed "except as necessary for tax reporting purposes or as otherwise required by law." In order to enforce the settlement agreement improperly breached by Plaintiff, the Court must review such evidence to ascertain the material terms and conditions in dispute and determine whether an agreement was reached that can be enforced. The only condition Plaintiff ever raised prior to reneging on the settlement was requesting that Frontier add a signature line for itself, which Frontier added and executed as requested. The written agreement was attached as part of the communications between Frontier and Plaintiff after the settlement agreement was reached, and those communications, along with the formal writing, demonstrate that the parties had reached an agreement on all material terms. There exists no reason to unwind the legally enforceable settlement, and the Court must therefore grant Frontier's motion to enforce.

**4.    *Plaintiff's Improper Request for Fees and Costs Must Be Denied.***

Finally, Plaintiff's allegation that Frontier acted in bad faith by entering into settlement negotiations with Plaintiff and her counsel and by filing the present motion cannot be taken lightly and must be denied. Plaintiff's assertions that Frontier "knew" she was emotionally unstable at the time she entered into the settlement agreement and somehow "took advantage" of her are completely unsupported by any evidence and wholly ignore the facts that Plaintiff is an

8

**181**

attorney herself and that her husband/counsel was present the entire time. Seeking to enforce a settlement that Plaintiff, along with her counsel, negotiated and agreed to does not constitute bad faith, and it is not proper for Plaintiff to even request such vexatious relief in her response brief.

On the other hand, the costs and attorneys' fees requested by Frontier for being forced to bring the present motion and continue litigating a settled case are proper and necessary to put Frontier back in the position it would have been had Plaintiff not wrongfully and willfully breached the settlement agreement. *See, e.g.*, *Sherman v. Phillip Morris, Inc.*, 1992 U.S. App. LEXIS 8457, at *8 (4th Cir. Va. Apr. 24, 1992) (affirming district court's award of attorneys' fees to defendant after prevailing on motion to enforce as a result of, *inter alia*, "plaintiff's actions in continuing to litigate after entering into a settlement agreement" (citing *Arnold v. Burger King Corp.*, 719 F.2d 63, 67 (4th Cir. 1983))); *see also Hoey v. Sunrise Senior Living Mgmt., Inc.*, 2013 U.S. Dist. LEXIS 27480, at *7-8 (E.D. Mich. Feb. 28, 2013) ("In order to restore [the non-breaching party] to the same position as she would have been if [the breaching party] had complied with the settlement agreement, the Court will award the costs and fees of bringing and defending this motion."). Under the circumstances present here, the Court should exercise its discretion to award Frontier its costs and fees incurred in bringing this Motion.

9

**182**

## CONCLUSION

WHEREFORE, Defendant Frontier Airlines, Inc. respectfully moves for entry of an Order compelling Plaintiff to comply with the parties' Settlement Agreement, dismiss the case in its entirety and with prejudice, and, given Plaintiff's unmerited refusal to comply with the Settlement Agreement, assess against Plaintiff all costs and fees incurred by Frontier in bringing this Motion.


Dated: February 16, 2015                    Respectfully submitted,


                                            /s/_____
                                            Sarah E. Moffett (VA Bar No. 72208)
                                            LECLAIRRYAN, A PROFESSIONAL CORPORATION
                                            2318 Mill Road, Suite 1100
                                            Alexandria, Virginia 22314
                                            Telephone: (703) 647-5930
                                            Facsimile: (703) 647-5980
                                            Email: sarah.moffett@leclairryan.com

                                            - and –

                                            Paula L. Wegman (*admitted pro hac vice*)
                                            Steven L. Boldt (*admitted pro hac vice*)
                                            ADLER MURPHY & MCQUILLEN LLP
                                            20 South Clark Street, Suite 2500
                                            Chicago, Illinois 60603
                                            Telephone: (312) 345-0700
                                            Facsimile: (312) 345-9860
                                            Email: sboldt@amm-law.com
                                            Email: pwegman@amm-law.com

                                            ***Attorneys for Frontier Airlines, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that, on February 16, 2015, I served the following via electronic case filing and sent a copy to Plaintiff's counsel at the below e-mail address:

Stephen Swift, Esq.
Swift & Swift, Attorneys at Law, P.L.L.C.
21 Eisenhower Avenue
Suite 200
Alexandria, VA 22314
steve@swift.law.pro

*/s/*_____

Sarah E. Moffett

**184**

1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3  CHARITY CHIDINMA EMERONYE  )  Case 1:14-cv-01139
    SWIFT,                     )
 4                            )
                 Plaintiff,    )
 5                            )
          v.                   )  Alexandria, Virginia
 6                            )  February 20, 2015
    FRONTIER AIRLINES, INC.,   )  9:58 a.m.
 7  et al.,                    )
                              )
 8               Defendants.   )
    _____)  Pages 1 - 25
 9

10      TRANSCRIPT OF FRONTIER AIRLINES, INC.'S MOTION TO

11   ENFORCE THE SETTLEMENT AGREEMENT AND FOR OTHER RELIEF

12        BEFORE THE HONORABLE ANTHONY J. TRENGA

13           UNITED STATES DISTRICT COURT JUDGE

14
```



```
16

17

18

19

20

21

22

23

24

25   COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

**185**

```
 1  APPEARANCES:

 2  FOR THE PLAINTIFF:

 3      STEPHEN CHRISTOPHER SWIFT, ESQUIRE
        SWIFT & SWIFT
 4      2121 Eisenhower Avenue, Suite 200
        Alexandria, Virginia  22314-4688
 5      (703) 418-0000

 6  FOR THE PLAINTIFF:

 7      PAULA L. WEGMAN, ESQUIRE, PRO HAC VICE
        ADLER, MURPHY & McQUILLEN, LLP
 8      20 South Clark Street, Suite 2500
        Chicago, Illinois  60603
 9      (312) 345-0700

10      SARAH E. MOFFETT, ESQUIRE
        LeCLAIRRYAN, PC
11      2318 Mill Road, Suite 1100
        Alexandria, Virginia  22314
12      (703) 684-8007

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1              THE CLERK:  Civil Action 1:14-cv-1139,
 2  Charity Chidinma Emeronye Swift v. Frontier Airlines,
 3  Inc., et al.
 4              Will counsel please identify themselves for
 5  the record.
 6              MR. SWIFT:  Stephen Christopher Swift for the
 7  plaintiff, Charity Chidinma Emeronye Swift.
 8              THE COURT:  Good morning.
 9              MR. SWIFT:  Good morning.
10              MS. WEGMAN:  Good morning, Your Honor.  Paula
11  Wegman on behalf of Frontier Airlines.
12              THE COURT:  All right.
13              MS. MOFFETT:  Good morning, Your Honor.
14  Sarah Moffett on behalf of the defendant.
15              THE COURT:  All right.  We're here on
16  defendant's motion to enforce a settlement agreement.
17  I've reviewed the submissions.  I'd be pleased to hear
18  further from counsel if there's something you would
19  like to add.
20              Counsel.
21              MS. WEGMAN:  Good morning, Your Honor.  As
22  you know, we are here on Frontier's motion to enforce
23  the settlement.  I am Paula Wegman.  I was one of the
24  prime counsel involved in the situation.
25              Today what we need to determine is whether or
```

4

1  not we've reached a full and complete settlement and
2  whether those terms can be ascertained, and we believe
3  that they have.  The documents submitted in support of
4  our motion, even looked at objectively beyond the
5  affidavits, clearly establish that a full and complete
6  settlement of all of plaintiff's claims was reached.
7  That was confirmed in writing.  At no times were those
8  terms disputed.
9          Correspondence flowed not only between myself
10  and plaintiff's counsel but also plaintiff herself.
11  There is no question here that an agreement wasn't
12  reached.  Plaintiff concedes as such in her motion.
13  Her counsel conceded as such in his correspondence to
14  me.
15          There's no -- under the Fourth Circuit, a
16  settlement can be enforceable -- for two factors are
17  supportive.  First, is it a complete settlement of the
18  underlying litigation, and was the terms and
19  conditions -- can they be clearly determined.  Both
20  conditions have been met here.
21          Plaintiff's only excuse for noncompliance is
22  comparatively unsubstantial.  Essentially, she said she
23  had second thoughts.  After I turned to the agreement,
24  at some point later, she determined the figure wasn't
25  what she wanted.  Under the law, that's not an excuse

5

1  to invalidate an otherwise enforceable settlement,

2  which is what we have here.

3          As I explained in the briefing, I personally

4  met with plaintiff and her counsel to discuss and

5  resolve the case.  During the meeting, she demanded a

6  certain monetary amount to settle her case.  Plaintiff

7  was represented by her counsel and her husband the

8  entire time.  Frontier agreed to pay the amount

9  demanded in exchange for a complete dismissal of all

10 her claims and confidentiality.  Plaintiff and her

11 counsel agreed.  We shook hands.  I advised that a

12 written settlement agreement would be provided the next

13 week.

14          I sent an e-mail to plaintiff and her counsel

15 confirming the settlement agreement less than an hour

16 later.  Plaintiff did not dispute, question, or object

17 to the settlement agreement confirmation.

18          A written Release and Settlement Agreement

19 was sent to plaintiff and her counsel, as I said I

20 would, the next Monday.  The next day plaintiff's

21 counsel sent an e-mail on which his own client, his

22 wife, was CC'd asking for the addition of a signature

23 line for a Frontier agent on the written agreement.  He

24 indicated that upon receipt of a version signed by

25 Frontier plaintiff would, and I quote, do her part and

1  sign it as well.  Plaintiff did not dispute, question,

2  or object to any of the terms contained in the written

3  Release and Settlement Agreement.  They never disputed,

4  questioned, or objected to anything in the confirming

5  e-mail sent immediately after the agreement was

6  reached.

7          Frontier was amenable to the addition of a

8  signature line to the release.  We added it and

9  obtained the signature that was needed.

10          THE COURT:  I've read all of that.

11          MS. WEGMAN:  All right.  Your Honor, simply

12  put, the agreement should be enforced.  Plaintiff

13  doesn't dispute that it was reached.  Rather, her

14  excuse is that she was in an emotional stupor when she

15  negotiated and agreed to the agreement.  She claimed

16  that she was somehow taken advantage of due to her

17  emotional state.

18          However, if that was the case, certainly her

19  lawyer, who was there the entire time and who is also

20  her husband, would have intervened.  In reality,

21  plaintiff has just decided that in hindsight she wants

22  more money than was already agreed to.

23          The Fourth Circuit has held that having

24  second thoughts about the results of a valid settlement

25  agreement does not justify setting aside an otherwise

7

1  valid agreement.  The settlement agreement here should

2  be enforced, and the case should be dismissed.

3          Thank you.

4          THE COURT:  All right.  Thank you.

5          Mr. Swift.

6          MR. SWIFT:  Okay.  I --

7          THE COURT:  Tell me what material factual

8  disputes there are, if you think there are any, with

9  respect to the agreement that was reached by the end of

10 the meeting on January 9.

11         MR. SWIFT:  Well, in the first place, our

12 understanding was it was not intended to be a final

13 settlement agreement.

14         THE COURT:  Did anybody say anything that

15 would have reflected that intention?

16         MR. SWIFT:  Well, you know, the agreement

17 itself implies that it's not final until it's signed.

18         THE COURT:  Well, what was said during the

19 meeting on January 9 that would have conveyed

20 objectively an understanding that what was agreed to

21 was contingent upon a final written settlement

22 agreement?

23         MR. SWIFT:  Well, for -- well, I think it was

24 more what was not said because, one thing, in the

25 agreement that was sent to us, it listed a long list of

8

1  parties who were not -- who were to be released who

2  were not mentioned during the discussion.

3           Another thing, my wife asked for an apology

4  from Frontier Airlines and that -- no agreement was

5  reached on that.  So it was not --

6           THE COURT:  Well, it was clear that Frontier

7  was not prepared to give that except as through what

8  the lawyer had already said, correct?  I mean, it was

9  specifically said that Frontier was not prepared to do

10 that.  Is that factually correct?

11          MR. SWIFT:  Well, my --

12          MRS. SWIFT:  Yes.

13          MR. SWIFT:  Yes.  But my wife had said,

14 "We'll see," meaning we'll see what you say when we get

15 your agreement, when we get the written agreement, if

16 we are satisfied with what you're offering in the

17 written agreement.

18          THE COURT:  She said that to whom?

19          MR. SWIFT:  She said that during -- to

20 everyone who was present at the meeting.

21          THE COURT:  Where is that in her affidavit?

22 I didn't understand that was said, that there was any

23 qualification with respect to the settlement that had

24 been reached on January 9.  I know there were other

25 discussions afterwards.

1          MR. SWIFT:  I think -- as I recall, somewhere
2     in the affidavit she said, "We'll see," when they were
3     discussing the apology.

4          MS. MOFFETT:  Your Honor, it's paragraph 23.

5          THE COURT:  So this was after the handshake,
6     and then there was this further discussion; is that
7     correct?

8          MRS. SWIFT:  Yes.

9          MR. SWIFT:  Yeah.

10          THE COURT:  All right.

11          MR. SWIFT:  So, you know, our position is
12     there was not a complete agreement.  Therefore, it's
13     not enforceable because, one, there is a disagreement
14     over how many parties are going to be included in the
15     release.  We never heard of -- during the discussion of
16     any parties other than Frontier Airlines, Incorporated,
17     itself.  Secondly, there was no mention of an apology
18     in the release.

19          Furthermore, I would like to point out that
20     the signature -- when they signed it, it was only
21     signed by counsel for Frontier Airlines, Incorporated,
22     not by an officer of Frontier Airlines, Incorporated,
23     which is what we wanted.

24          At any rate, when we -- we got these, the
25     release, on -- by e-mail on Monday.  That night I said

1  we -- we noticed there was no signature line.  We would

2  want this signed by both parties.

3           Then the next morning I e-mailed them to say

4  that the agreement was inadequate.  So if my e-mail on

5  the night of Monday -- let me put it this way:  There

6  was not a complete agreement.  At best, my e-mail on

7  the night -- Monday would be a counteroffer.  And the

8  next morning I revoked the counteroffer before they

9  accepted it later in the week.  So there was never a

10 meeting of the minds for a complete settlement

11 agreement.

12           THE COURT:  All right.  Anything else?

13           MR. SWIFT:  I would beg the Court's

14 indulgence to read some remarks I prepared.

15           THE COURT:  All right.  Go ahead.

16           MR. SWIFT:  Your Honor, Plaintiff Charity

17 Swift opposes Defendant Frontier Airlines' motion to

18 enforce defendant's alleged settlement agreement

19 because no binding and enforceable agreement was

20 reached for several reasons:

21           One, there was no complete settlement

22 agreement.  A settlement agreement is enforceable only

23 if it is a complete settlement of all disputed issues

24 between the parties.  As the Fourth Circuit said in

25 *Hensley v. Alcon Laboratories*, Because exercise of the

1 authority to enforce settlement agreements depends on

2 the parties' agreement to a complete settlement, the

3 court cannot enforce a settlement until it concludes

4 that a complete agreement has been reached and

5 determines the terms and conditions of that agreement.

6      In *Moore v. Beaufort County*, the court found

7 that there was a complete settlement agreement where

8 the plaintiff's attorney signed a document drafted by

9 defendant's attorney.  In the present case, no one has

10 signed a document drafted by the other side.

11      Two, there was no meeting of the minds.  The

12 Court should find that there was no contract for a

13 settlement agreement because there was no meeting of

14 the minds between Mrs. Swift and Frontier Airlines, nor

15 any complete settlement agreement.

16      After the meeting between Mrs. Swift, her

17 counsel, and counsel for Frontier Airlines on Friday,

18 January 9, 2015, the Confidential Full Release and

19 Settlement Agreement that counsel for Frontier Airlines

20 e-mailed on Monday, January 12, 2015, added provisions

21 that had not been discussed in the meeting, including a

22 long list of parties to be released from all liability.

23 This document did not include an apology from Frontier

24 Airlines, which Mrs. Swift had said she wanted at the

25 meeting.

1          At no time whatsoever during the meeting did

2     anyone, including counsel for Frontier Airlines,

3     expressly mention, imply, or allude to Republic Airways

4     Holdings, Incorporated; Indigo Partners, LLC; Falcon

5     Acquisition Group, Incorporated; Frontier Airlines

6     Holdings, Incorporated; Air World Travel & Training

7     Corp.; Worldwide Flight Services, Incorporated; Allianz

8     Global Corporate and Specialty; Allianz Global Risks US

9     Insurance Company; and Allianz Aviation Managers, LLC,

10    as part of the discussion or are they in any way part

11    of the present lawsuit.

12          As noted in our affidavit attached to her

13    opposition to the present motion, Mrs. Swift has no

14    suit pending against any of these institutions;

15    although, she may have an independent legal cause of

16    action against and the right to sue some of them should

17    she decide to do so and reserves the right to do so.

18    She has not even heard the names of most of them, nor

19    did she know of their existence until, to her surprise,

20    she saw their names in defendant's documents.  She

21    certainly did not discuss nor have them in

22    contemplation during her discussion with counsel for

23    Frontier Airlines as it was humanly impossible for her

24    to discuss release of institutions she did not sue or

25    know existed prior to or during an apparent settlement

1 discussion or afterwards until she began reading

2 defendant's documents.

3        Three, plaintiff's counsel's e-mail of

4 January 13 was a counteroffer that was properly revoked

5 before acceptance by defendants.  There was no complete

6 settlement agreement despite my e-mailed request on the

7 night of Tuesday, January 13, 2015, to add a signature

8 line for Frontier Airlines because that was a

9 counteroffer to make a contract.  That counteroffer was

10 revoked by my e-mail the next morning because it was

11 accepted by Frontier Airlines counsel's e-mail of

12 Friday, January 16, 2015, adding a counsel signature.

13 So no contract was formed.

14        Furthermore, the signature of counsel for

15 Frontier Airlines, rather than that of a corporate

16 officer, was not the requisite signature and, as such,

17 was inadequate.

18        Four, by voiding the confidentiality of the

19 release itself, defendant made it impossible to carry

20 out.  Assuming for the sake of argument that there was

21 a contract, paragraph H of the Confidential Full

22 Release and Settlement Agreement provides, Releasor and

23 the Released Parties further agree that this

24 Confidential Full Release and Settlement Agreement

25 shall be confidential and that they will not disclose

14

1   the content of any terms of this Confidential Full

2   Release and Settlement Agreement to anyone except as

3   necessary for tax reporting purposes or as otherwise

4   required by law.

5           Thus, it is not merely the redacted dollar

6   amount that was supposed to be kept confidential but

7   the entire agreement.  By not redacting any other terms

8   and filing it and publishing it on PACER for all the

9   world to see, not under seal, and with no protective

10  order in place, Frontier Airlines has made the

11  agreement impossible to carry out.  Frontier Airlines

12  was not required by law to publish the document on

13  PACER to enforce it.  They could have filed it under

14  seal.

15          Five, forcing plaintiff to sign the agreement

16  against her will means the Court is ordering plaintiff

17  to commit perjury, which is against public policy.

18          THE COURT:  I've read that in your previous

19  submissions.

20          MR. SWIFT:  Okay.  Well -- okay.  I'll skip

21  to the next point since that's already in the record.

22          THE COURT:  All right.

23          MR. SWIFT:  Six, this Court has no

24  jurisdiction because there is no independent basis for

25  it.

1          THE COURT:  Right.  That was covered in your

2   submission as well.

3          MR. SWIFT:  All right.  Well, okay.  I'll

4   skip -- oh, I do have one response to something in the

5   reply brief to make.

6          THE COURT:  All right.

7          MR. SWIFT:  In its reply brief, Frontier

8   Airlines argues that *Kokkonen* and similar cases are

9   irrelevant to the present case because in *Kokkonen* the

10  district court had dismissed the case before a motion

11  was filed to enforce a settlement agreement, but the

12  Supreme Court did not state in *Kokkonen* that the

13  district court lost jurisdiction because it had

14  dismissed the case.  Rather than merely relying on the

15  facts of the case, the Supreme Court was making a

16  general ruling about the limits of federal

17  jurisdiction.

18          My seventh point is the plaintiff has not

19  waived her right to jury trial and a summary

20  disposition is improper.

21          THE COURT:  All right.

22          MR. SWIFT:  Assuming for the sake of argument

23  that the U.S. District Court has jurisdiction, a proper

24  demand for a jury trial has been made, and there is a

25  disputed issue of material fact as to whether or not

 1  there is a settlement agreement.  So the plaintiff is

 2  entitled to have the issue decided by a jury, rather

 3  than by the Court in summary judgment or the

 4  equivalent.

 5          As the Fourth Circuit stated *Millner v.*

 6  *Norfolk & Western Railway Company*, plaintiff has made

 7  timely demand for jury trial in --

 8          THE COURT:  That was covered also.

 9          MR. SWIFT:  All right.  I'll skip to the next

10  point.  This is the last point:  Eight, plaintiff

11  demands attorney's fees and costs because defendant

12  acted in bad faith.  While the American Rule provides

13  that each party should generally --

14          THE COURT:  That was covered as well.

15          MR. SWIFT:  Okay.  I do have something to add

16  to what I said earlier, though.

17          THE COURT:  All right.

18          MR. SWIFT:  The Fourth Circuit said under its

19  inherent power the district court has authority to

20  shift attorney's fees but, again, only in the

21  extraordinary circumstances where bad faith or abuse

22  can form a basis for doing so.  There are such

23  extraordinary circumstances in the present case.  For

24  instance, counsel for Frontier Airlines knew that

25  Mrs. Swift was overwhelmed emotionally during the

1    discussion -- because Mrs. Swift told her several times

2    that she was emotional and feeling like she was about

3    to cry -- but unreasonably pushed for an agreement that

4    plaintiff would not have agreed to but for her

5    emotional state that she was in during the discussion

6    and is now trying to enforce the alleged agreement

7    despite its own requirement that it be freely signed.

8          While Mrs. Swift is a lawyer, she is also a

9    human, and being in an emotional state has nothing to

10   do with intellect.  And no one in an emotional state

11   could fairly or reasonably be required to have the

12   requisite capacity to reach a valid settlement

13   agreement.  While Mrs. Swift is a lawyer, she was a

14   victim of an unmerited discrimination that has

15   continued to cause her emotional distress.

16         In conclusion, Mrs. Swift respectfully

17   requests the Court to enter an order denying the

18   opposed motion because there has been no meeting of the

19   minds required for a valid settlement agreement.  It is

20   impossible to carry out the alleged settlement

21   agreement.  And by its terms, it cannot be signed

22   involuntarily.  The Court does not have jurisdiction

23   and should not decide the matter without a jury.

24         Plaintiff also asks the Court to assess

25   against Defendant Frontier Airlines, Incorporated, all

18

1  costs and fees incurred by her in opposing said motion

2  because it was made in bad faith.

3              THE COURT:  All right.  Thank you.

4              Anything further?

5              MS. WEGMAN:  Your Honor, just a couple of

6  quick points.  I won't repeat what was already stated

7  in the reply.  We respond to all of those arguments.

8              As you can tell from the affidavit that was

9  submitted, an apology from Frontier was clearly not a

10 part of the agreement.  The settlement agreement was

11 reached and consummated prior to that comment by

12 Plaintiff Swift.

13             The purpose of the agreement was to settle

14 the entire litigation.  It was a complete and entire

15 settlement of the litigation.  Any of the additional

16 names that are listed in the release are primarily

17 Frontier Airlines' parent and sister corporations

18 disclosed in their corporate disclosure.  There is

19 nothing nefarious or of surprise here.  The purpose was

20 to settle the litigation in its entirety so that

21 plaintiff did not choose to come back and perhaps sue

22 Frontier's parent corporation.

23             The settlement resolved her claims.  The

24 objective documents establish that.

25             None of these objections were raised below.

```
 1  These claims that the release wasn't reviewed, these
 2  comments or terms weren't seen, that's not borne out by
 3  these documents.  Plaintiff's counsel must've looked at
 4  that release in order to notice he wanted an additional
 5  signature line added.  In order to even determine that,
 6  he must've looked at the release.  Plaintiff received
 7  all of these correspondence, all of these documents.
 8  At no time were any of these issues raised.
 9          Again, this is not a proper reason to
10  overturn a complete and valid settlement.  This is
11  merely plaintiff having second thoughts.
12          THE COURT:  All right.  Thank you.
13          This matter is before the Court on Defendant
14  Frontier Airlines' motion to enforce the settlement
15  agreement and for other relief.  Frontier Airlines
16  claims that it entered into a settlement agreement with
17  the plaintiff as to all issues and that the plaintiff
18  subsequently breached that agreement when she refused
19  to dismiss her claims in exchange for the agreed upon
20  amount.
21          Based on the submissions that have been
22  provided to the Court, the Court concludes that the
23  material facts are not in dispute.  Following a hearing
24  before Judge Davis on January 9, 2015, the parties
25  adjourned to the offices of defendant's counsel where
```

1  there occurred settlement discussions.  Parties are in

2  agreement that during those discussions, the plaintiff

3  offered to settle for a certain amount.  Frontier

4  responded that Frontier would pay that amount in

5  exchange for dismissal of all of plaintiff's claims

6  against Frontier and a confidentiality as to the

7  settlement.  Plaintiff and her counsel agreed and the

8  meeting ended with the plaintiff and counsel shaking

9  hands in consummation of the agreement.  The

10  defendant's counsel confirmed the terms of the

11  settlement agreement that same day by e-mail dated

12  January 9 at 12:31 p.m.

13          On Monday, January 12, at 4:20 p.m.,

14  defendant's counsel forwarded a written Release and

15  Settlement Agreement.  On Tuesday, January 13, at

16  5:46 p.m., plaintiff's counsel requested by e-mail that

17  a line be added to the settlement agreement for

18  Frontier Airlines' signature, as well as plaintiff's.

19          Then on Wednesday, January 14, at 10:36 a.m.

20  plaintiff's counsel advised defendant's counsel by

21  e-mail that, quote, I have now had the time to fully

22  and properly evaluate her case after Judge Davis'

23  decision to allow her to partly amend her complaint.

24  On the basis of my review, I have advised my client

25  that she should not go ahead with the agreement at this

1    time because the settlement is not fair and not in her

2    best interest, and she has accepted my advice.  In view

3    of this, we are not prepared to settle at this time for

4    the amount previously agreed to, close quote.

5         On Friday, January 16, at 2:02 p.m.,

6    defendant's counsel forwarded the previously tendered

7    written agreement with the previously requested line

8    for Frontier's signature which had been signed on

9    behalf of Frontier.  The plaintiff refused to sign the

10   agreement, and this motion followed.

11        Plaintiff first claims that this Court does

12   not have jurisdiction over the subject matter of the

13   motion because it has the breach of contract action

14   that is governed by state law over which state courts

15   have jurisdiction except in cases arising under the

16   federal court's diversity jurisdiction or where a

17   federal court has reserved jurisdiction to enforce a

18   settlement.

19        Alternatively, she argues that there are

20   disputed issues of material fact that must be decided

21   by a jury in order to determine whether there is an

22   enforceable settlement agreement.

23        Third, plaintiff argues that there is no

24   enforceable contract because there was no meeting of

25   the minds between the plaintiff and the defendant or

22

1  any completed written settlement agreement.

2       Finally, plaintiff claims that it is

3  impossible to carry out the settlement agreement

4  according to its terms because the confidentiality

5  called for under the agreement has been breached

6  through defendant's filing of this motion.

7       Based on the record before the Court, the

8  Court finds and concludes that there are no material

9  facts in dispute and that the parties entered into a

10  complete settlement during their meeting on January 9,

11  the terms of which were confirmed by the defendant's

12  e-mail dated January 9.

13       Those terms were clear.  In exchange for the

14  agreed upon amount, defendant would dismiss all her

15  claims against Frontier Airlines, Inc., and agree to

16  confidentiality as to the settlement agreement.

17       Any subsequent disputes that arose either as

18  to the form of the written settlement agreement or the

19  scope of any releases or plaintiff's willingness to

20  sign the written agreement did not affect the finality

21  and enforceability of the oral settlement agreement

22  that had been consummated on January 9.

23       Likewise, plaintiff's comments after the

24  consummation of that agreement that she was still

25  hopeful or expected or wanted an apology does not

1  vitiate the finality, enforceability of the previously

2  reached oral settlement agreement.  That term was

3  specifically proposed and rejected before the parties,

4  in fact, reached a complete agreement on the terms of

5  that oral agreement.

6        With respect to plaintiff's defenses raised

7  as to the enforceability of the settlement agreement,

8  the Court concludes that none has any merit.  This

9  Court clearly has subject matter jurisdiction to

10  enforce the settlement of the pending litigation before

11  it.  The cases relied upon by the plaintiff relate only

12  to those instances where the parties attempt to enforce

13  a settlement with respect to a previously dismissed

14  action but did not reserve its jurisdiction to enforce

15  a settlement.  Courts are in agreement that they have

16  the inherent authority during the pendency of an action

17  to enforce settlement agreements to resolve pending

18  litigation as happened in this case.

19        Second, there were no material facts in

20  dispute.  For that reason, there is no need to have an

21  evidentiary hearing, which in any event would not

22  involve a jury.

23        Third, as the Court has concluded, there was,

24  in fact, a meeting of the minds as reflected in the

25  objective manifestations of intent and consent that

1  occurred at the meeting on January 9.  In that regard,

2  there was no discussion that the oral settlement was

3  contingent upon the parties executing a formal written

4  settlement agreement.  And the plaintiff's unexpressed

5  subjective intentions not to be bound in the absence of

6  her executing such a written agreement does not affect

7  the enforceability of the fully consummated oral

8  agreement that was reached on January 9.

9            Finally, the defendant's filing of this

10  motion did not constitute a breach of the agreement or

11  the confidentiality provision of that oral agreement

12  since the amount of the settlement remains undisclosed.

13            For all of these reasons, the Court concludes

14  that the parties have reached a binding, complete

15  settlement agreement.  For that reason, this case will

16  be dismissed as settled.  The Court will issue an

17  order.

18            Is there anything further?

19            MS. WEGMAN:  Your Honor, we did have one

20  additional request for our fees.

21            THE COURT:  Right.  The Court is going to

22  deny fees from both parties.

23            MS. WEGMAN:  Nothing further.

24            THE COURT:  All right.  Anything further?

25        (No response.)

1          THE COURT:  All right.  Counsel is excused.

2    The Court will issue an order.

3          MS. MOFFETT:  Thank you, Your Honor.

4          ------------------------------------
                    Time:  10:26 a.m.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    I certify that the foregoing is a true and

23    accurate transcription of my stenographic notes.

24

25                    _____
                      Rhonda F. Montgomery, CCR, RPR

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHARITY CHIDINMA                    )
EMERONYE SWIFT,                     )
                                    )
            Plaintiff,              )
                                    )
v.                                  )     Civil Action No.  1:14-cv-1139 (AJT/IDD)
                                    )
FRONTIER AIRLINES, INC., *et al.*,  )
                                    )
            Defendants.             )
                                    )

## ORDER

This matter is before the Court on Frontier Airlines, Inc.'s Motion to Enforce the

Settlement Agreement and for Other Relief [Doc. No. 48] (the "Motion"). Upon consideration

of the Motion, the memoranda in support thereof and in opposition thereto, the argument of

counsel presented at the hearing held on February 20, 2015, and for the reasons stated in open

court, it is hereby

ORDERED that Frontier Airlines, Inc.'s Motion to Enforce the Settlement Agreement

and for Other Relief [Doc. No. 48] be, and the same hereby is, GRANTED in part and DENIED

in part. The Motion is GRANTED to the extent that this matter is hereby DISMISSED as settled

and it is otherwise DENIED.

The Clerk is directed to forward copies of this Order to all counsel of record.

                                              _____
                                              Anthony J. Trenga
                                              United States District Judge

Alexandria, Virginia
February 20, 2015

**210**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| |
| :--- |

|

**CHARITY CHIDINMA**
**EMERONYE SWIFT,**

        **Plaintiff,**

    **v.**

**FRONTIER AIRLINES, INC.**
**(a Colorado corporation),**
**and JANE DOE,**

        **Defendants.**

|
|
|
|
|
|
|
|
|
|
|
|
|

**Civil Action No. 1:14-cv-1139**

**Hon. Anthony J. Trenga**
**Hon. Magistrate Judge Ivan D. Davis**

## NOTICE OF APPEAL

Notice is hereby given that Charity Chidinma Emeronye Swift, Plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the Order dismissing this case as settled, entered in this action on the twentieth day of February, 2015.

Dated: March 5, 2015                    Respectfully submitted,


                                        */s/ Stephen Christopher Swift*
                                        Stephen Christopher Swift
                                        Virginia State Bar ID No. 38419
                                        Swift & Swift, Attorneys at Law, P.L.L.C.
                                        2121 Eisenhower Avenue, Suite 200
                                        Alexandria, Virginia  22314-4688
                                        Telephone: (703) 418-0000
                                        Facsimile: (703) 535-8205
                                        E-Mail: steve@swift.law.pro

                                        *Attorney for Plaintiff*
                                        *Charity Chidinma Emeronye Swift*

-2-

**212**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 5, 2015, I electronically filed the foregoing Notice of

Appeal with the Clerk of the Court, using the Court's CM/ECF system, which will automatically

cause all counsel of record to be served therewith.


<u>*/s/ Stephen Christopher Swift*</u>
Stephen Christopher Swift

-3-

**213**